**Received Electronically**
**May 8, 2024**
United States Court of Appeals
For the First Circuit

# United States Court of Appeals for the First Circuit

*IN RE CRAIG MEDOFF,*
                    *Petitioner.*

*Petition for Writ of Mandamus to the United States District Court, District of Massachusetts*
*(No. 24-10048-MLW)*

## PETITION FOR WRIT OF MANDAMUS

Peter Charles Horstmann, Esq.
BBO #556377
450 Lexington Street, Suite 450
Newton, Massachusetts 02466
(617) 519-9011
pete@horstmannlaw.com

*Attorney for Petitioner Craig Medoff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…..........................................ii

RELIEF SOUGHT BY THE PETITIONER…...............................1

ISSUES PRESENTED IN THE PETITION…..............................1

STATEMENT OF FACTS…...........................................2

REASONS WHY THE WRIT SHOULD ISSUE..............................13

I.     THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS BECAUSE THE
       DISTRICT JUDGE ABUSED HIS DISCRETION IN REJECTING THE
       PARTIES' RULE 11(e)(1)(c) PLEA AGREEMENT.   .   .   .   13

       A. The District Court Judge erred in rejecting the plea
          agreement without conducting a hearing, and prior to
          conducting a sentencing hearing.

       B. The District Court Judge had no discretion to reject the
          plea agreement without a hearing, based upon speculation
          that the 2 level reduction for acceptance of
          responsibility may not apply.   .    .    .    .    .16

       C. The District Court Judge had no discretion to reject the
          plea agreement upon speculation that there may be an
          unknown basis for an upward departure from the guideline
          range agreed to by the parties..    .    .    .    .17

II.    THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS BECAUSE 28
       U.S.C. § 455 REQUIRES THE DISTRICT COURT JUDGE'S
       DISQUALIFICATION, AND BECAUSE POST-TRIAL APPELLATE REVIEW
       WILL NOT PREVENT IRREPARABLE HARM TO THE DEFENDANT.  .18

       A. A petition for a Writ of Mandamus is the appropriate
          method of challenging a trial judge's denial of a
          motion for recusal.   .    .    .    .    .    .18

       B. The District Court Judge must recuse himself
          pursuant to 28 U.S.C. § 455(a) to avoid the appearance
          of a lack of impartiality.   .    .    .    .   20

       C. Absent a Writ of Mandamus requiring recusal, Mr.
          Medoff will suffer irreparable harm that cannot be
          remedied by post-trial appellate review.   .   23

    D. The District Court Judge's refusal to accept the
       parties' Rule 11(e)(1)(c) plea agreement, as argued
       above, constitutes further evidence of
       prejudicial bias.    .     .     .     .     .     .     .25


CONCLUSION .................................................25

**TABLE OF AUTHORITIES**

**Cases**                                                      **Page(s)**

*Freeman v. United States,* 564 U.S. 522 (2011)    .    .    .  14

*Hughes v. United States,* 584 U.S. 675 (2018)    .    .    .  14

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) .  23

*In re Cargill, Inc.*, 66 F.3d 1256 (1st Cir. 1995) .    .    .  18

*In re Cooper*, 821 F.2d 833 (1st Cir. 1987)  .    .    .    .  18

*In re United States*, 666 F.2d 690 (1st Cir. 1981) .    .    .  19

*In re United States*, 158 F.3d 26 (1st Cir. 1998) .    .    .  19

*In re United States*, 441 F.3d 44, 67 (1st Cir. 2006)  .    .  23

*In re Vasquez-Botet*, 464 F.3d 54, 57 (1st Cir. 2006)  .    .  18

*Liteky v. United States*, 510 U.S. 540 (1994)    .    .  20

*Rosen v. Sugarman*, 357 F.2d 794 (2nd Cir. 1966)  .    .    19,24

*Sell v. United States*, 539 U.S. 166 (2003)  .    .    .  19-21

*Shillitani v. United States*, 384 U.S. 364 (1966) .    .    .  4,6

*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001)  .    .    .    .  20

*United States v. Antar*, 53 F.3d 568 (3rd Cir. 1995)   .  20,22-24

*United States v. Balistrieri*, 77 9 F.2d 1191 (7th Cir. 1985)  24

*United States v. Bertoli,* 40 F.3d 1384, 1412 (3d Cir.1994)  20,21

*United States v. Blanco*, 888 F.2d 907 (1st Cir. 1989)  .    17,18

*United States v. Hyde,* 520 U.S. 670 (1997) .    .    .    .  14

*United States v. Marquardo*, 149 F.3d 36 (1st Cir. 1998).    .  12

*Union Carbide Corp. v. U.S. Cutting Service, Inc.*,
782 F.2d 710 (7th Cir. 1986)  .    .    .    .    .    .    .  19

**Statutes & Rules**

28 U.S.C. § 455 . . . . . . . . passim

28 U.S.C. § 1292 . . . . . . . . .19-20

28 U.S.C. § 1651 . . . . . . . . . 1

Fed.R.App.,Rule 21 . . . . . . . . . 1

Fed.R.Crim.P., Rule 11 . . . . . . . passim

## Relief Sought by the Petitioner

Petitioner, Craig Medoff, Defendant in *United States v. Craig Medoff*, No. 24-10048-MLW in the United States District Court for the District of Massachusetts, hereby petitions, pursuant to 28 U.S.C. § 1651 and Rule 21(a) of the Federal Rules of Appellate Procedure, for a Writ of Mandamus to be issued by this court directing the Honorable Mark L. Wolf, Judge of the United States District Court for the District of Massachusetts, to:

1. vacate his prior Order rejecting the parties' Rule 11(e)(1)(C) plea agreement without a hearing; and to

2. vacate his prior Order denying Mr. Medoff's motion for recusal and disqualify himself from presiding in the above-named action now pending before him.

## Issues Presented in the Petition

Does the district court's rejection of a Rule 11(e)(1)(c) plea agreement, without deferring acceptance until sentencing, and for speculative concerns about the timing of the plea three weeks before trial as a potential disqualification for an acceptance of responsibility reduction under the plea agreement, and for alleged unspecified upward departures, constitute an abuse of discretion?

Does 28 U.S.C. § 455(a) require disqualification of Judge Wolf based on (1) Judge Wolf's commentary and escalation of the

case below to a criminal contempt; (2) Judge Wolf's refusal to consider the guidelines range plea agreement which creates an appearance of partiality; and (3) Judge Wolf's action resulting in him presiding over his own conduct in inducing the Defendant to waive his Fifth Amendment privilege and testify at a deposition?

These issues are especially pertinent where the Securities and Exchange Commission,("SEC") (the plaintiff in the underlying case from which the contempt arises) **was not seeking criminal contempt**, thereby rendering the District Judge the putative "victim" because it was the Judge's Order that was allegedly violated. This puts the Judge in the role of a "victim" and should therefore never be given the opportunity to preside over a case involving his alleged "perpetrator."

### Statement of Facts[1]

1. On February 21, 2024, Judge Wolf *sua sponte* ordered the Department of Justice to prosecute Mr. Craig Medoff ("Medoff" or "the Defendant") for criminal contempt for violating a 2016 settlement agreement with the Securities and Exchange Commission, ("SEC"). [ECF#1].

---

[1] This case arises out of a 2012 civil case in which the SEC commenced a civil action against Biochemics, Inc. and 3 individual's including Mr. Medoff, alleging a fraudulent scheme to sell Biochemics' securities. *Securities and Exchange Commission v. Medoff*, 12-12324-MLW; [ECF#786]. On May 25, 2016, the District Judge entered a Final Judgment affirming the settlement agreement between the parties that prohibited Mr. Medoff for a period of 10 years "from participating in the issuance, offer, or sale of any security." [ECF#786, #204]. Seven years later, on September 27, 2023, the SEC moved for an order to show cause as to why Mr. Medoff should not be held in **civil contempt** for violating the Final Judgment. [ECF#786, #737].

2. On February 28, 2024, the Defendant was arraigned on the charge. [ECF#15].

**THE COURT'S DENIALS OF THE RULE 11(e)(1)(c) PLEA AGREEMENTS:**

3. On April 17, 2024, Judge Wolf denied an initial Rule 11(e)(1)(c) plea agreement to a below guideline range sentence, but informed the parties of his calculations. (Add.58)[2].

4. On April 23, 2024, Judge Wolf changed the trial date to May 20, 2023, *sua sponte.* [ECF#62,p.15].

5. On April 26, 2024, the parties jointly submitted a revised Motion for Rule 11(e)(1)(c) Hearing, with a revised plea agreement, reflecting the exact guideline range established by Judge Wolf's prior Order of April 17, 2024. (Add.1).

6. On April 29, 2024, Judge Wolf refused to accept the parties' Revised Motion for a Rule 11(e)(1)(c) Hearing and the accompanying revised plea agreement. (Add.6-13).

7. In rejecting the second plea agreement without a hearing Judge Wolf complained that it (1) contained a 2 level reduction for acceptance of responsibility which Judge Wolf deemed premature (because the trial was scheduled for May 20, 2024), and (2) because there may allegedly be yet to be discovered upward departures. (Add.6-13).

---

[2] References to the Addendum filed herewith will appear herein as "(Add. p.#)".

**THE DISTRICT COURT JUDGE'S REFUSAL TO RECUSE HIMSELF BASED UPON COMMENTS MADE IN *SECURITIES AND EXCHANGE COMMISSION V. MEDOFF*, 12-12324-MLW:**

8. Judge Wolf *sua sponte* raised the issue of **criminal contempt** for the first time in his October 13, 2023 Order, without any request or intimation from the SEC, stating:

> [T]he evidence provided by the SEC raises the question of whether it would be appropriate for the court to initiate **criminal contempt proceedings** instead. In view of Medoff's proven history of violating court orders, conducting proceedings that could result in another order that could be violated might be futile. Therefore, that civil remedy may be inappropriate and **criminal contempt proceedings** may be justified. See *Shillitani v. United States*, 384 U.S. 364, 370 n.9 (1966).

[ECF#786] (emphasis added).

9. As evidenced by his October 13, 2023 Order, Judge Wolf seemed fixated on the idea that Mr. Medoff had repeatedly done something wrong and only a prison sentence would prevent future alleged misconduct. *Id*.

10. At a hearing on October 23, 2023, Judge Wolf continued to push the idea that he was already considering criminal sanctions before any factual hearing had been held, and before any negotiations had occurred regarding potential resolution of the civil matter.

11. After inviting a representative of the U.S. Attorney's Office and a CJA Attorney to attend the hearing, Judge Wolf stated the following to the CJA Attorney:

> This is not a **criminal** matter at this point. If you just go back and do what I told you, I think you'll have a better understanding of why I was -- I wanted somebody here and I had no duty to have

anybody here for him. If it's a civil matter, he
has no right to the appointment of counsel. If it's
a **criminal** matter, he didn't obey my order to file
a CJA affidavit, so you don't even have to stay if
you don't want to.[3] (Add.157-159).

12.     At the same hearing, Judge Wolf stated:

In my October 13, 2023, order, I questioned
whether, in view of the defendant's history of not
obeying orders to stay out of the securities
business and his guilty plea to committing
securities fraud, whether issuing another order
that could be violated would be futile. And I
informed the parties that I was considering
instituting **criminal contempt** proceedings.
(Add.159).

13.     Still later, Judge Wolf stated:

No counsel for Mr. Medoff filed an appearance, nor
did he file the financial affidavit as ordered
required for the appointment of CJA counsel if this
matter becomes a **criminal** matter.  (Add.160).

14.     Still later in the same proceeding Judge Wolf again

   drifted back to criminal contempt:

But when I was preparing for this hearing earlier
today, this had not been filed. So basically, there
have been violations of my October 13 and 20th
orders that could also be addressed as civil or
criminal contempt, but that's not the focus for
today.

[and]

Among other things, he [Medoff] agreed not to
participate in the securities business for ten
years, and I ordered that. If I institute civil or
**criminal contempt proceedings**, the defendant will
be given even more specific notice and a reasonable
time to prepare. If it's a criminal case and
there's a satisfactory, accurate, and complete
financial affidavit submitted under oath indicating
-- showing that he cannot afford to retain a
lawyer, then a lawyer will be appointed to

---

[3] Counsel has highlighted in bold the number of times Judge Wolf has used the
words "criminal" and "criminal contempt' in his commentary at hearings.

5

represent him.  (Add.162).

15.    Later, Judge Wolf focused on how serious he thought the

alleged violations were, prior to even allowing the parties

to litigate any issues:

> You provided me declarations and a memorandum that
> provide substantial reason to be concerned that Mr.
> Medoff's in the securities business now. I'm being
> somewhat colloquial but violating the order in
> several ways.  And you filed that on September 27.
>
> …
>
> Because that's -- I mean, that's a serious concern.
>
> …
>
> But ordinarily I would start with civil contempt
> proceedings before going to **criminal contempt
> proceedings.** But, as the Supreme Court said in the
> case I cited in my October 13 order --*Shillitani*,
> 384 US 364, 370, n.9 -- if a judge has good reason
> to be concerned that it would be fruitless, futile
> to start with civil contempt proceedings, you can
> start with **criminal proceedings.**[4]  (Add.168).

16.    Judge Wolf also prejudged the case based upon prior

conduct and he considered Mr. Medoff to constitute a "danger"

without allowing the case to proceed to discovery, and prior

to hearing from the SEC whether they were interested in a

civil settlement with Mr. Medoff:

> But whatever it is, he ended up as a result of that
> guilty plea doing time in federal prison. And it
> wasn't sufficient, according to what you've
> submitted, or to deter him from doing it again. I'm
> open minded about this as to whether it was
> actually done, but I think there's ample evidence
> to institute contempt proceedings, civil or
> **criminal.**  But I don't issue orders that I don't
> expect are going to be obeyed and my concern is --

---

[4] It is important to note that the district judge may have a divergent view of
*Shillitani* at footnote 9 which states: "This doctrine further requires that the
trial judge first consider the feasibility of coercing testimony through the
imposition of civil contempt. The judge should resort to criminal sanctions
only after he determines, for good reason, that the civil remedy would be
inappropriate."  It is not clear where the additional language utilized by the Court
derives from, but it is clear that *Shillitani* is a coercion case.

and you can tell me more about the order you're requesting -- that if I just order him not to --not engage in the securities business, I don't know why I would have any confidence he's going to obey the order the third time when he, according to you, didn't obey the 2016 order at all. **And if he's in the securities business, he's continuing to present a danger.** One reason, if he's convicted -- which would require proof beyond a reasonable doubt that he violated the order willfully -- would be to protect the community from the danger, continuing danger, to send Mr. Medoff a message don't keep doing this -- if he's doing it, don't keep doing this and to try to send that message to others. You signed a consent decree. If you've got a court order, don't violate the order.  (Add.169)(Emphasis added).[5]

17.     Judge Wolf continually repeated the same premature

   concerns throughout the hearing:

            Is there a reason that I shouldn't be seriously
            concerned that just getting another order to not
            participate in the securities business will be
            obeyed?  (Add.169-170).

18.     Judge Wolf was also singularly focused on "locking up"

   Mr. Medoff long before any of the evidence was established

   and before the SEC had a chance to present Mr. Medoff or the

   Court with a proposed resolution:

            Well, I've jailed people for civil contempt. But
            typically, you have to exhaust the less onerous
            means to coerce, although I don't know what other
            means there would be. But there could be.
            (Add.170).

19.     Judge Wolf was also fixated on the fact that Biometrics

   had not paid its financial obligation of $16,000,000, which

   had nothing to do with Mr. Medoff:

---

[5] It is important to note the Court's exaggerated view of Mr. Medoff's purported criminal history. Mr. Medoff served time 10 years ago for violating substance abuse restrictions of probation stemming from a 30 year old criminal case. (Add.121).

And it's a case in which I found the SEC -- I
remember this vividly, I don't think you were here,
but some of the lawyers sitting in the back were --
my eyes are good enough to recognize them -- this
doesn't relate to Mr. Medoff, it related to
Biochemics. I think I was asked to sign an order
directing them to pay a judgment of $16 million and
I said, "Do they have $16 million?" And the answer
was no. So I said what I just said today, "I don't
issue orders I don't intend to enforce," and then
you worked out an agreement where they would pay a
million dollars and more over time, and that
generated a shell game that required years of
litigation, including proceedings I conducted with
a bankruptcy judge.

…

They got the million dollars by probably engaging
in fraudulent conveyance of property and then they
borrowed money in a separate entity, supposedly
separate entity, and didn't pay the rest of the
money and then the people who lent the money for an
IPO that the SEC wouldn't let go forward. Lost
their money and sued. I mean, it was very
complicated. And I thought concluded. But, you
know, Mr. Medoff wasn't part of any of that.  (Add.
172).

20.    In response to the Judge Wolf's clear invitation to

request criminal contempt, **the SEC stated:**

**I am hopeful that a civil contempt motion here,
with targeted relief, could accomplish in the short
term what we're hopeful to accomplish. If I'm
wrong, then the recourse to criminal contempt
remains.** (Add.173)(Emphasis added).

21.    To which Judge Wolf responded dismissively:

It sounds like -- again, it sounds like, to me, all
of this work would prove to be a hollow exercise
because –.  (Add.174).

22.    Judge Wolf also issued protective orders without

allowing Mr. Medoff the opportunity to respond and ordered

expedited discovery which was not requested by any Party and

is very similar to the Court's expedited practice in the

instant case:

> And then you want an order providing for expedited
> discovery in preventing the destruction alteration
> of any documents. That order -- I'm going to issue
> that today while this is pending. I'm going to
> order that Mr. Medoff and anybody acting in concert
> with him not destroy, alter, conceal any documents,
> texts, e-mails or other records or information
> relevant to the SEC's motion for contempt. In fact,
> I'm giving you that order orally right now. You'll
> get it in writing, Mr. Medoff. But you don't want
> to violate that order.  Then you want an order
> requiring to disgorge all money obtained in
> violation of provisions of the final judgment.
> Again, as I said, maybe he's hiding assets, but I
> think when he says he doesn't have enough money to
> hire a lawyer, if he had assets -  (Add.174).

23.    Judge Wolf then hearkened back to its fixation on

criminal contempt, even though the SEC had just clearly

stated that that it was not seeking criminal contempt:

> You see, if -- I wanted to have this hearing to
> decide whether -- I am going to institute contempt
> proceedings. That's just the beginning. If they're
> **criminal** proceedings, it will have to be proven
> beyond a reasonable doubt that you willfully
> violated my order. If it's a civil proceeding,
> they'll have to be clear and convincing evidence
> that you violated it. And depending on how long a
> potential --if it's a **criminal** case, depending on
> the potential sentence, you may have a right to a
> jury trial.  If you face the potential of being
> sentenced to more than six months in prison, you
> would have a jury trial and you would have a right
> to a lawyer, if it's a **criminal** case, but not if
> it's a civil case. But if it's a **criminal** case –
> just so you understand this, and these are legal
> requirements and they're matters of fairness -- I
> would, as required by federal rule of criminal
> procedure 42, tell you the time and place of
> the trial and tell you whether it's likely to be a
> jury trial or not and I would allow you a
> reasonable time to prepare.  (Add.176).

24.    Judge Wolf then repeated its conclusion that it was

eligible to preside over a criminal contempt proceeding:

I would be eligible to be the judge because this is
an issue of whether you disobeyed an order I
issued. You haven't criticized me or been
disrespectful, so I would be eligible to
preside in the case myself.  (Add.177).

25.    Shockingly, Judge Wolf then threatened Mr. Medoff,

stating that Mr. Medoff could be detained pending trial for

criminal contempt and repeated its concern that Mr. Medoff

was allegedly a possible danger to the community.

I'll tell you another thing, too, and that is, if
it's a **criminal** case then either I or a magistrate
judge would decide whether you should be released
or detained prior to trial. It's like any other
**criminal** case. There would be a question of whether
you're dangerous and whether there's some
combination of conditions that would protect the
community from any danger you might present. And
danger is not just physical danger.  (Add.177).

26.    Judge Wolf again restated its inclination to proceed

with criminal contempt, but appeared to offer Mr. Medoff some

hope for a better outcome, if he cooperated with the SEC:

The discussion today has been helpful.  I'll tell
you that based on what I know now, if I was going
to decide this matter today, I would initiate
**criminal contempt** proceedings. However, it seems to
me that what the SEC has asked for is modest in the
circumstances. But Mr. Medoff, would you like a
couple days -- and it will be a couple days --
to try to determine whether you can reach some
agreement with the SEC to resolve its motion for
civil contempt?
…

I'm not ordering you to talk to them, unless you
want to. It would be probably simplest for me to
just initiate the **criminal contempt** proceedings.
But what I'm thinking of is having you report
tomorrow after you talk to George Krupp, the
trustee, as to whether he's going to give you the
money to hire a lawyer. If the answer is no and you
don't want to talk with the SEC to try to resolve
this, I'll issue an order initiating **criminal**

**contempt** proceedings. But if you tell me by
Thursday at noon that you've reached an agreement
to resolve this and ask me to enter another order,
I'll do that and defer deciding whether to
institute criminal contempt proceedings. I'm
trying to be fair to you. I'm not trying to
threaten you into doing anything you don't want to
do. You don't have to talk to them, and I can
launch this formal process and if you give me an
accurate and complete financial affidavit and it
shows that you don't have access to funds to
hire a lawyer, then I'll appoint a lawyer for you.
(Add.179).
…

I'm like a jury, I continue to keep an open mind
until I hear all the evidence, but the SEC's done a
lot of work and they have more than enough to
initiate some form of contempt proceedings and, you
know, if -- Mr. Medoff, if you violated the order
and are still violating the order, one way or
another, it's got to stop. (Add.180).
If you have a trial and if it's a jury trial, if
you're facing the prospect of a sentence of more
than six months -- and there's actually no maximum
possible penalty, but you haven't killed anybody.
(Add.181).

27.     Last, Judge Wolf seemed to acknowledge and dismiss the

mitigating evidence in one breath:

And look, you explained to me that you had a drug
problem. You say you don't have one now and you
seem to be taking this seriously, which you should,
because you know what it's like to be in federal
prison. So just take it seriously this week, see
what they've asked for in their motion, decide what
you want to agree on or not agree on, and let me
know tomorrow about the lawyer, I'll tell you, 4:00
tomorrow, Tuesday, October 24. And Thursday, 12:00
noon either you have an agreement in principle or
you don't. And then I'll decide how to proceed, **and
I've told you what my inclination is.**
(Add.182)(Emphasis added).

28.     At a hearing on December 1, 2023, Judge Wolf gave

another lecture on criminal contempt:

The parties filed the proposed order, Docket Number 764. As I directed, it states that entry of this order is without prejudice to the Court's authority to initiate **criminal contempt proceedings** for any possible violation of defendant Craig Medoff's prior orders of the Court and/or this order.

As the First Circuit has explained, civil and **criminal contempts** are for different purposes. Civil contempt is used to coerce compliance with an order of the Court. **Criminal contempt** is used to punish disobedience of a Court order and vindicate the authority of the Court. There can be simultaneous or consequential civil or **criminal contempt proceedings,** as the First Circuit discussed in *Marquardo*, 149 F.3d 36 at 39 and 41. I've previously expressed an inclination to institute criminal contempt proceedings, but I remain open-minded regarding whether that's appropriate.

(Add.189).

29.     Also at the December 1, 2023 hearing, Judge Wolf again repeatedly mentioned criminal, again without any prompting from the SEC. (Add.207,209).

30.     It was not until a February 5, 2024 Status Report that the SEC first indicated that criminal contempt may be the "most appropriate" course of action. [ECF#786].

31.     However, four days after submitting its status report, the SEC on February 9, 2024, reported to Judge Wolf that it was satisfied with Mr. Medoff's compliance with discovery, and the SEC also reported that Mr. Medoff had been deposed. (Add.239).

32.     The SEC's relevant statements to Judge Wolf consisted of the following:

MR. MAWN: The relief, as requested from Mr. Medoff,

was to cease the violative conduct. It was put in
affidavit to the Court and to the SEC that he's
halted the conduct.  Mr. Levy also put forth an
affidavit to the Court and the SEC about Mr.
Medoff's current business activities and his future
business activities.

THE COURT: Could you speak up a little, please?

MR. MAWN: Mr. Levy put an affidavit to the Court
and to the SEC that he has also spoken to the
status of Mr. Medoff's business activities, so Mr.
Medoff has halted the conduct. Mr. Medoff provided
notice to the clients and the investors of Nova
Capital that he used an alias and that there was a
2016 judgment against him, and he provided notice
of that to them. He also provided, as part of
discovery, rescission agreements for certain income
and engagement for current clients. And then he
provided the accounting as required.  (Add.239).

33.    To which Judge Wolf dismissively responded:

THE COURT: **So basically, he's been cooperative
since he got counsel and came to court?**

(Add.239)(emphasis added).


## <u>Reasons Why the Writ of Mandamus Should Issue</u>

**II.  THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS BECAUSE THE
DISTRICT JUDGE ABUSED HIS DISCRETION IN REJECTING THE
PARTIES' RULE 11(e)(1)(c) PLEA AGREEMENT.**

**A. The District Court Judge erred in rejecting the plea
agreement agreement without conducting a hearing, and
prior to conducting a sentencing hearing.**

When the parties submitted a plea agreement that was within

the District Court Judge's own guideline calculations, [ECF#49,

pp.5-6], the District Court Judge should have conducted a Rule 11

hearing, as requested, and should have proceeded to schedule a

sentencing hearing. *Hughes v. United States,* 584 U.S. 675, 682

(2018); *United States v. Hyde,* 520 U.S. 670, 678 (1997)("the

decision whether to accept the agreement will often be deferred until the sentencing hearing"). Deferring acceptance of a plea agreement is the most efficient method of satisfying any concerns that a court may have that the parties may have incorrectly calculated the guideline range. Indeed, the Supreme Court has recognized that "uncertainty about how to calculate the appropriate Guidelines range" may be the basis for the agreement itself. *Freeman v. United States,* 564 U.S. 522, 549 (2011).

Here, the District Court Judge speculates that, because the government did some pretrial preparation (that is expected and is performed in every case), the Defendant may not be entitled to a 2 level reduction for acceptance of responsibility. (Add.19-20). Without this agreed-upon reduction, the Defendant's guideline range would potentially be increased by four months above the parties' agreed-upon range. *Id.*[6]

It is clear that the District Court Judge may not accept a C-plea that is not within the applicable guideline range. *Hughes,* at 682. On the contrary, the District Court Judge should not be permitted to speculate as to possible, although unlikely, miscalculations in the range agreed to by the parties, especially where the range was previously calculated by District Court Judge

---

[6] The District Court Judge also unfairly characterized the trial as scheduled to start on the day of the hearing on April 29, 2024, when, in fact, the District Court Judge had already *sua sponte* continued the trial until May 20, 2024. [ECF#62]. Having previously rejected a Rule 11(e)(1)(c) agreement, the Defendant was entitled to submit a second plea agreement that complied with the District Court Judge's own guideline calculations. This proposed plea agreement was indeed submitted on April 26, 2024. [ECF#69][deemed filed by the Court on 4/29/24. (4/29/24, p.1)].

in his April 17, 2024, Order.

Additionally, it is procedurally unfair for the District Court Judge to rush the parties to trial in less than three months from arraignment, only to deny an agreement for a 2-level reduction for acceptance of responsibility, submitted three weeks before trial. In its denial, the District Court Judge appears to be setting the goalposts in such a way as to allow it to sentence the Defendant to the highest possible sentence, without allowing for any possibility for the benefit of acceptance of responsibility. The District Court Judge stated as much in its April 29, 2024 ruling where he indicated his refusal to delay a May trial that it had just set days earlier (in order to allow for the preparation of a Pre-sentence Report). To be sure, there is simply no justification for this infringement on the Defendant's rights to a fair sentence based upon the District Court Judge's expedited trial schedule, in a case that was less than three months old.

The above factors provide ample support for the issuance of a Writ of Mandamus from this Court, where the District Court Judge abused his discretion in rejecting the parties' revised plea agreement without conducting a hearing on the parties Rule 11(e)(1)(c) Motion, and prior to conducting a sentencing hearing. It is respectfully submitted that this Court should also include these factors in its consideration of the District Court Judge's refusal to recuse himself, as discussed *infra.*

**B. The District Court Judge had no discretion to reject the plea agreement without a hearing, based upon speculation that the 2 level reduction for acceptance of responsibility may not apply.**

For support of its rejection of the revised plea agreement, the District Court Judge relied upon the general language of Application Note 3 to USSG, Section 3E1.1, which instructs that the timeliness of acceptance of responsibility is a factor to be weighed. Here, parties submitted their revised proposed plea agreements three full weeks before trial (on April 26, 2024), and after a prior plea agreement was rejected by the court (on April 17, 2024).

Given the weakness of this argument on its face, the District Court Judge shifted its focus to the amount of work the government has done since April 17, 2024. (4/29/24, p.8). Once again, the quantity of work performed here is attributable to the short deadlines set by the District Court Judge, and is not based upon the age of the case. The Defendant has done nothing to justify any conclusion that he delayed the adjudication of a case that was barely two months old at the time he initially entered into a plea agreement. Moreover, even though the government had done some initial preparatory work, the government remained motivated and willing to afford the Defendant a 2-level downward adjustment for acceptance of responsibility on April 26, 2024.

The District Court Judge also relied upon this Court's

opinion in *United States v. Blanco*, 888 F.2d 907, 911 (1ˢᵗ Cir. 1989), which is inapposite to any timeliness or government workload assessment. *Blanco* simply states that a defendant is not entitled to acceptance of responsibility as a matter of right and that the Defendant *Blanco* was correctly denied the adjustment because he continued to blame others for his conduct. *Id.*

At a minimum the District Court Judge should have scheduled a sentencing hearing to gather all the facts surrounding the Defendant's timeliness so as to make a fully informed decision in regard to the parties' revised plea agreement. Instead, the District Court Judge simply denied the Rule 11 motion out of hand based upon pure speculation, and based upon his apparent prejudgment of the case.

**C. The District Court Judge had no discretion to reject the plea agreement upon speculation that there may be an unknown basis for an upward departure from the guideline range agreed to by the parties.**

The District Court Judge also speculated that there may be a basis for an upward departure based upon "unscored criminal history". (4/29/24, p.8). In so stating, the court was referring to a probation violation that that had occurred at least 10 years earlier and had resulted in the Defendant's incarceration. *Id.* The court did not cite any authority for the proposition that conduct that enhanced the Defendant's criminal history score could be considered "unscored" or how this could result in an upward departure under USSG 4A1.3. The mere fact that the Defendant has a prior criminal record that is more than 10 years old does not

17

constitute an adequate basis for the departure. The age of any such conduct was clearly considered by the guidelines themselves.

As a result, a Mandamus should issue directing the District Court Judge to

- vacate his April 29, 2024, Order denying the parties' Motion for a Rule 11 Hearing, and to conduct a Rule 11 hearing, or

- recuse himself from the proceeding, as set forth further herein.

**II. THIS COURT SHOULD ISSUE A WRIT OF MANDAMUS BECAUSE 28 U.S.C. § 455 REQUIRES THE DISTRICT COURT JUDGE'S DISQUALIFICATION, AND BECAUSE POST-TRIAL APPELLATE REVIEW WILL NOT PREVENT IRREPARABLE HARM TO THE DEFENDANT.**

**A. A petition for a Writ of Mandamus is the appropriate method of challenging a trial judge's denial of a motion for recusal.**

Denials of motions to disqualify are reviewable via mandamus and relief will be accorded when petitioners show a "clear and indisputable right" to the Writ. *In re Cooper*, 821 F. 2d 833, 834 (1st Cir. 1987)(internal citations omitted). A petitioner must make "a showing of both clear entitlement to the requested relief and irreparable harm without it, accompanied by a favorable balance of the equities." In re *Vasquez-Botet*, 464 F.3d 54, 57 (1st Cir. 2006) quoting *In re Cargill, Inc.,* 66 F.3d 1256, 1260 (1st Cir. 1995). "Although [courts] maintain a standing watch over attempted piecemeal review, whether by interlocutory appeal or petitions for Writs of Mandamus, the issue of judicial disqualification presents an extraordinary

situation suitable for the exercise of [their] mandamus jurisdiction." *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981).

"A case involving a motion for disqualification is clearly distinguishable from those where a party alleges an error of law that, despite the hardship of delay, may be fully addressed and remedied on appeal." *Id*. In particular, when "the issue of partiality has been broadly publicized, and the claim of bias cannot be labeled as frivolous," the propriety of judicial disqualification need not await end-of-case review. *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998) quoting *United States*, 666 F.2d at 694. "[W]e can think of few situations more appropriate for mandamus than a judge's clearly wrongful refusal to disqualify himself." *Rosen v. Sugarman*, 357 F.2d 794, 797 (2d Cir. 1966).

Mr. Medoff has no remedy other than to seek a Writ of Mandamus from this court. Mandamus is the only method of correcting a judge's erroneous refusal to recuse himself under 28 U.S.C. § 455(a). *Union Carbide Corp. v. U.S. Cutting Service, Inc.*, 782 F.2d 710, 713 (7th Cir. 1986). Mr. Medoff cannot presently appeal under 28 U.S.C. § 1291 because the District Court Judge's denial of the motion for recusal does not satisfy the finality requirement of that statute. *See Sell v. United States*, 539 U.S. 166, 176 (2003)("The relevant jurisdictional statute, 28 U.S.C. § 1291, authorizes federal courts of appeals to review '*final* decisions of the district

courts' . . . the term 'final decision' normally refers to a
final judgment, such as a judgment of guilt, that terminates a
criminal proceeding") (emphasis in original). Similarly, the
District Court Judge's refusal to recuse himself does not fall
within any of the enumerated categories for interlocutory appeal
under 28 U.S.C. § 1292. Accordingly, the Mr. Medoff's only avenue
of relief is the filing of this petition.

**B. The District Court Judge must recuse himself pursuant
to 28 U.S.C. § 455(a) to avoid the appearance of a lack of
impartiality.**

28 U.S.C. § 455(a) provides: "Any justice, judge, or
magistrate judge of the United States shall disqualify himself
in any proceeding in which his impartiality might reasonably be
questioned." 28 U.S.C. § 455(a). See, *Liteky v. United States,*
510 U.S. 540 (1994); *United States v. Bertoli,* 40 F.3d 1384,
1412 (3d Cir.1994). The statute requires that "courts must not
only be, but must seem to be, free of bias or prejudice." *In re
United States*, 158 F.3d 26, 30 (1st Cir. 1998). For recusal to
be required, "[t]he judge does not have to be *subjectively*
biased or prejudiced, so long as he *appears* to be so." *Liteky
v. United States*, 510 U.S. at 553 n.2.

As the U.S. Supreme Court has made clear, generally beliefs
or opinions which merit recusal must involve an extrajudicial
factor. *Liteky,* 510 U.S. at 550. For example, if a judge has
acquired a dislike of a litigant because of events occurring
outside of the courtroom, a duty to recuse might ensue.  However,
although such situations are not common, "opinions formed during a

judicial proceeding may in certain instances give rise to a duty to recuse." *Bertoli,* 40 F.3d at 1412.

Here, the District Court Judge seemed fixated on extrajudicial factors including a corporate Defendant's (Biochemics) alleged failure to pay an amount of money that had nothing to do with Mr. Medoff. (Add.172). The District Court Judge also focused on such extrajudicial factors as Mr. Medoff's prior criminal history including a 30 year old alleged failure to pay a $95,000 fine. [ECF#786]. As the *Liteky* Court pointed out, if during "a lengthy trial ... the presiding judge for the first time learns" of obscure factors that formulated its beliefs, the fact that the beliefs arose through a judicial proceeding does not negate the duty to recuse. *Liteky, at 510 U.S. 547; see also Bertoli,* 40 F.3d at 1412.

It is true that "[b]iases stemming from facts gleaned during judicial proceedings themselves must be particularly strong in order to merit recusal." *United States v. Antar*, 53 F.3d 568, 574 (3d Cir. 1995), overruled on other grounds by *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001). However, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion **unless** they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. at 555. Here, the record is clear that the District Court Judge was heavily invested in pursuing criminal contempt charges against Mr.

21

Medoff from his very first order, and this investment and the District Court Judge's antagonism toward Mr. Medoff, permeated every hearing and order thereafter. The fact that the parties achieved a settlement of all claims, in which the SEC attorney vouched for Mr. Medoff's compliance, yet the District Court Judge still initiated criminal contempt proceedings, speaks volumes to the lack of impartiality.

In *United States v. Antar*, 53 F.3d at 574, the Defendant was the subject of both a civil SEC action and a criminal contempt action for failing to comply with the Court's Order in the civil case regarding the return of money. *Id.* at 574. When imposing sentence in a criminal case, the judge in *Antar* stated that his object, "from day one . . . was to get back to the public that which was taken from it." *Id.* at 573, 576. The Third Circuit Court held that this statement by the District Court Judge unambiguously demonstrated that the Judge had lacked the impartiality required and had clearly prejudged the case. *Id.* Had the judge in *Antar* announced at the opening of the trial that this was his object, clearly he would be recused. The fact that he made this disclosure at the end of the trial makes no difference. *Id.* at 576.

Similarly, the Third Circuit Court decision in *Antar* focuses on public perception of the remarks made by the District Court Judge, noting that any reasonable person hearing the remarks would conclude that the District Court Judge was biased. *Id.* The Third Circuit Court opined:

> A reasonable observer in such a scenario would have
> serious reason to question whether prior rulings in the
> case were based on impartial considerations or on the
> judge's stated goal.

*Id.* The same is true here.

In considering recusal, a judge must "take the objective view of an informed outsider." *In re United States*, 441 F.3d 44, 67 (1st Cir. 2006). A recusal motion "requires . . . that there be no reasonable question, in any informed person's mind, as to the impartiality of the judge." *Id*. Where recusal is a close question, the Court of Appeals for the First Circuit has directed District judges that "the balance tips in favor of recusal." *In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2001).

In this case, any 'informed outsider' would have no reasonable questions as to Judge Wolf's explicit and apparent partiality in all matters relative to the litigation and trial of this case. Accordingly, the balance has tipped in favor of recusal, and is required under 28 U.S.C. § 455(a).

### C. Absent a Writ of Mandamus requiring recusal, Mr. Medoff will suffer irreparable harm that cannot be remedied by post-trial appellate review.

Post-trial appellate review is inadequate because of the unique nature of this case, as opposed to the typical criminal case. For various reasons peculiar to this case, it is imperative that it be tried correctly the first time. At a post-appeal retrial, this may be an insurmountable challenge.

Any hint of judicial impartiality has the capacity to cast

a pall over the entire course of a trial. "[A] trial is not likely to proceed in a very satisfactory way if an unsettled claim of judicial bias is an ever present source of tension and irritation." *Rosen*, 357 F.2d at 797. "Only a final ruling on the matter by a disinterested higher court before trial can dispel this unwholesome aura." *Id*. Without this Court's intervention, Mr. Medoff's trial will go forward under a dark cloud that threatens to taint the integrity of every aspect of the proceedings.

A Writ of Mandamus is essential to "prevent[] injury to the public perception of the judicial system before it has a chance to occur." *United States v. Balistrieri*, 779 F.2d 1191, 1205 (7th Cir. 1985). A post-trial appellate ruling in favor of Mr. Medoff would do little to ensure public confidence in the courts. Assuming, *arguendo*, that even if a favorable post-trial ruling could sufficiently safeguard Mr. Medoff's rights, "the harm to the public's perception of the judicial system when a judge who appears to be biased proceeds in a case is more difficult to correct." *Id*. Further, it is likely that Mr. Medoff will have served the entirety of his sentence before the issue is resolved.

While the courts have highlighted the necessity of recusal in cases where the public has a front row seat in the courtroom, thanks to enhanced media attention, it cannot be the case that bias is tolerated in less publicized cases, as *Antar* clearly demonstrates. *Antar,* 53 F.3d at 574.

An additional risk of irreparable injury to Mr. Medoff is

that the state of the evidence may be dramatically and
detrimentally different at a retrial.

> **D. The District Court Judge's refusal to accept the
> parties' Rule 11(e)(1)(c) plea agreement, as argued
> above, constitutes further evidence of prejudicial
> bias.**

As set forth in Argument I, *supra*, the District Court
Judge's refusal to accept the parties' plea agreement or to hold
a hearing on the proposed agreement, based on the Judge's
inappropriate speculation about Mr. Medoff, constitutes further
evidence of bias. As such, this Court is respectfully urged to
consider both the Judge's outright rejection of the plea
agreement, in conjunction with the Judge's many recorded
statements described *supra*, in establishing the perceived bias
and lack of partiality of the District Court Judge.

## CONCLUSION

For the forgoing reasons, the Petitioner asks this
Honorable Court to issue a Writ of Mandamus directing the
District Court Judge to:

1.) vacate his Order denying the parties' Motion for a
Rule 11 Hearing, and

2.) vacate his Order denying the Petitioner's Motion for
Recusal.

CRAIG MEDOFF

By His Attorney,

_____

/s/Peter C. Horstmann, Esq.
BBO #556377
450 Lexington Street, Suite 450
Newton, Massachusetts 02466
(617) 519-9011
*pete@horstmannlaw.com*

May 8, 2024


**CERTIFICATE OF SERVICE**

I, Peter Charles Horstmann, hereby certify that on May 8th, 2024, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Peter Charles Horstmann, Esquire

# ADDENDUM

**ADDENDUM**

**TABLE OF CONTENTS**

Joint Motion for Leave to File Motion for Rule 11 Hearing dated 4/26/24.        .        . 1

Joint Motion for Rule 11 Hearing dated 4/26/24        .        .        .        .        . 4

Proposed Plea Agreement dated 4/26/24    .        .        .        .        .        . 5

4/29/24 Transcript of Hearing denying Motion for Rule 11 Hearing        .        . 13

Order dated 4/30/24 denying Motion for Rule 11 Hearing based on 4/29/24 Transcript  55

Order dated 4/17/24 denying initial Joint Motion for Rule 11 Hearing        .        . 58

Motion to Recuse District Judge dated 3/20/24    .        .        .        .        . 66

4/9/24 Transcript of Hearing Denying Motion to Recuse    .        .        .        . 88

Order dated 4/10/24 Denying Motion to Recuse    .        .        .        .        . 152

10/23/23        Transcript of Hearing.        .        .        .        .        .        . 155

12/1/23        Transcript of Hearing.        .        .        .        .        .        . 185

2/9/24        Transcript of Hearing.        .        .        .        .        .        . 226

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CRAIG MEDOFF,<br><br>                    Defendant. | Crim. No. 24-10048-MLW |

### JOINT MOTION FOR LEAVE TO FILE A MOTION FOR RULE 11 HEARING AND A PLEA AGREEMENT AND DECLARATION

The parties hereby respectfully request leave to file a motion for a hearing pursuant to Rule 11 and a proposed plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure as well as an accompanying declaration of defendant Craig Medoff.

On February 12, 2024, the Court issued a memorandum and order charging the defendant with criminal contempt. Dkt. No. 1. Thereafter, the parties filed a motion for a Rule 11 hearing and a proposed plea agreement pursuant to Rule 11(c)(1)(C). Dkt. No. 46. The Court denied the motion and rejected the plea agreement in a memorandum and order dated April 17, 2024. Dkt. No. 49 ("Mem. & Order"). The Court explained its rejection of the plea agreement by identifying specific concerns. The parties now request leave to file a motion for a hearing pursuant to Rule 11 as well as a revised plea agreement pursuant to Rule 11(c)(1)(C) and an accompanying declaration that the parties believe address the issues previously identified by the Court.

First, the Court noted that the binding sentencing range in the previously-proposed plea agreement would require the Court to impose a sentence of between 0 and 3 months incarceration and 12 months of supervised release. Based on the defendant's criminal history, the Court found that the defendant's likely Guidelines Sentencing Range was between four and ten months, such

that the plea agreement would, if accepted, require a downward departure. Mem. & Order at 6. The Court further noted that it was "not now willing to commit to giving a sentence of less than 6 months" in the event of the defendant's conviction for the charged conduct. *Id*. at 7. *See also id*. at 5 (explaining that a binding plea agreement should not be accepted unless the agreed sentence is (1) "within the applicable guideline range" or (2) "outside the applicable guideline range for justifiable reasons" that are "set forth with specificity") (citations and internal quotations omitted). The proposed plea agreement seeks to address this issue by proposing a binding sentence of four to ten months, and a supervised release term of three years, which the parties believe is within the applicable guidelines range.

Second, the Court noted that, based on the Court's practice of deferring until sentencing the decision whether to accept a binding plea agreement, a decision rejecting the plea agreement would entitle the defendant to withdraw his guilty plea at sentencing and thereby obtain "the lengthy postponement of his trial that he has repeatedly sought unsuccessfully." *Id*. The proposed plea agreement seeks to address this concern by including a sworn declaration of the defendant admitting to the charged conduct. The proposed plea agreement provides that, in the event the defendant moves to withdraw his guilty plea or otherwise breaches the plea agreement, the declaration will be admissible against him in any subsequent prosecution of 18 U.S.C. § 401. The parties believe the declaration—which is a signed confession that can only be used if the defendant fails to plead pursuant to the plea agreement—provides a strong safeguard against the defendant using the plea agreement as a method of postponing the trial.

Third, the Court ordered that, in the event the defendant chose "to enter a guilty plea which is not pursuant to a Rule 11(c)(1)(C) agreement, he shall, by April 22, 2024, inform the court in order to spare counsel the time and expense of preparing further for trial and spare potential jurors

2

from being ordered to appear for trial on April 29, 2024 unnecessarily." *Id.* at 8. The parties have

worked diligently to negotiate a plea agreement that addresses the concerns previously identified

by the Court but were unable to finalize the agreement by the April 22, 2024 deadline. In light of

that fact, and the fact that the trial date has now been adjourned until May 20, 2024, the parties

respectfully request leave to file the attached motion and accompanying plea agreement and

declaration beyond the April 22, 2024 deadline.

Respectfully submitted,

| | |
|---|---|
| CRAIG MEDOFF | JOSHUA S. LEVY |
| By his attorney, | Acting United States Attorney |
| | |
| */s/ Peter C. Horstmann* | By: */s/ Leslie A. Wright* |
| Peter C. Horstmann | LESLIE A. WRIGHT |
| 450 Lexington St., Suite 101 | CHRISTOPHER J. MARKHAM |
| Newton, MA 02466 | Assistant United States Attorneys |

CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent
electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

Dated:   April 26, 2024                    By:   */s/ Leslie A. Wright*
                                                  LESLIE A. WRIGHT
                                                  Assistant United States Attorney

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| CRAIG MEDOFF, | Crim. No. 24-10048-MLW |
| Defendant. | |

## JOINT MOTION FOR RULE 11 HEARING

The parties hereby respectfully request that the Court set a Rule 11 hearing. A copy of the

parties' proposed plea agreement is attached hereto.


Respectfully submitted,


| | |
|---|---|
| CRAIG MEDOFF | JOSHUA S. LEVY |
| By his attorney, | Acting United States Attorney |
| | |
| */s/ Peter C. Horstmann* | By:   */s/ Leslie A. Wright* |
| Peter C. Horstmann | LESLIE A. WRIGHT |
| 450 Lexington St., Suite 101 | CHRISTOPHER J. MARKHAM |
| Newton, MA 02466 | Assistant United States Attorneys |


CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent
electronically to the registered participants identified on the Notice of Electronic Filing (NEF).


Dated:  April 26, 2024                          By:   */s/ Leslie A. Wright*
                                                      LESLIE A. WRIGHT
                                                      Assistant United States Attorney



**U.S. Department of Justice**

*Joshua S. Levy*
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*        *John Joseph Moakley United States Courthouse*
                                        *1 Courthouse Way*
                                        *Suite 9200*
                                        *Boston, Massachusetts 02210*

April 26, 2024

Peter Charles Horstmann, Esq.
450 Lexington Street, Suite 101
Newton, MA 02466

      Re:    United States v. Craig Medoff
            <u>Criminal No. 24-10048-MLW</u>

Dear Counsel:

The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Craig Medoff ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure ("Rule") 11(c)(1)(C):

1.    <u>Change of Plea</u>

At the earliest practicable date, Defendant will plead guilty to one count of criminal contempt, in violation of 18 U.S.C. § 401, as charged in the Court's order of February 12, 2024 (Dkt. 1). Defendant admits that Defendant committed the crime specified in the Court's order and is in fact guilty of that crime. Defendant agrees that, in the event Defendant moves to withdraw Defendant's guilty plea or otherwise breaches this Plea Agreement, the attached sworn Declaration will be admissible against Defendant in any subsequent prosecution of 18 U.S.C. § 401.

2.    <u>Penalties</u>

Defendant faces a maximum penalty of life imprisonment.

3.    <u>Rule 11(c)(1)(C) Plea</u>

In accordance with Rule 11(c)(1)(C), if the Court accepts this Plea Agreement, the Court must include the agreed disposition in the judgment. If the Court rejects any part of this Plea Agreement, the U.S. Attorney may void the agreement and/or Defendant may withdraw from it. Defendant may not withdraw Defendant's plea for any other reason.

Should the U.S. Attorney void the agreement and/or Defendant moves to withdraw Defendant's guilty plea, Defendant agrees to waive any defenses based upon statute of limitations, the constitutional protection against pre-indictment delay, and the Speedy Trial Act for all charges that could have been brought as of the date of this Plea Agreement.

4.   Sentencing Guidelines

The parties agree, based on the following calculation, that Defendant's total "offense level" under the Guidelines is 8:

   a)  Defendant's base offense level is 6 (USSG §§ 2J1.1, 2X5.1, 2B1.1(a)(2));

   b)  Defendant's offense level is increased to 10, because the offense involved violation of a prior judicial order (USSG § 2B1.1(b)(9)(C)); and

   c)  Defendant's offense level is decreased by 2, because Defendant has accepted responsibility for Defendant's crime (USSG § 3E1.1).

Defendant understands that the Court is not required to follow this calculation. Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility, and may be released from the parties' agreed-upon disposition in Paragraph 5 if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

5.   Agreed Disposition

The parties agree on the following sentence:

   a)  incarceration for a term between 4 and 10 months;

   b)  36 months of supervised release; and

   c)  a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing.

The U.S. Attorney agrees to recommend incarceration for 4 months.

6.     <u>Waiver of Appellate Rights and Challenges to Conviction or Sentence</u>

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

    a)   Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

    b)   Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

The U.S. Attorney agrees not to appeal the imposition of a sentence within the range agreed to by the parties in paragraph 5.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

7.     <u>Civil Liability</u>

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charge specified in Paragraph 1 of this Agreement.

8.      <u>Breach of Plea Agreement</u>

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release, or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

9.      <u>Who is Bound by Plea Agreement</u>

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

10.     <u>Modifications to Plea Agreement</u>

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

*       *       *

4

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Leslie A. Wright.

Sincerely,

JOSHUA S. LEVY
Acting United States Attorney

By: _____
STEPHEN E. FRANK
Chief
Securities, Financial & Cyber Fraud Unit

SETH B. KOSTO
Deputy Chief
Securities, Financial & Cyber Fraud Unit

_____
LESLIE A. WRIGHT
CHRISTOPHER J. MARKHAM
Assistant U.S. Attorneys

5

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and the attached Declaration and discussed those documents with my attorney. The letter and Declaration accurately present my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I previously entered into an agreement with the United States Attorney's Office via letter dated April 16, 2024, which the Court rejected pursuant to Federal Rule of Criminal Procedure 11(c)(3)(A).

I understand the crime I am pleading guilty to, and the maximum penalty for that crime. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement and signed the attached Declaration freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

Craig Medoff
Craig Medoff
Defendant

Date:    April 26, 2024

I certify that Craig Medoff has read this Agreement and the attached Declaration and that we have discussed what those documents mean. I believe Craig Medoff understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also believe Craig Medoff understands the attached Declaration and is signing it freely, voluntarily, and knowingly. I also certify that, in addition to this offer, the U.S. Attorney extended an offer dated April 16, 2024, which Defendant accepted but the Court rejected pursuant to Federal Rule of Criminal Procedure 11(c)(3)(A).

Peter Charles Horstmann, Esq.
Attorney for Defendant

Date:    4/26/24

6

# ATTACHMENT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

CRAIG MEDOFF,                                    Crim. No. 24-10048-MLW

        Defendant.

## DECLARATION OF DEFENDANT CRAIG MEDOFF

Defendant submits the following Declaration and agrees that the Declaration will be admissible against Defendant in any prosecution of 18 U.S.C. § 401, as charged in the Court's order of February 12, 2024 (Dkt. 1), in the event that Defendant moves to withdraw Defendant's guilty plea or otherwise breaches the Plea Agreement dated April 26, 2024.

I, Craig Medoff, declare under penalty of perjury that the following is true and accurate:

1.    I consented to the May 25, 2016 Final Judgment ("2016 Final Judgement") in *Securities and Exchange Commission v. Biochemics, Inc., et al.*, Civ. No. 12-12324.

2.    The 2016 Final Judgment was a clear and reasonably specific lawful order.

3.    I knowingly and willfully violated paragraph V of the 2016 Final Judgment by participating and engaging in the offer and sale of securities by my conduct related to Nova Capital International LLC.

4.    I committed the crime of 18 U.S.C. § 401, as charged in the Court's order of February 12, 2024 (Dkt. 1), and I am guilty of that crime.

Date:  April 26, 2024                      *Craig Medoff*
                                  Craig Medoff
                                  Defendant

1                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                  )
4    UNITED STATES OF AMERICA,     )
                                  )
5            Plaintiff,            )
                                  )  Criminal Action
6    v.                            )  No. 1:24-cr-10048-MLW
                                  )  Pages 1 to 42
7    Craig Medoff,                 )
                                  )
8            Defendant.            )
                                  )
9

10

11          BEFORE THE HONORABLE MARK L. WOLF
               UNITED STATES DISTRICT JUDGE
12

13               PRETRIAL CONFERENCE

14

15                  April 29, 2024
                       2:00
16

17        John J. Moakley United States Courthouse
                  Courtroom No. 2
18               One Courthouse Way
               Boston, Massachusetts 02210
19

20

21

22          Jessica M. Leonard, CSR, FCRR
                Official Court Reporter
23    John J. Moakley United States Courthouse
                  One Courthouse Way
24           Boston, Massachusetts 02210
            JessicaMichaelLeonard@gmail.com
25

```
 1   APPEARANCES:

 2   On Behalf of the Government:

 3       UNITED STATES ATTORNEY'S OFFICE
         By: Leslie Wright
 4       J. Joseph Moakley U.S. Courthouse
         1 Courthouse Way
 5       Suite 9200
         Boston, MA 02210
 6       617-748-3367
         Leslie.wright@usdoj.gov
 7
     On Behalf of the Defendant:
 8
         LAW OFFICES OF PETER CHARLES HORSTMANN
 9       By: Peter C. Horstmann
         450 Lexington St.
10       Suite 101
         Newton, MA 02466
11       617-519-9011
         Pete@horstmannlaw.com
12

13

14

15

16

17

18

19

20

21

22

23

24
                 Proceedings reported and produced
25                by computer-aided stenography.
```

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  This is criminal matter of 1:24-cr-10048,

 3    United States v. Craig Medoff.

 4              THE COURT:  Good afternoon.  Would counsel please

 5    identify themselves for the Court and for the record?

 6              MS. WRIGHT:  Good afternoon, Your Honor.  Leslie

 7    Wright and Christopher Markham for the Government.

 8              MR. HORSTMANN:  Good afternoon, Your Honor.  Pete

 9    Horstmann for Mr. Medoff, who is present in court.

10              THE COURT:  And would the probation officers identify

11    themselves.

12              U.S. PROBATION:  Martha Victoria, Maureen Curran, and

13    Maria D'Addieco from US Probation.

14              THE COURT:  Thank you.

15              The pretrial conference has twice been scheduled in

16    this case.  On April 10, it was scheduled for April 26, and on

17    April 23 it was rescheduled for today pursuant to orders that

18    were necessitated by what I would characterize as unforeseen

19    developments in this case.

20              At about 7:15 on Friday -- today is Monday -- Friday,

21    April 26, the parties filed a joint motion for leave to file a

22    motion for a Rule 11 hearing and plea agreement and

23    declaration, Dkt. No. 69.  Under the rules, since it was filed

24    after 6:00 p.m., it's deemed filed today, the first next

25    business day, April 29.
```

1    I've read the motion.  It provides for another

2  proposed binding Rule 11(c)(1)(C) binding plea agreement.  If

3  the plea agreement were accepted, as I read it, I would be

4  required to impose a sentence of four to ten months, and if I

5  rejected that, if I understand it right, the defendant could

6  withdraw his plea under Rule 11(d)(2)(A) and elect to have a

7  trial.  If he did, the declaration he attaches, that is

8  attached to the joint motion in which he admits guilt, would be

9  admissible at trial.

10    Please either confirm or clarify my understanding of

11  the motion and, once it's clarified, I'd like to hear you speak

12  to it.

13    MR. HORSTMANN:  I think you just summarized it

14  accurately, Your Honor.  I have no disagreement with your

15  summary.

16    MS. WRIGHT:  I'm in agreement with Mr. Horstmann.

17    THE COURT:  You want to speak into those microphones,

18  please.

19    Well, while you address this somewhat in the

20  submission, why should I proceed in this way?

21    MS. WRIGHT:  Your Honor, the parties worked really

22  hard to reach an agreement that was acceptable to both sides

23  and address the concerns articulated in the Court's order.  We

24  do lay this out in the filing.  I don't know if you want me to

25  repeat them.  I'm happy to answer any questions --

          1          THE COURT:  Well, no, you can repeat them, because I
          2    don't think you fully understood them, either of you.  Go
          3    ahead.
          4          MS. WRIGHT:  Perhaps.
          5          So our understanding of the concerns expressed by the
          6    Court were, first, that the initial -- the previously proposed
          7    plea agreement called for a guideline sentencing range that was
          8    outside -- due to the defendant's criminal history, was outside
          9    the guideline sentencing range as we've now calculated it, four
         10    to ten months.
         11          THE COURT:  And what I wrote was that your
         12    zero-to-three-month recommendation was not a guideline sentence
         13    and there weren't justifiable reasons for downward departure,
         14    and I said the guidelines were at least four to ten months.  I
         15    noted in the footnote that there's criminal conduct, one
         16    conviction that's not scored, and others that, at the time of
         17    the bail, report the resolution was uncertain.  So the
         18    guidelines might have been higher.  I still don't know what the
         19    criminal history is.
         20          You filed that motion several weeks ago.  Your current
         21    binding plea agreement gives the defendant a two-point
         22    reduction for acceptance of responsibility.  That's not
         23    automatic.  The First Circuit said that -- and he might be
         24    entitled to it; he might not be entitled to it.  I'll give
         25    you -- let me hear from Mr. Horstmann and then I'll tell you

1    what my concerns are.

2        MR. HORSTMANN:  Thank you, Your Honor, and I think you

3    hit the nail on the head.  The two points, from the defendant's

4    standpoint, is worth everything here.  It's worth, you know,

5    potentially, up to six months of incarceration if he were to go

6    to trial and if he were to be found guilty and, as Your Honor

7    has pointed out several times, there's many challenges to the

8    defense of this case.  So those two --

9        THE COURT:  Including the fact that before his

10   declaration he admitted, when represented by capable counsel,

11   that he was guilty.

12       Let me tell you what my concerns are.

13       MR. HORSTMANN:  May I say one more thing, Your Honor?

14       THE COURT:  Please do.

15       MR. HORSTMANN:  He's also 64 years old.  He's in a

16   place in his life where time matters.

17       THE COURT:  It does matter.  And I know, if and when

18   we get to sentencing, Probation will give me everything I

19   should have to make a properly informed judgment, you will.

20   Unless the Government has a change of heart, it's not going to

21   be seeking the highest possible sentence, reasonable sentence.

22   But -- all right.  I do understand this.  This isn't the first

23   time any of us have been in court.

24       However, I'm allowing the motion for leave to file

25   your motion for a Rule 11 hearing and I'm denying the motion

1  for the following reasons:  I rejected the motion for an

2  emergency hearing on the first proposed Rule 11(c)(1)(C) plea

3  agreement that would have required that I impose a sentence of

4  zero to three months for the criminal contempt that's alleged,

5  and I did that in an April 17, 2024, order, Dkt. No. 49, which,

6  at page 6, I wrote that the guidelines were at least a total

7  offense level 8, a Criminal History Category of II, a

8  guidelines of four to ten months if that were it.  But in

9  footnote 2, I noted that the defendant had a 1982 conviction

10  that was too old to score, and other criminal cases, the

11  disposition of which were unknown at the time of the February

12  28, 2024, bail report, which is what I was relying on.

13       As of today, April 29, the date we were scheduled to

14  start trial, there's a meaningful question -- it's only a

15  question, but it's a meaningful question -- about whether the

16  defendant can prove that he's entitled to a two-point reduction

17  for acceptance of responsibility.  That reduction doesn't come

18  automatically.  It's not a matter of right.  If the defendant

19  pleads guilty, as said in Application Note 3 to the guideline

20  3(E)1.1(a), and as the First Circuit said in *Blanco*, 888, F.2d

21  907 at 911, timeliness of acceptance of responsibility is a

22  factor to be weighed.  That's in Application Note 1.

23       And although we're not under Section (b) of Section

24  3(E)1.1, which elaborates on timeliness, one of the things that

25  is to be considered in terms of timeliness is whether the

1   Government and the Court had to prepare for trial.  Until April
2   22 -- one week ago -- the trial was scheduled for today, and
3   this is an element of timeliness under Section (a) as well.
4        Since April 17, when I rejected the first proposed
5   binding plea agreement, the Government's filed voluminous
6   exhibits, which undoubtedly took considerable work, a trial
7   brief, voir dire questions, and I ordered the defendant to
8   inform the Government and me, the Court, by April 22 if you
9   wanted to plead guilty without a binding plea agreement to
10  spare Counsel and the Court the time required to prepare for
11  trial.  That's in the April 22 order.
12       If there's no acceptance of responsibility, the total
13  offense level would be 10, the Criminal History Category was
14  II, the guidelines would be eight to 14 months.  So four to ten
15  months might not be a guideline sentence.  The Government's
16  obliged in the plea agreement to recommend four months.  That
17  would not be within the guidelines and there may not be
18  justifiable reasons for a sentence of eight to ten months.
19       There's an issue, also, of possible upward departure
20  under Section 4A1.3(C)(1) if the criminal history score
21  substantially under-represents the risk of recidivism.  The
22  defendant has unscored criminal history.  At the October 23,
23  2023, hearing, I noted that being in prison from 2011 to 2014
24  for violating his probation after being convicted of two counts
25  of conspiracy to commit securities fraud was not sufficient to

1   deter the defendant, Mr. Medoff, from allegedly violating the

2   2016 final judgment in this case.  And I noted that conspiracy

3   to commit securities fraud conviction and sentence in the

4   February 12, 2024, memorandum and order at pages 1 to 2,

5   instituting the criminal contempt proceedings that are now on

6   going.

7         As I said in that April 17, 2024, order rejecting the

8   first binding plea agreement, I explained that, essentially,

9   that the parties should have foreseen that I would not be

10  willing to accept the binding plea agreement of four to ten

11  months.  Well, I explained why I was not willing to accept the

12  first one and essentially the same is true now.  I wrote in

13  Docket 49 on April 17, "If Mr. Medoff is convicted or decides

14  to plead guilty without a Rule (c)1(C) binding plea agreement,

15  the Court will order the preparation of a Presentence Report,

16  receive sentencing memoranda, conduct a sentencing hearing, and

17  decide what sentence is sufficient and no more than necessary

18  as required by 18 United States Code Section 3553(a).  That

19  sentence could be in the zero to three-month range or less than

20  six months.  It could be higher.  However, the Court is not now

21  willing to commit to giving a sentence of less than six months

22  if Medoff is found guilty or to postpone trial again."

23        And then in paragraph 4 of the order on page 8 I said,

24  "If Medoff wishes to enter a guilty plea which is not pursuant

25  to a Rule 11(c)(1)(C) agreement, he shall, by April 22, 2024,

1    inform the Court in order to spare counsel the time and expense

2    of preparing further for trial and spare potential jurors from

3    being ordered to appear for trial on April 29, 2024,

4    unnecessarily."

5            I continue to be open-minded about what sentence will

6    prove to be sufficient and no more than necessary to serve the

7    statutory purposes of sentencing if Mr. Medoff's convicted at

8    the trial that's going to start on May 20 or pleads guilty

9    without a binding plea agreement.  But I'm not willing to

10   commit now without hearing the arguments of counsel, without

11   having a Presentence Report, and without hearing from

12   Mr. Medoff if he wants to say anything at sentencing.  I'm not

13   willing to commit now to giving a sentence of ten months or

14   less and to risk delay, again, of the May 20 hearing, May 20

15   trial, when it's clear to me that, when we get to sentencing,

16   based on what I know now -- well, there's a substantial

17   question as to whether I would commit to accepting the binding

18   plea agreement and would likely reject it because I think, with

19   regard to acceptance -- if he doesn't get acceptance of

20   responsibility, this probably is not properly viewed as a

21   guideline sentence.

22           But whatever it is, there have to be justifiable

23   reasons to give less than a guideline sentence and it's

24   axiomatic under the guidelines.  I have to start by properly

25   calculating the guideline range, and there are these

1    questions -- acceptance of responsibility questions.

2          So the motion for leave to file the motion for a Rule

3    11 hearing is allowed and the motion for the Rule 11 hearing

4    Docket 69 is, for the reasons I just stated, denied.

5          MR. HORSTMANN:  Can I be heard briefly, Your Honor, on

6    one of your rationales for denying the plea itself?  I think

7    you spoke about timeliness.  I don't know how any assessment of

8    timeliness in this case can leave out the fact that the case is

9    only two months old.

10          THE COURT:  It's two months old?

11          MR. HORSTMANN: It's two months old.

12          THE COURT:  About 60 days old?

13          MR. HORSTMANN:  Sixty days old.

14          THE COURT:  And how much time does the Speedy Trial

15    Act provide before you get to excludable time to try a case?

16    60 days.  60 days is supposed to be the presumptive time for

17    trying a case.

18          MR. HORSTMANN:  But that never happens.  I mean, it

19    just doesn't.  And my point, Your Honor, is that what normally

20    takes place after a case is indicted is the parties engage in

21    discovery, there's lengthy motions practice, sometimes the

22    Government has to respond to not one but many suppression

23    motions, motions to dismiss.  In this case, there really wasn't

24    anything, and Your Honor denied my motions before the

25    Government even had a chance to respond.

1          THE COURT:  I denied them because -- well, first of

2   all, that's not true with regard to your motion to recuse,

3   which I deemed to be frivolous.  That's one of them.  Then I

4   denied your motion to dismiss and suppress for the reasons

5   explained:  A, it wasn't a motion in limine, it wasn't timely.

6   You could have filed it before the frivolous motion to recuse.

7   Look, you were seeking righteous delay, perhaps, your words.

8   But it's fine.  I understand your argument.  Have a seat.

9   Please.

10          But in a case where the defendant is facing one count

11   of criminal contempt, previously represented by capable

12   counsel -- but not you, who, as I said, evidently had a

13   different strategy, I think hoping that discovery in the civil

14   predecessor to this criminal contempt would provide information

15   that would cause me to change my repeated statement that I felt

16   criminal contempt was justified.  And, if not, put Mr. Medoff

17   in a posture where he could argue at sentencing that he'd been

18   totally cooperative since this had come up, he hadn't contested

19   anything because he had admitted, essentially, or maybe not

20   essentially, had admitted as in he willfully violated the

21   injunction in the final order.  And he's taken a different tack

22   since then.  But --

23          MR. HORSTMANN:  I don't understand how he's taken a

24   different tack.

25          THE COURT:  Have a seat.  He's taken a different tack

1   by filing at least one unmeritorious motion to recuse that -- a

2   motion to recuse that I found to be frivolous, and then not

3   filing the motion to suppress or dismiss, which you had

4   foreshadowed -- I wrote about this -- much earlier.  But filing

5   these seriatim and essentially -- but have a seat.  Listen,

6   just ruled.  I ruled.  Have a seat.

7          MR. HORSTMANN:  That's not Mr. Medoff's fault.  That's

8   counsel filing motions.

9          THE COURT:  Excuse me, you're his agent.

10          MR. HORSTMANN:  Of course, but --

11          THE COURT:  Have a seat.

12          MR. HORSTMANN:  -- I have a constitutional obligation.

13          THE COURT:  I've explained my reasoning.  I'm

14   rejecting the binding plea agreement, and this shouldn't come

15   as a surprise to either of you.  I mean, I wrote twice -- I

16   assume we're going to trial.  If you change your mind, we can

17   get to the point where you can strive to do what you've

18   successfully done in other cases, some of them you remember

19   them more vividly -- some of them -- than I do that are in the

20   footnote to your motion to recuse.  Sometimes you're

21   persuasive.

22          MR. HORSTMANN:  Not today.

23          THE COURT:  Not so far on the matters in this case.

24   So here we are.  We're going to trial.

25          In response to the trial order, I have the

1    Government's trial brief; the Government's proposed voir dire

2    questions; the defendant's proposed voir dire questions;

3    Mr. Medoff's exhibit list and two proposed exhibits; the

4    Government's exhibit list, which is at the beginning of its

5    large volume of proposed exhibits; the Government's proposed

6    jury instructions; the defendant's proposed jury instructions,

7    that are materially incomplete because they don't address the

8    elements of the offense.

9          I've granted the defendant's motion to sequester

10   witnesses and issued a sequestration order, but is there

11   anything else in preparation for trial that hasn't been ruled

12   on that I should have received and read?

13         MS. WRIGHT:  There's nothing that you should have

14   received.  I did just want to note for the record that, since

15   we filed our trial brief, we have added additional witnesses to

16   our witness list.  We did let the defense know, but since the

17   Court's pretrial order does not require us to file that, I'm

18   happy to file it --

19         THE COURT:  You anticipate me.  We're coming to that

20   next.  I've read everything so far.

21         MR. HORSTMANN:  In an effort not to agitate the Court,

22   I did not seek leave yet to file requested jury instructions,

23   but I do plan to file some.

24         THE COURT:  Well, I'm going to order you to.  They're

25   overdue.  But we'll get to that.  I've got that on my agenda.

 1          All right.  So with regard to the process of jury

 2     selection.  We're going to get about 60 potential jurors.  They

 3     will be seated in the courtroom, one to 60.  I'll ask all of

 4     the questions that I decide are appropriate -- usually it's

 5     about one to 17 -- we'll see who answers yes.  And then we'll

 6     go back in the jury room and -- Mr. Medoff --

 7          THE DEFENDANT:  Yes, sir?  You don't want me to confer

 8     with counsel?

 9          THE COURT:  That's right.  I don't want you to talk to

10     your lawyer while I'm talking.

11          THE DEFENDANT:  I apologize.

12          THE COURT:  You can write him a note and then if he

13     asks me when I finish, I'll give him a chance to speak to you.

14     But it distracts him so he can't hear me and give me an

15     informed response, and it distracts me.

16          THE DEFENDANT:  My apologies.  I was actually pointing

17     to a note, but I understand.

18          THE COURT:  It's not the first time I said this to

19     you.  I said this to you at the beginning of the last hearing.

20          We'll go back in the jury room.  It will be open to

21     the public and any members of the public or media who want to

22     attend can attend.  My aim will be to qualify 32 potential

23     jurors.  The defendant will have ten strikes for the first 28,

24     the Government six, and if all of them are exercised, we'll

25     have 12 jurors, we'll have four potential alternates, and

1    you'll each get one strike and I'll explain this in more detail

2    at the outset of trial.

3            At present, it's my intention to try from essentially

4    9:00 to 4:00 to 4:30 with a break at 11:00 and around 1:00 or

5    12:30 for lunch.

6            I would like the Government's witness list.  About how

7    many witnesses do you anticipate now?

8            MS. WRIGHT:  We currently anticipate at least three

9    witnesses, Your Honor.  There may be one or two additional, and

10   that's in the form of clients of Nova Capital, so we would just

11   reserve the right to be able to supplement.

12           THE COURT:  So it would be up to five witnesses?

13           MS. WRIGHT:  I think that's fair, yes.

14           THE COURT:  Because I have to tell -- and I need the

15   witness list from both of you to read to the jurors to make

16   sure they don't know any of the potential witnesses.

17           If we try, essentially, full days, how many days do

18   you think it will take to try after we get a jury?

19           MS. WRIGHT:  With that full day, I think it's

20   possible, depending on the length of cross, that we go into the

21   second trial day, but I can't imagine it being three trial

22   days.

23           THE COURT:  Let's say two to three, and if we went

24   9:00 to 1:00, what do you estimate?

25           MS. WRIGHT:  Three-ish.

1    THE COURT:  Now, tell me, please, what the minimum

2    reasonable time is to give me the list of the witnesses with

3    the order in which at this time you intend to call them and the

4    associated exhibits with each.

5    MS. WRIGHT:  Well, the first is easier, Your Honor.

6    We can file something today with our current list, like I said.

7    THE COURT:  No, not today.  How about Wednesday?

8    MS. WRIGHT:  Okay.

9    THE COURT:  Can you do that?

10   MS. WRIGHT:  With respect to the exhibits, could we

11   have until -- you know, associate the exhibits with the

12   witness, could we have until Friday to do that?

13   THE COURT:  Okay.

14   MS. WRIGHT:  Thank you.

15   THE COURT:  So Friday is the 3rd of May.  And then

16   Mr. Horstmann, I'm ordering that by the 8th you make a filing

17   that states whether there are objections to any of the

18   exhibits.  You can say -- just annotate this briefly:  hearsay,

19   relevance, Rule 403.  Mr. Horstmann, do you anticipate calling

20   any witnesses?

21   MR. HORSTMANN:  At the present time, Your Honor, we

22   may call two witnesses.

23   THE COURT:  Two witnesses?  Then you'll have to

24   give -- you'll have to do exactly the same.  You have to give

25   that list -- well, do you have any -- so two witnesses.  Is one

1    of those Mr. Medoff or do you --

2              MR. HORSTMANN:  I do not anticipate calling him.

3              THE COURT:  Is he likely to testify?

4              MR. HORSTMANN:  He is not likely to testify, Your

5    Honor.

6              THE COURT:  I'll explain to him that he's got a right

7    to testify but he doesn't have a duty to testify as the time

8    comes.  And have you given the Government the names of those

9    two witnesses?

10             MR. HORSTMANN:  I have, Your Honor.

11             THE COURT:  You have?

12             MR. HORSTMANN:  Yes.

13             THE COURT:  And what generally will be the nature of

14   their testimony?

15             MR. HORSTMANN:  They will testify relative to

16   Mr. Medoff's state of mind during that time period.

17             THE COURT:  And, although they may not have been

18   timely filed, you filed two proposed exhibits:  An excerpt from

19   the October 23, 2023, hearing and an excerpt from the February

20   9, 2024, hearing.  Through which witnesses would you propose to

21   offer those excerpts?

22             MR. HORSTMANN:  Depending on which witnesses the

23   Government calls may have been here during those hearings.  If

24   they don't produce a witness that was here during those

25   hearings, I would ask the Court to take judicial notice of

1    statements that the Court made during those proceedings.

2    Respectfully.

3          THE COURT:  And what rule of evidence would permit the

4    introduction of those statements?

5          MR. HORSTMANN:  I believe, Your Honor, that they are

6    statements by the Court that, as I argued in my motion to

7    dismiss or suppress -- which your honor denied -- that induced

8    Mr. Medoff to comply with the SEC's request.

9          THE COURT:  But I denied the motion to dismiss.  So

10   what's the relevance of that?

11         MR. HORSTMANN:  I think the jury decides estoppel.  I

12   think that's a jury question.

13         THE COURT:  Well, you're going to have to brief that.

14         MR. HORSTMANN:  I'm doing may best.  I haven't gotten

15   anything to you yet --

16         THE COURT:  What's that?

17         MR. HORSTMANN:  I will get you a proposed instruction.

18         THE COURT:  Well, with authority, because that's

19   essentially -- today's April 29.  I'm ordering that you make

20   that filing by Thursday.  This would have been a motion in

21   limine, not a motion to suppress, maybe a motion in limine or

22   dismiss.  It should have been litigated weeks ago.  So you can

23   have until Thursday, which is May 2, and the Government shall

24   respond by the following Tuesday.

25         My availability in the foreseeable future is very

1    limited.  You may have read it in the *Boston Globe* I'm a fact

2    witness in the case I mentioned -- not by name -- previously,

3    but it's been in the media.  And that's going to occupy some of

4    my time in the near future.

5         You'll have to address what federal rule of evidence

6    and what makes it admissible.

7         MR. HORSTMANN:  Your Honor, could I beg for a little

8    more time?  I have jury duty on the 1st, believe it or not.

9         THE COURT:  You have jury duty on the 1st?

10        MR. HORSTMANN:  Yes, Superior Court.

11        THE COURT:  You can have on Friday and the Government

12   can have one more day.

13        MR. HORSTMANN:  Can I ask again if I get picked for

14   more time?

15        THE COURT:  No.  You can ask but denied.  Presumably

16   you've done this, you've thought about this before I raised it,

17   so something, as I said, that should have been done weeks ago.

18   It's a motion in limine.

19        MR. HORSTMANN:  I didn't know you were going to deny

20   my other motion, Your Honor.  It's all related.

21        THE COURT:  It's pretty presumptuous to think you can

22   ignore court orders that set deadlines and then file motions

23   seriatim.  That's not reasonable.  Your filing is due the 3rd,

24   the Government's response is due the 8th, and there's no reply

25   without leave of court being granted.

1    Has the Government asked the SEC and any other -- if

2  there is any other -- organization that participated in the

3  investigation of this case for all material exculpatory

4  evidence oral or written?

5    MS. WRIGHT:  Yes, Your Honor, we have.

6    THE COURT:  And have you disclosed all of that to the

7  defendant?

8    MS. WRIGHT:  We have, Your Honor.

9    THE COURT:  And do you understand that this is a

10  continuing obligation so if, for example, you're preparing a

11  witness and the witness says something different than what she

12  or he said before, that should be disclosed?

13    MS. WRIGHT:  Understood, Your Honor.

14    THE COURT:  Unless it's certainly trivial, not

15  material.  All right.  Then, this is addressed well in the

16  Government's trial brief in the response to the defendant's

17  motion in limine, and it's addressed in my April 23 order.

18    So with regard to the -- what the defendant regards as

19  Rule 404(b) evidence relating to his prior conduct, I addressed

20  this in my April 23 order, Docket 62, at pages 1 through 3.  I

21  think there are two -- the Government discerned two aspects.

22  First, it takes a position, as I understand it, that the

23  failure to pay disgorgement in the civil penalty in this case

24  is admissible.  As I wrote, it's either intrinsic to the

25  alleged offense or it's probative of factors that are

1    admissible, or purposes that are admissible under Rule 404(b),

2    such as intent, and then would be subject to a Rule 403

3    balancing.  And, as I wrote, that evidence -- the probative

4    value of that evidence, if it's not intrinsic, which I found it

5    was, is admissible -- is not substantially outweighed by the

6    risk of any form of unfair prejudice.  But is that evidence,

7    Mr. Horstmann, you were seeking to exclude?

8         MR. HORSTMANN:  Yeah.  I was attempting to exclude

9    anything other than the specific contempt that you cited

10   Mr. Medoff for.  I think it's confusing, collateral, and

11   overly --

12        THE COURT:  I considered all that when I decide it's

13   admissible.  As I said, as I wrote, first, I believe it's

14   intrinsic not extrinsic and, second, its probative value with

15   regard -- is not substantially outweighed by any of the Rule

16   403 considerations.  I didn't include that in the charge.  I'll

17   be transparent about it, because I was trying to keep this as

18   simple and straightforward as possible, and rather than have

19   possibly time consuming and immaterial litigation over whether

20   Mr. Medoff had the capacity to pay, I just instituted what I

21   considered the most straightforward charge and one that I had

22   understood that he had admitted prior to his declaration today,

23   prior to February 12.

24        Then, with regard to evidence regarding the prior

25   cases, which I think are the earlier injunction against

1  violating the securities laws, the conviction on two counts of

2  conspiracy to commit securities fraud, and the violation of the

3  conditions of his probation.  As I understand it, the

4  Government's not seeking to admit that in its case in chief, or

5  maybe there's a refinement, unless the questioning of the

6  witnesses makes issue, for example, of intent or voluntariness

7  an issue.

8          Do I understand the Government's position correctly.

9          MS. WRIGHT:  Yes, that's exactly right, Your Honor.  I

10 don't think the court likes the "open the door" reference but I

11 didn't know better.

12         THE COURT:  No, actually, I have it in my notes.  I

13 mean, we can be colloquial to some extent.  Mr. Horstmann,

14 you've proffered two exhibits.  You have to brief their

15 possible admissibility.  And you say you have two witnesses who

16 would -- two potential witnesses who may testify to

17 Mr. Medoff's state of mind.  The evidence of Mr. Medoff's prior

18 conduct -- I'm not ruling on this -- might be admissible to

19 prove intent, preparation, plan, absence of mistake.  And I

20 think that's what the Government -- I mean, is that essentially

21 what the Government has in mind when you talk about opening the

22 door?

23         MS. WRIGHT:  Yes, Your Honor.

24         THE COURT:  You want to listen to the examination of

25 your witnesses and then decide whether you want to inform

 1    Mr. Horstmann and ask me if you can admit evidence of his prior

 2    conduct?

 3            MS. WRIGHT:  That's correct, Your Honor.

 4            THE COURT:  In other cases?

 5            MS. WRIGHT:  That's correct.

 6            THE COURT:  Well, you should keep that in mind,

 7    Mr. Horstmann.  I'm not ruling on anything now.  If I'm asked,

 8    I'll hear you both and then decide whether whatever evidence is

 9    proffered is admissible under Rule 404(b) and, if so, should be

10    excluded under Rule 403.  And I cited some, not all, of the

11    First Circuit cases that provide the standards for that.

12            Then the Government said in its trial brief that it's

13    going to present a summary -- a witness concerning a summary of

14    the information and the financial records, admissibility of

15    which is governed by Federal Rule of Evidence 1006.  Have all

16    of the underlying documents that have been summarized been

17    disclosed to the defendant?

18            MS. WRIGHT:  Yes, they have, Your Honor, and I was

19    going to ask for the Court's guidance in terms of summary

20    charts.

21            THE COURT:  That's my next question.  We're on the

22    same track.  Do you have a summary chart?

23            MS. WRIGHT:  Not yet.  And I will just note that we

24    did divide that witness kind of into two.  So there's an SEC

25    witness and then a separate financial investigator from our

1   office who will go through the bank records, but we have turned

2   all the bank records over to the defense.

3           THE COURT:  All right.  Now, are you going to be

4   seeking admission of the chart as evidence or just used to

5   illustrate testimony as a chalk?  The standards are related but

6   different.

7           MS. WRIGHT:  I think we would seek to introduce them

8   as exhibits so that we don't have to introduce the underlying

9   records, but I don't know Your Honor's practice with respect to

10  that.

11          THE COURT:  No, if you offer it and it satisfies the

12  requirements of the rule, the document would be admitted into

13  evidence, but I'll have to -- but you didn't prepare it as one

14  of the exhibits for the big binder, and you're going to have to

15  prepare it and show it to Mr. Horstmann so we can see if he's

16  got any objection to the accuracy.  And you want to make sure

17  that the caption of it is neutral, not arguably -- even

18  arguably argumentative.  I'm ordering that you file that by

19  this Friday unless you tell me that's not feasible.

20          MS. WRIGHT:  I don't know that that's feasible, Your

21  Honor.  The financial investigator is new to the case.

22          THE COURT:  I'm sorry, I'm having a little trouble

23  hearing.

24          MS. WRIGHT:  My apologies.  I don't know that this

25  Friday is feasible.  The financial investigator is new to the

1   case and it's a lot of bank records.  I would ask for next

2   Friday if possible.

3           THE COURT:  A week from Friday?

4           MS. WRIGHT:  Yes, Your Honor.  And it's only -- if we

5   have drafts before them, we'll turn them over as soon as we

6   have drafts.

7           MR. HORSTMANN:  I have no problem with that, Your

8   Honor.  I always object to summary charts, anyway.  I'll be

9   prepared to object.

10          THE COURT:  I know.  Then I want your objection in

11  writing.  That's too long.  I'll give you until the eighth

12  and -- I mean, this is a real problem with my availability.

13          MR. HORSTMANN:  No disrespect, Your Honor, you set the

14  time frame.  No disrespect, but you set the time frame.  This

15  doesn't have to go this fast.

16          THE COURT:  Yes, it does.  It does.  Because this is

17  not the only case that I have.

18          MR. HORSTMANN:  Nor me.

19          THE COURT:  Then have a seat.  You would have plenty

20  of time to have done this if you hadn't filed a series of

21  frivolous motions that were untimely as well as frivolous and

22  you can sit there -- you better start obeying orders or getting

23  leave in advance to be excused from deadlines.

24          I'm ordering that the Government file its proposed

25  exhibit -- show it to the defendant, but if you have time, the

1    proposed exhibit by May 7, and if there's any objection to it,

2    it will have to be filed by the 10th with an explanation of the

3    reason for the objection.  And the Government shall respond to

4    any objection by May 14.

5            Then the Government's trial brief says that it intends

6    to have a summary witness to introduce other statements made by

7    the defendant.  That's at page 2 of the trial brief.  What does

8    that mean?

9            MS. WRIGHT:  We would anticipate that that would be an

10   SEC witness to introduce, for example, the deposition

11   transcript.

12           THE COURT:  Introduce what?

13           MS. WRIGHT:  The deposition transcript.

14           THE COURT:  Not to summarize them?

15           MS. WRIGHT:  So that's what I was trying to explain.

16   We have kind of split that out into two separate witnesses.  So

17   there will be a summary witness who will do the financials and

18   an SEC witness who will testify to separate matters.

19           THE COURT:  And that person will testify as you

20   anticipated in what form?  Are you going to have somebody read

21   the questions and somebody read the answers?

22           MS. WRIGHT:  I think we defer to the Court on how

23   exactly that comes in.  I don't know if it's a transcript and

24   there's a reading and we just have a reader, I think that's

25   traditionally how we would do it.

1    THE COURT:  Well, if that's being done, that's -- I'm

2  asking what you mean by "summary."  I don't think somebody can

3  get up and say -- I mean, they could -- "I was there, I heard

4  Mr. Medoff say this."  They can't just give a discursive

5  summary.

6    MS. WRIGHT:  Understood.

7    THE COURT:  It has to be his actual statements.

8    MS. WRIGHT:  I see the concern.  I think, to the

9  extent the SEC witness provides any summary testimony, it would

10  not be with respect to the defendant's statements.  It would

11  be, for example, what the SEC is, how it operates, what kinds

12  of prohibitions it puts in place when it's resolving a case.

13  That kind of summary testimony.  Not as to the defendant's

14  statements.

15    THE COURT:  I don't think that's a summary at the

16  moment.  All right.  But in terms of introducing the

17  transcripts --

18    MR. HORSTMANN:  I'm amenable to proposed stipulations

19  on those two, Your Honor.

20    THE COURT:  A stipulation?

21    MR. HORSTMANN:  It's not in dispute.

22    THE COURT:  What's not in dispute?

23    MR. HORSTMANN:  He said what he said.

24    THE COURT:  Well, the stipulations were supposed to

25  have been filed previously.  But whatever you can stipulate --

1    I'll give you another time where you stipulate -- you're

2    stipulating to admissibility or -- what does it mean to

3    stipulate?

4         MR. HORSTMANN:  Subject to our prior objections, we

5    may be willing to stipulate to what he said at a prior

6    deposition or in a prior affidavit or -- I mean, you saw what

7    we filed attached to the proposed plea agreement.  There's

8    no -- he's not refuting anything.

9         THE COURT:  Right.  So -- okay.  Well, sometimes the

10   Government's not satisfied with a stipulation, they'd rather

11   read the words into the record.  They'd rather have the

12   documents go as exhibits.  The Government needs to identify for

13   the defendant what particularly in those depositions you want

14   read and then there would be context.  You know, the questions

15   get admitted and provide context for the answers.  The date I

16   just gave you for the summary chart was what?

17        MS. WRIGHT:  May 7.

18        THE COURT:  Which is a week from tomorrow.  There's

19   going to be a stipulation to any of this -- all right.  You'll

20   need to tell me no later than the 10th and earlier, ideally.

21        Then as I noted, I have the Government's jury

22   instructions.  With regard to the elements of the offense, they

23   appear to me to be correct to track the *Michaud* case, which I

24   think I initially brought to your attention, elements of

25   criminal contempt.  In my notes, I intended to give you until

1   this Wednesday, the 1st, to file your instructions, but I think
2   I gave you a different date.  What date did I provide?  Well,
3   basically, it's what I said before and you'll get a written
4   order with this in the next day or two.
5           I didn't ask this before.  How much time would you
6   each like for your openings?
7           MS. WRIGHT:  I can't imagine we would go any longer
8   than 15 minutes and I think probably ten is closer to reality.
9           THE COURT:  I'll give you each up to 30 minutes.  You
10  don't have to use it all.  Then there's one more matter.  Let
11  me say this.
12          Now we have a May 20 trial date.  As I said, I was
13  concerned that I couldn't -- if I started this trial today,
14  complete it by Friday when I have to have root canal oral
15  surgery, and this conference is helpful in trying to make sure
16  that the trial will be fair and efficient.  Now trial is
17  deferred to May 20 and if the defendant's convicted or chooses
18  to plead guilty with a plea agreement that's not a binding plea
19  agreement.
20          I mean, it's conceivable you could have a binding plea
21  agreement that's acceptable and it's entirely up to the
22  parties.  I'm not involved in plea negotiations.  But I really
23  do have to manage my docket and my schedule, and the defendant
24  wants to argue that he should get acceptance of responsibility
25  because it was timely.

1    I'm ordering that you -- Mr. Horstmann, that you

2    report by Friday, talk to the Government again.  You don't have

3    to agree on anything.  I'm assuming the case will be tried.

4    But just report by Friday at 12:00 noon -- not 7:00 at night,

5    12:00 noon -- whether the defendant intends to go to trial or

6    not.  Okay?

7         MR. HORSTMANN:  Yes, Your Honor.

8         THE COURT:  And then there's one more matter that I

9    raised in the order that I issued on April 26, and that is

10   whether -- well, I said, on page 2 of Docket 68:   The parties

11   shall be prepared to address at today's hearing, the April 29

12   hearing, whether Medoff's conditions of release should be

13   modified to include drug testing and, if appropriate, drug

14   treatment.  At an October 23, 2023, hearing, Medoff stated that

15   he was a drug addict, had been incarcerated for violating

16   conditions of his probation for using drugs, and had been in 12

17   inpatient rehabs and six outpatient rehabs.  His February 28,

18   2024, pretrial services report indicates that Medoff also

19   provided this information concerning drug use to Probation,

20   added that he still attends AA/NA meetings two to three times a

21   week, and that he last used drugs in 2019, his longest period

22   of sobriety ever.

23        And then I noted that Mr. Medoff's appearance and

24   conduct at the April 9, 2024, hearing caused me to be concerned

25   that he's again using drugs illegally and therefore I provided

1    you notice that I'm in an opportunity to be heard on whether

2    his conditions of release should be modified to include drug

3    testing and, if appropriate, drug treatment.  Do you want to

4    address that, Mr. Horstmann?

5            MR. HORSTMANN:  I will, Your Honor.

6            First of all, with respect to any conduct that the

7    Court was concerned about on April 9, he was ill and he had

8    told me the night before that he felt something coming on.  And

9    what I experienced on the 9th was a client who was physically

10   ill.  I don't know if Your Honor also noticed, I kept trying to

11   move away from him because I really didn't want to catch

12   whatever he had.

13           I can also say that since February 21, when I was

14   appointed on the case, he has been my most compliant,

15   cooperative, responsive, sober, professional defendant that

16   I've represented.  He responds to phone calls; he responds to

17   texts.  We have almost daily contact.  He's aware of current

18   events.  This is not someone who I have concerns about using

19   controlled substances.  And he is 64 years old, Your Honor.

20   Any substance abuse at this age he knows would be fatal.  And I

21   just don't have any concerns about that.  I appreciate the

22   Court's concerns, but I don't have any.

23           THE COURT:  Well, we're going to address my concerns.

24   I'm ordering drug testing and drug treatment.  I was very

25   surprised that the magistrate judge hadn't done that in view of

1   the information in the bail report and -- although she wouldn't
2   have had it -- the information that was provided to me.
3   Mr. Medoff, want to say something to me?
4          THE DEFENDANT:  Yes.
5          MR. HORSTMANN:  No.  He is prohibited from speaking
6   with you, Your Honor.
7          THE COURT:  He's what?
8          MR. HORSTMANN: He's prohibited.
9          THE DEFENDANT:  He's prohibiting me.
10         THE COURT:  Well, we're here because Mr. Medoff
11  allegedly didn't obey court orders.  And that was good advice,
12  but I'm adding a condition of drug testing and drug treatment.
13         MR. HORSTMANN:  I don't know if you can do that
14  without a hearing.
15         THE COURT:  I'm doing it.
16         MR. HORSTMANN:  He hasn't violated anything, there's
17  no allegation that he's done anything wrong.
18         Sit, sit, sit, sit.
19         THE DEFENDANT:  I just want to make one statement. I'm
20  not allowed to make one statement?
21         MR. HORSTMANN:  No, please sit.
22         THE DEFENDANT:  It's just one statement.  It's
23  logical, and I think Judge Wolf could understand it.
24         Judge Wolf, Your Honor, I am a documented freebase
25  cocaine addict, which is similar to crack but more powerful.

1    The result of smoking freebase cocaine is that you're frenetic.

2    You're paranoid.  You march back and forth.  It does not make

3    you tired like I was in court.  I had a severe chest cold and

4    aches and pains which turned into a fever, but I can assure

5    you, all the documentation going back since 1989, my first

6    rehab, substantiates that my drug of choice is freebase

7    cocaine, not heroin, not opiates, not anything that would make

8    me sleepy.

9         And I just want to say that, respectfully, I've been

10   on time to every hearing.  I've attended every hearing.  I've

11   interacted with every person I'm supposed to on a consistent

12   basis, on a daily basis, texts, e-mail, et cetera.  But I want

13   to say that your presumption that I was actually using drugs

14   that doesn't reflect my drug of choice is just totally

15   inaccurate.

16        THE COURT:  Okay.  Well, we'll see.

17        At the April 9 hearing, while I was delivering my

18   decision, Mr. Medoff had his head on the table for a long

19   period of time.  I don't know what caused the glass of water to

20   turn over that caused Mr. Horstmann to interrupt the

21   explanation of my decision, all this is in the transcript.

22   Mr. Horstmann told me Mr. Medoff was ill, could he be excused.

23   I excused him.  I think, given Mr. Medoff's history, there

24   should be this drug testing requirement and I'm ordering that

25   he go with Probation right now to be tested.  If he tests

1  positive, it's not a violation because it wasn't a condition of

2  his pretrial release.  It is now.  But I want a baseline and

3  I'm ordering that you do that and that you all come back at

4  4:30.

5      Court is in recess.

6      (The hearing recessed from 3:25 to 4:35.)

7      THE COURT:  Counsel and Mr. Medoff are here with the

8  probation officers.  I may ask the probation officer,

9  Ms. Curran, to testify about this, but I've been informed that

10 Probation conducted a drug test with an instant cup urinalysis,

11 it came back positive for marijuana, Mr. Medoff admitted the

12 use of edibles.  It also came back positive for cocaine, and

13 that sample is going to be sent for further testing.

14      Mr. Horstmann, is there anything you or Mr. Medoff

15 would like to say about this?

16      MR. HORSTMANN:  Yeah.  I would ask the Court to defer

17 any action on this until we get further results on the cocaine

18 test.  If the Court is inclined to do anything --

19      THE COURT:  Keep your voice up, please.

20      MR. HORSTMANN:  I would ask the Court to defer any

21 action on this until we get the further test results and, if

22 the Court is inclined to do something today, I might -- my

23 memory is cocaine doesn't stay in your system long.  Another

24 test next week might show that he's not actively using, so

25 that's what I would suggest. I don't know that he needs to be

1    on a program.  He's --

2              THE COURT:  He doesn't need to be what?

3              MR. HORSTMANN:  I don't know that he needs to be on an

4    official Probation program.  He goes to NA and AA and let's see

5    what the levels are before we --

6              THE COURT:  Would either party like the probation

7    officer to testify about the results?

8              MR. HORSTMANN:  No, Your Honor.

9              THE DEFENDANT:  No.

10             MS. WRIGHT:  I don't think that's necessary from our

11   perspective.

12             THE COURT:  All right.  Well, I'm satisfied that

13   Mr. Medoff tested positive for marijuana and admitted the use

14   of, I take it, marijuana edibles.  He also tested positive for

15   cocaine, and that sample is being sent out for further testing.

16             I was talking shorthand previously when I said I was

17   modifying the conditions of his release to require drug testing

18   and treatment.  I'm ordering that they be modified on the

19   standard orders concerning release to specifically prohibit,

20   not use or unlawfully possess, a narcotic drug or other

21   controlled substance defined in 21 U.S.C. Section 802 unless

22   prescribed by a licensed medical practitioner and submit to

23   testing for prohibited substance if required by the pretrial

24   services office or supervising officer.  Testing may be used

25   with random frequency and may include urine testing, the

1    wearing of a sweat patch, a remote alcohol system and/or any

2    other form of prohibited substance, screening, or testing.

3          The defendant must not obstruct, attempt to obstruct,

4    or tamper with the efficiency and accuracy of prohibited

5    substance screening or testing and, in fact, I'm directing

6    Probation to use the sweat patch, although you may be concerned

7    that it can't be put on immediately.

8          U.S. PROBATION:  No, Your Honor.  I'm just hesitating.

9    I don't know if the sweat patch is the best way to detect

10   cocaine.  I can --

11         THE COURT:  Well, it's not at the exclusion of

12   anything else, but it's not necessarily -- Mr. Medoff

13   energetically, adamantly, insisted that he hadn't been using

14   drugs.  That was about an hour and a half ago.  The sweat

15   patch, there's no harm.  And then participate in a program of

16   inpatient or outpatient substance abuse therapy and counseling

17   if directed by the pretrial services officer or supervising

18   officer.

19         I said, maybe too hastily, that I wouldn't revoke

20   Mr. Medoff if he tested positive.  There is an order of his

21   conditions of release that he violated, apparently, and that is

22   the first one:  The defendant must not violate federal, state,

23   or local law while on release.  21 United States Code Section

24   844 is the federal statute that criminalizes simple possession

25   of a controlled substance unless it's been obtained directly or

1    pursuant to a valid prescription or order from a practitioner

2    while acting in the course of his professional practice or

3    otherwise authorized by that subsection.  The test results, if

4    reliable, would also constitute a violation of Mass General Law

5    Chapter 94 Section 34 that makes possession of a controlled

6    substance without a prescription unlawful.

7         But I did say he wouldn't be revoked and so that

8    representation is reliable, and he's not being revoked.  If you

9    test positive again, Mr. Medoff, for anything, there's

10   substantial risk that you will be revoked, but hopefully that

11   won't become an issue.

12        This case is consuming substantial prosecutorial,

13   Criminal Justice Act and judicial resources.  It is disruptive

14   to my ability to manage my docket, but it's important.  This

15   case -- this contempt exists because of the allegations of

16   which there's substantial evidence -- completely independent of

17   the declaration filed with the latest motion -- that Mr. Medoff

18   willfully disobeyed the injunction in the final judgment.  And

19   while Mr. Medoff was animated and adamant that he hadn't been

20   using drugs, and Mr. Horstmann, being a good lawyer, advised

21   him not to, here we are.

22        Mr. Medoff, it would be in your very best interest

23   that there not be any repetition of this and that you

24   fastidiously obey all orders.  And though it should be

25   unnecessary, I'm ordering that you be here at every hearing,

1  including trial, because you have a lawyer who's capable of

2  doing a good job for you, but this drug test, the results of

3  this drug test, if they're reliable, are concerning.

4  So I'll issue an order with all the deadlines. The

5  longer this -- all the deadlines, except I'm going to alter one

6  of them. It's entirely up to the defendant. If there's going

7  to be a plea in this case, I want to be -- I'm ordering that

8  you report to me by 4:00 p.m. on Thursday, May 2. If

9  Mr. Horstmann's put on a jury and that doesn't become feasible,

10  you can move for another day or two.

11  But the simple point is, this case needs to be tried.

12  I'll be here, I'll try it, and try it starting on the 20th.

13  The longer this goes, the harder -- as I said, there's a

14  substantial question about acceptance of responsibility if

15  there is a plea. But it's up to you. I just need to plan my

16  schedule, and just tell me what you'd like to do that's within

17  your control, largely, and that's the way we'll go.

18  MR. HORSTMANN: Can I ask a question of the Court?

19  THE COURT: I don't know if you'll get an answer but

20  go ahead.

21  MR. HORSTMANN: It's designed to save everybody time,

22  especially Probation. Would the Court, assuming Mr. Medoff is

23  qualified --

24  THE COURT: Assuming he's what?

25  MR. HORSTMANN: Qualified. Would the Court consider a

1    RISE application and plea given what we've just talked about?

2         THE COURT:  And defer this for a year?  No.

3         Look, I'm very concerned that Mr. Medoff is dangerous

4    because I don't know what he's doing.  In fact, I've thought

5    about this, I'll put you on notice of it.  You may get another

6    new condition -- in fact, I hadn't thought about it today, I

7    was thinking about it.  I'm ordering biweekly reports of his

8    income and expenses.  I accepted his CJA affidavit, even though

9    he's got a $900,000 trust fund that his uncle controls and gave

10   him money to retain his prior counsel and, as far as I know,

11   he's still living in Harbor Towers.  I was told that his --

12   I'll have to look at the affidavit, but I was told what his

13   income was, and I don't know if his income even exceeds his

14   rent let alone his other living expenses, and I just don't know

15   how he's spending his time, what he's doing.

16        But there's substantial evidence that a month after I

17   entered the judgment that he asked me to enter enjoining him

18   from engaging in the securities business, he engaged in the

19   securities business and he made -- according to the SEC, he

20   netted about $1,600,000.  He didn't pay any of it to the SEC as

21   he'd been ordered to do and, again, I'll look at the affidavit.

22   I think there's a reported liability to Mr. Levy who was

23   involved with him in Hercules Capital which, as I recall, was

24   involved in the 1990 cases with the SEC and involved in Nova.

25   I'm concerned.

1         So I do think there's urgency to getting this case

2   resolved.  Mr. Medoff has said that he's been in 12 inpatient

3   rehabs and six outpatient rehabs, that he attends AA and NA two

4   to three times a week.  I think he's had the resources and

5   opportunities that the RISE Program gives other people from

6   different circumstances who haven't had all that treatment, and

7   it appears he's failed and then lied about it.  So the answer

8   is no.

9         MR. HORSTMANN:  Thank you, Your Honor.

10        THE COURT:  I'm also ordering that you order the

11   transcript of today's proceedings and I'll thank my staff and

12   the probation officers for doing their usual excellent work and

13   they're getting out early today at 4:55.  Thank you.

14        (Whereupon the hearing was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                 CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Jessica Leonard, Certified Shorthand Reporter

 4    and Federal Certified Realtime Reporter for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter, to the best of my skill and ability.

 9              Dated this 6th day of May, 2024.

10

11

12              /s/ Jessica M. Leonard

13              Jessica M. Leonard, CSR, FCRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR. No. 24-10048-MLW |
| | ) | |
| CRAIG MEDOFF, | ) | |
| Defendant. | ) | |

ORDER

WOLF, D.J.                                        April 30, 2024

For the reasons stated in court at the April 29, 2024 hearing, it is hereby ORDERED that:

1. The parties' Joint Motion for Leave to File a Motion for a Rule 11 Hearing (Dkt. No. 69) is ALLOWED.

2. The parties' Joint Motion for a Rule 11 Hearing (Dkt. No. 73) is DENIED.

3. Defendant Craig Medoff shall, by 4:00 p.m. on May 2, 2024, report whether he intends to proceed to trial or whether he wishes to change his plea.

4. The government shall, by May 3, 2024, submit a revised witness list and identify the exhibits it proposes to introduce through each witness.

5. Medoff shall, by May 3, 2024, file a memorandum addressing the bases under the Federal Rules of Evidence, including relevance, for admitting his two proposed exhibits. He shall also identify any witness(es) through whom he proposes to introduce those documents. The government shall respond by May 8, 2024. No reply shall be filed

1

without leave of court.

6. The government shall, by May 7, 2024, file the summaries it proposes to introduce as exhibits or use as "chalks" in its case-in-chief. Medoff shall, by May 10, 2024, state whether he objects to any exhibit and, if so, briefly state the reason(s) for the objection(s). The government shall respond to any objections by May 14, 2024.

7. Medoff shall, by May 8, 2024, file any objections to the government's exhibits and briefly state the reason(s) for each.

8. The parties shall, by May 10, 2024, and earlier if possible, file a stipulation of any facts that they agree are not in dispute, signed by Medoff, his counsel, and counsel for the government.

9. Medoff's pretrial conditions of release are MODIFIED to add the following conditions:

(a) Medoff shall not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. §802 unless prescribed by a licensed medical provider.

(b) Medoff shall submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. Medoff must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

(c) Medoff shall participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

10. A separate order shall be issued concerning the additional condition of release, which the court ordered at the April 29, 2024 hearing, requiring bi-weekly reporting of Medoff's income, revenue, expenses, and other financial information.

11. Medoff shall attend all hearings and other court events, including trial.

12. The parties shall order a transcript of the April 29, 2024 hearing.

UNITED STATES DISTRICT COURT

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | Cr. No. 24-10048 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CRAIG MEDOFF, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                              April 17, 2024

On April 16, 2024, without leave of court, the government and defendant Craig Medoff did not make the filings required by the April 10, 2024 Pretrial Order. Rather, they filed an Emergency Motion for a Rule 11 Hearing (Dkt. No. 46)[1] and a binding Fed. R. Crim. P. 11(c)(1)(C) plea agreement which would, if accepted, require the court to impose a 0-3 month sentence. For the reasons explained in this Memorandum, the motion is being denied and the plea agreement is being rejected.

I.   BACKGROUND

At a hearing on February 9, 2024, the court stated its intent to institute criminal contempt proceedings against defendant Craig Medoff for violating certain provisions of the injunction that was included in the May 25, 2016 Final Judgment, to which Medoff

---

[1] Unless otherwise specified, all docket entry citations in this Memorandum refer to Crim. No. 24-10048.

consented, in <u>Securities and Exchange Commission v. Biochemics,</u> <u>Inc. et al.</u>, Civ. No. 12-12324. In doing so, the court explained that the violations, which Medoff had essentially admitted:

> are very serious. I don't think in my 39 years as a judge I've confronted such flagrant, repeated, now-alleged violations of a court order. And it's necessary that, if admitted or proven, that it be appropriately punished to promote respect for the law, to deter Mr. Medoff and perhaps send a message to others.
>
> Because a sentence of six months could be necessary under the sentencing guidelines . . . Mr. Medoff will be entitled to a jury trial.

Feb. 9, 2024 Hr'g Tr. 23:15-24, Civ. No. 12-12324 (Dkt. No. 799).

On February 12, 2024, the court issued a Memorandum and Order charging Medoff with criminal contempt. <u>See</u> Civ. No. 12-12324, Dkt. No. 789. In it the court again stated that "[b]ecause a sentence of more than six months in prison might be necessary to serve the purposes of sentencing, Medoff is entitled to a jury trial." <u>Id.</u> at 7 (hyphen omitted) (citing <u>Codispoti v.</u> <u>Pennsylvania</u>, 418 U.S. 506, 512, 516-17 (1974); Fed. R. Crim. P. 42(a)(3)). The court ordered that trial would begin on April 1, 2024. <u>Id.</u> The court also issued a Pretrial Order setting deadlines for certain events leading up to the April 1, 2024 trial. <u>See</u> Dkt. No. 7.

On February 21, 2024, the court allowed Medoff's counsel to withdraw and appointed Peter Horstmann to serve as Criminal Justice Act counsel for Medoff. <u>See</u> Dkt. No. 5. On February 29, 2024, the

2

court allowed Mr. Horstmann's assented-to motion to continue the April 1, 2024 trial and provided the parties the opportunity they requested to attempt to reach a proposed resolution of this case. See Dkt. No. 18.

In response to that Order, Mr. Horstmann stated that Medoff might file a motion to disqualify this court. See Dkt. No. 20. On March 14, 2024, the court ordered that Mr. Horstmann file any such motion by March 20, 2024, and stated its intention to begin trial on April 22, 2024 if the motion to disqualify was not allowed. See Dkt. No. 22. On March 20, 2024, the parties filed an assented-to motion to continue the trial date until September 2024, see Dkt. No. 25, which the court denied, see Dkt. No. 27.

On March 20, 2024, Mr. Horstmann filed Medoff's motion to recuse. See Dkt. No. 24. The government did not oppose that motion. See Dkt. No. 29. Rather, in its two-page response it took no position on the merits of it. See id.

At an April 9, 2024 hearing, the court heard argument on the motion to recuse and explained in detail its reasoning for denying it. See Dkt. No. 43. In doing so, the court stated that:

> This motion to recuse appears to me to be frivolous. It appears to me to be an effort to . . . further delay the trial. It is, in my view -- and I'm not the ultimate arbiter if there's an appeal [] -- an effort to manipulate the system for strategic purposes, perhaps to obtain another judge who would have to do a great deal of work to prepare and, as I say, at a minimum, to further delay this matter.

Apr. 9, 2024 Hr'g Tr. 56:4-10 (Dkt. No. 47). While Mr. Horstmann denied he was shopping for a better judge, he acknowledged that the motion was filed for "[m]aybe righteous delay." Id. 62:1-5.

The court also expressed concern about the government's reasoning in declining to take a position on the motion to recuse. It told the prosecutor that "it causes me to doubt whether your office has the intention to properly prosecute this case." Id. 8:21-22; see also id. at 56.

At the April 9, 2024 hearing, the court postponed the April 22, 2024 date to begin trial to April 29, 2024 to provide Mr. Horstmann more time to prepare, and set deadlines for pretrial events. See id. at 53, 59-60.

On April 10, 2024, the court issued an Order denying the motion to recuse. Dkt. No. 45. Because it was relevant to a possible petition for a writ of mandamus, the court quoted its previous statement that "the motion to recuse appears to me to be frivolous. It appears to me to be an effort to . . . further delay the trial." Id. at 2. The court also noted that at the April 9, 2024 hearing Mr. Horstmann stated that "'maybe' it was filed 'to obtain righteous delay.'" Id. at 3.

On April 10, 2024, this court also issued a Pretrial Order memorializing the deadlines established at the April 9, 2024 hearing. Dkt. No. 44. Among other things, the parties were ordered to file, by April 16, 2024, proposed voir dire questions, jury

4

instructions, and motions in limine with supporting memoranda. Id. ¶3. The government was also ordered to file a trial brief. Id.

The parties did not make the required filings on April 16, 2024. Instead they filed the Emergency Motion for a Rule 11 hearing and the binding Federal Rule of Criminal Procedure 11(a)(1)(C) plea agreement which, if accepted, would require the court to impose a sentence of 0 to 3 months incarceration and 12 months of supervised release. See Dkt. Nos. 46, 46-1.

II. DISCUSSION

With regard to Rule 11(c)(1)(C) binding plea agreements, the Supreme Court has instructed that:

> In deciding whether to accept an agreement that includes a specific sentence, the district court must consider the Sentencing Guidelines. The court may not accept the agreement unless the court is satisfied that "(1) the agreed sentence is within the applicable guideline range; or (2)(A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity." United States Sentencing Commission, Guidelines Manual §6B1.2(c) (Nov. 2016) (USSG).

Hughes v. United States, 138 S.Ct. 1765, 1773 (2018).

With regard to the applicable Guidelines range, in their plea agreement the parties may have calculated Medoff's Total Offense Level correctly as 8. See Dkt. No. 46-1 ¶4. However, it appears that his Criminal History Category is at least II because he was in custody for a sentence--14 months--that exceeded one year and one month within 15 years of the alleged criminal conduct in this case. This sentence is assigned three Criminal History points. See

5

U.S.S.G. §4A1.1(a) & A.N. 1, §4A1.2(k). Therefore, Medoff is at least in Criminal History Category II.[2] The Guidelines range for an individual with a Total Offense Level of 8 and a Criminal History Category of II is 4-10 months imprisonment. Accordingly, the binding plea agreement would, if accepted, require a downward departure.

As explained earlier, the court repeatedly informed the parties that it was ordering a jury trial because a six-month sentence might not be sufficient if Medoff is convicted. They should have foreseen that the court would not now accept a guilty plea and as is common practice, pursuant to Fed. R. Crim. P. 11(c)(3)(A), defer until sentencing deciding whether to accept the binding plea agreement because the court would likely then reject the binding plea agreement. If the court did reject the plea agreement at sentencing, Medoff would, pursuant to Rule 11(c)(5)(B), be entitled to withdraw his plea, thus obtaining the lengthy postponement of his trial that he has repeatedly sought unsuccessfully.

---

[2] Medoff's February 28, 2024 Pretrial Services Report includes a 1992 conviction which is too old to contribute to his Criminal History Score and other criminal cases, the disposition of which are "unknown."

000063

Medoff and the government should, in any event, have made the required filings on April 16, 2024, or at least before that date requested leave of court to be excused from doing so.

In view of the foregoing, the parties' Emergency Motion for a Rule 11 Hearing "at the earliest opportunity" is being denied and, pursuant to Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is being rejected.[3]

If Medoff is convicted or decides to plead guilty without a Rule 11(c)(1)(C) binding plea agreement, the court will order the preparation of a Presentence Report, receive sentencing memoranda, conduct a sentencing hearing, and decide what sentence is sufficient and no more than necessary, as required by 18 U.S.C. §3553(a). That sentence could be in the 0-to-3-month range or less than 6 months. It could be higher. However, the court is not now willing to commit to giving a sentence of less than 6 months if Medoff is found guilty or to postpone the trial again.

As the parties, without seeking leave of court, failed to make the required filings on April 16, 2024, the court is giving them until April 18, 2024 to do so.

---

[3] If the parties, by April 22, 2024, file a renewed motion for a Rule 11 hearing based on their binding plea agreement, with a memorandum providing persuasive authority for any contention that the agreement can only be rejected at a Rule 11 hearing, the court will conduct such a hearing in connection with the previously scheduled April 26, 2024 pretrial hearing.

7

III. ORDER

Accordingly, it is hereby ORDERED that:

1. The Emergency Motion for a Rule 11 Hearing at the earliest opportunity (Dkt. No. 46) is DENIED.

2. The parties' Federal Rule of Criminal Procedure 11(c)(1)(C) binding plea agreement which would, if accepted, require a 0-to-3-month sentence of incarceration (Dkt. No. 46-1) is REJECTED.

3. The parties shall, by April 18, 2024, make the filings required by paragraph 3 of the April 10, 2024 Pretrial Order. No further extension will be granted. All other deadlines in that Pretrial Order remain in effect.

4. If Medoff wishes to enter a guilty plea which is not pursuant to a Rule 11(c)(1)(C) agreement, he shall, by April 22, 2024, inform the court in order to spare counsel the time and expense of preparing further for trial and spare potential jurors from being ordered to appear for trial on April 29, 2024 unnecessarily.

UNITED STATES DISTRICT JUDGE

8

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) |
| | ) **Criminal No:  24-cr-10048-MLW** |
| **CRAIG MEDOFF,** | ) |
| **Defendant.** | ) |
| | ) |

### MOTION TO RECUSE DISTRICT JUDGE AND
### INCORPORATED MEMORANDUM OF LAW

NOW COMES the defendant, Craig Medoff, through counsel, and hereby moves this Honorable Court to recuse himself from the instant case pursuant to 28 U.S.C., § 455(a), based upon the apparent bias exhibited in prior proceedings against the defendant and based upon the breathtaking speed with which the Court seeks to proceed with a criminal contempt trial.[1]  In support thereof, counsel states the following:

---

[1] Counsel does not file the instant motion lightly, frivolously or disingenuously.  Counsel has had a front row seat in this session for the last 30 years and has the utmost respect for the distinguished District Judge.  Counsel was appointed to the bar of this Court in 1991 and the District Judge appointed counsel to the CJA list in 1997.  It has been an honor to serve the Court in this capacity since 1997, including in the instant case.  During this time counsel has had approximately ten dozen cases, both criminal and civil, (including one criminal trial), before the District Judge in addition to the 150-200 cases counsel has litigated in this District.  In 1999, the District Judge granted counsel's motion to dismiss an indictment for speedy trial violations *with prejudice* for which counsel continues to receive inquiries from far and wide to this day.  *United States v. Restrepo,* 59 F.Supp.2d 133 (1999).  Both the District Judge and counsel were also mentioned in complementary fashion in the best-selling book *Trapped Under the Sea*, by Neil Swidey which heralds the heroic exploits of Donald Gillis who was represented by counsel and sentenced by the District Judge.  *United States v. Donald Gillis,* 08-10180-MLW.

1

## FACTS

1. Facts found by the District Judge to date are incorporated in its

   Memorandum and Order dated February 12, 2024.  [ECF#786].

2. In 2012, the SEC commenced a civil action against Biochemics, Inc. and

   three individuals including Mr. Medoff alleging a fraudulent scheme to sell

   Biochemics' securities.  *Securities and Exchange Commission v. Medoff*, 12-

   12324-MLW; [ECF#786].

3. On May 25, 2016, the District Judge entered a Final Judgment affirming the

   settlement agreement between the Parties that prohibited Mr. Medoff for a

   period of 10 years "from participating in the issuance, offer, or sale of any

   security."  [ECF#786, #204].

4. On September 27, 2023, the SEC moved for and order to show cause as to

   why Mr. Medoff should not be held in **civil contempt** for violating the Final

   Judgment.  [ECF#786, #737].

5. *Sua sponte* the District Judge raised the issue of **criminal contempt** for the

   first time in his October 13, 2023 Order without any request or intimation

   from the SEC:

> [T]he evidence provided by the SEC raises the question of
> whether it would be appropriate for the court to initiate

2

**criminal contempt proceedings** instead.  In view of Medoff's proven history of violating court orders, conducting proceedings that could result in another order that could be violated might be futile.  Therefore, that civil remedy may be inappropriate and **criminal contempt proceedings** may be justified.  See *Shillitani v. United States*, 384 U.S. 364, 370 n.9 (1966).

[ECF#786], (Emphasis added).

## **Speed of the Court's Criminal Contempt Proceedings**

6.   Next, the undersigned counsel was appointed to represent Mr. Medoff on February 21, 2024.

7.   The Court had previously set deadlines and a trial date of April 1, 2024, which was not reported on the docket until after the appointment of counsel.

8.   Under the Speedy Trial Act, ("STA"), the minimum amount of time a defendant may be brought to trial is 30 days from the defendant's first appearance "through counsel".  18 U.S.C. § 3161(c)(2).

9.   The defendant's first appearance before a Magistrate Judge of this Court was on February 28, 2024.  [ECF#10].

10. As a result, the initial trial date set by the District Judge barely complied with the STA 30-day prohibition for setting the earliest possible trial date.[2]

---

[2] The Court has since reset the trial date to April 22, 2024, after initially resetting it to September 1, 2024.

000068

11. More importantly, affording counsel such a short period of time to exchange discovery and prepare for a jury trial is inconsistent with the practice in this District of allowing the government 28 days to provide initial discovery and 42 days for the Parties to send letters requesting discovery.  See Local Rule 116.1(C) and 116.3.

12. The median national averages for the U.S. District Courts for the period of time from filing to disposition from 12/31/13 to 12/31/18 was between 6.9 months and 7.6 months.  (See Exhibit 1, attached hereto); https://judicialstudies.duke.edu/wp-content/uploads/2019/04/Federal-Caseload-Statistics.pdf

**Comments by the Court**

13. In addition to the Court's desire to proceed unusually fast with a criminal contempt trial, the Court has made many comments on the record that establish a bias and/or lack of impartiality against the defendant.

14. As evidenced by its October 13, 2023 Order, the Court seemed fixated on the idea that Mr. Medoff had repeatedly done something wrong and only a prison sentence would prevent future alleged misconduct.

15. Indeed, it is important to note at the outset that the SEC had **not** moved for

4

criminal contempt sanctions or even mentioned criminal contempt as the relief sought in this case.

16. The only individual in these proceedings that was fixated on the idea of criminal contempt was the District Judge.

17. At a hearing on October 23, 2023, the District Judge continued to push the idea that it was already considering criminal sanctions before awaiting any negotiated resolution of the civil matter.

18. After inviting a representative of the U.S. Attorney's Office and a CJA Attorney to attend the hearing, the District Judge stated the following to the CJA Attorney the Judge had required to attend:

> This is not a **criminal** matter at this point. If you just go back and do what I told you, I think you'll have a better understanding of why I was -- I wanted somebody here and I had no duty to have anybody here for him.  If it's a civil matter, he has no right to the appointment of counsel. If it's a **criminal** matter, he didn't obey my order to file a CJA affidavit, so you don't even have to stay if you don't want to.[3] (Tr. 10/23/23, pp. 3-4).

19. Later, at the same hearing, the Judge stated:

> In my October 13, 2023, order, I questioned whether,
> in view of the defendant's history of not obeying orders to
> stay out of the securities business and his guilty plea to

---

[3] Counsel has highlighted in bold the number of times the Court uses the words "criminal" and "criminal contempt' in its commentary at hearings.

5

> committing securities fraud, whether issuing another order that
> could be violated would be futile. And I informed the parties
> that I was considering instituting **criminal contempt**
> proceedings.  (Tr. 10/23/23, p.5).

20. Still later the Court stated:

> No counsel for Mr. Medoff filed an appearance, nor did he file
> the financial affidavit as ordered required for the appointment
> of CJA counsel if this matter becomes a **criminal** matter.  (Tr.
> 10/23/23, p.6).

21. Still later in the same proceeding the Court drifted back to criminal

   contempt:

> But when I was preparing for this hearing earlier today, this had
> not been filed. So basically, there have been violations of my
> October 13 and 20th orders that could also be addressed as civil
> or criminal contempt, but that's not the focus for today.
>
> [and]
>
> Among other things, he [Medoff] agreed not to participate in
> the securities business for ten years, and I ordered that. If I
> institute civil or **criminal contempt proceedings**, the
> defendant will be given even more specific notice and a
> reasonable time to prepare. If it's a criminal case and there's a
> satisfactory, accurate, and complete financial affidavit
> submitted under oath indicating -- showing that he cannot
> afford to retain a lawyer, then a lawyer will be appointed to
> represent him.  (Tr. 10/23/23, p.8).

22. Later the Court focused on how serious it thought the alleged violations

   were before even allowing the Parties to litigate any issues:

6

you provided me declarations and a memorandum that provide
substantial reason to be concerned that Mr. Medoff's in the
securities business now. I'm being somewhat colloquial but
violating the order in several ways.  And you filed that on
September 27.

…

Because that's -- I mean, that's a serious concern.

…

But ordinarily I would start with civil contempt proceedings
before going to **criminal contempt proceedings**. But, as the
Supreme Court said in the case I cited in my October 13 order -
-*Shillitani*, 384 US 364, 370, n.9 -- if a judge has good reason
to be concerned that it would be fruitless, futile to start
with civil contempt proceedings, you can start with **criminal
proceedings**.[4]  (Tr. 10/23/23, p.14).

23. The Court also prejudged the case based upon prior conduct and considered

Mr. Medoff to constitute a "danger" without allowing the case to proceed to

discovery or hearing from the SEC as to whether they were interested in a

civil settlement with Mr. Medoff:

But whatever it is, he ended up as a result of that guilty plea
doing time in federal prison. And it wasn't sufficient, according
to what you've submitted, or the deter him from doing it again.
I'm open minded about this as to whether it was actually done,
but I think there's ample evidence to institute contempt
proceedings, civil or **criminal**.  But I don't issue orders that I
don't expect are going to be obeyed and my concern is -- and
you can tell me more about the order you're requesting -- that if

---

[4] It is important to note that the District Judge may have a divergent view of *Shillitani* at footnote 9 which states:
"This doctrine further requires that the trial judge first consider the feasibility of coercing testimony through the
imposition of civil contempt. The judge should resort to criminal sanctions only after he determines, for good
reason, that the civil remedy would be inappropriate."  It is not clear where the additional language utilized by the Court
derives from, but it is clear that *Shillitani* is a coercion case.

I just order him not to --not engage in the securities business, I don't know why I would have any confidence he's going to obey the order the third time when he, according to you, didn't obey the 2016 order at all. **And if he's in the securities business, he's continuing to present a danger.** One reason, if he's convicted -- which would require proof beyond a reasonable doubt that he violated the order willfully -- would be to protect the community from the danger, continuing danger, to send Mr. Medoff a message don't keep doing this -- if he's doing it, don't keep doing this and to try to send that message to others. You signed a consent decree. If you've got a court order, don't violate the order.  (Tr. 10/23/23, p.15)(Emphasis added).

24.  The Court continually repeated the same premature concerns throughout the hearing:

Is there a reason that I shouldn't be seriously concerned that just getting another order to not participate in the securities business will be obeyed?  (Tr. 10/23/23, pp.15-16).

25. The Court was also singularly focused on "locking up" Mr. Medoff long before any the evidence was established and before the SEC had a chance to present Mr. Medoff or the Court with a resolution:

Well, I've jailed people for civil contempt. But typically, you have to exhaust the less onerous means to coerce, although I don't know what other means there would be. But there could be.  (Tr. 10/23/23, p.17).

26. The Court was also fixated on the fact that Biometrics had not paid its financial obligation of $16,000,000 which had nothing to do with Mr.

8

Medoff:

> And it's a case in which I found the SEC -- I remember this
> vividly, I don't think you were here, but some of the lawyers
> sitting in the back were -- my eyes are good enough
> to recognize them -- this doesn't relate to Mr. Medoff, it
> related to Biochemics. I think I was asked to sign an order
> directing them to pay a judgment of $16 million and I said, "Do
> they have $16 million?" And the answer was no. So I said what
> I just said today, "I don't issue orders I don't intend to
> enforce," and then you worked out an agreement where they
> would pay a million dollars and more over time, and that
> generated a shell game that required years of litigation,
> including proceedings I conducted with a bankruptcy judge.
> …
>
> They got the million dollars by probably engaging in fraudulent
> conveyance of property and then they borrowed money in a
> separate entity, supposedly separate entity, and didn't pay the
> rest of the money and then the people who lent the money for
> an IPO that the SEC wouldn't let go forward. Lost their money
> and sued. I mean, it was very complicated. And I thought
> concluded. But, you know, Mr. Medoff wasn't part of any of
> that.  (Tr. 10/23/23, p.18).

26. In response to the Court's clear invitation to request criminal contempt **the**

   **SEC stated:**

> **I am hopeful that a civil contempt motion here, with
> targeted relief, could accomplish in the short term what
> we're hopeful to accomplish. If I'm wrong, then the
> recourse to criminal contempt remains**.  (Tr. 10/23/23,
> p.19)(Emphasis added).

27. To which the Court responded dismissively that:

000074

> It sounds like -- again, it sounds like, to me, all of this work
> would prove to be a hollow exercise because –.  (Tr. 10/23/23,
> p.20).

28. The Court also issued protective orders without allowing Mr. Medoff the

opportunity to respond and ordered expedited discovery which was not

requested by any Party and is very similar to the Court's expedited practice

in the instant case:

> And then you want an order providing for expedited discovery
> in preventing the destruction alteration of any documents. That
> order -- I'm going to issue that today while this is pending. I'm
> going to order that Mr. Medoff and anybody acting in concert
> with him not destroy, alter, conceal any documents, texts, e-
> mails or other records or information relevant to the SEC's
> motion for contempt. In fact, I'm giving you that order orally
> right now. You'll get it in writing, Mr. Medoff. But you don't
> want to violate that order.  Then you want an order requiring to
> disgorge all money obtained in violation of provisions of the
> final judgment.  Again, as I said, maybe he's hiding assets, but I
> think when he says he doesn't have enough money to hire a
> lawyer, if he had assets -  (Tr. 10/23/23, p. 20).

29. The Court then hearkened back to its fixation on criminal contempt even

though the SEC had just clearly stated that that it was not seeking criminal

contempt:

> You see, if -- I wanted to have this hearing to decide whether --
> I am going to institute contempt proceedings. That's just the
> beginning. If they're **criminal** proceedings, it will have to be

proven beyond a reasonable doubt that you willfully violated
my order. If it's a civil proceeding, they'll have to be clear and
convincing evidence that you violated it. And depending on
how long a potential --if it's a **criminal** case, depending on the
potential sentence, you may have a right to a jury trial.
If you face the potential of being sentenced to more
than six months in prison, you would have a jury trial and you
would have a right to a lawyer, if it's a **criminal** case, but
not if it's a civil case. But if it's a **criminal** case -- just
so you understand this, and these are legal requirements and
they're matters of fairness -- I would, as required by federal
rule of criminal procedure 42, tell you the time and place of
the trial and tell you whether it's likely to be a jury trial
or not and I would allow you a reasonable time to prepare.  (Tr.
10/23/23, p.22).

30. The Court then repeated its conclusion that it was eligible to preside over a

criminal contempt proceeding:

I would be eligible to be the judge because this is an
issue of whether you disobeyed an order I issued. You haven't
criticized me or been disrespectful, so I would be eligible to
preside in the case myself.  (Tr. 10/23/23, p.23).

31. Shockingly, the Court then threatened Mr. Medoff that he could be detained

pending trial for criminal contempt and repeated its concern that Mr. Medoff

was some sort of danger to the community.

I'll tell you another thing, too, and that is, if it's
a **criminal** case then either I or a magistrate judge would
decide whether you should be released or detained prior to
trial. It's like any other **criminal** case. There would be a
question of whether you're dangerous and whether there's some

11

combination of conditions that would protect the community
from any danger you might present. And danger is not just
physical danger.  (Tr. 10/23/23, p.23).

32. The Court again restated its inclination to proceed with criminal contempt,

but appeared to offer Mr. Medoff some hope for a better outcome, if he

complied:

> The discussion today has been helpful.
> I'll tell you that based on what I know now, if I was going to
> decide this matter today, I would initiate **criminal contempt**
> proceedings. However, it seems to me that what the SEC has
> asked for is modest in the circumstances. But Mr. Medoff,
> would you like a couple days -- and it will be a couple days --
> to try to determine whether you can reach some agreement with
> the SEC to resolve its motion for civil contempt?
> …
>
> I'm not ordering you to talk to them, unless you want to. It
> would be probably simplest for me to just initiate the **criminal
> contempt** proceedings. But what I'm thinking of is having you
> report tomorrow after you talk to George Krupp, the trustee, as
> to whether he's going to give you the money to hire a lawyer. If
> the answer is no and you don't want to talk with the SEC to try
> to resolve this, I'll issue an order initiating **criminal contempt**
> proceedings. But if you tell me by Thursday at noon that you've
> reached an agreement to resolve this and ask me to enter
> another order, I'll do that and defer deciding whether to institute
> criminal contempt proceedings.  I'm trying to be fair to you. I'm
> not trying to threaten you into doing anything you don't want to
> do. You don't have to talk to them, and I can launch this formal
> process and if you give me an accurate and complete financial
> affidavit and it shows that you don't have access to funds to
> hire a lawyer, then I'll appoint a lawyer for you. (Tr. 10/23/23,

12

p.25).

…

I'm like a jury, I continue to keep an open mind until I hear all
the evidence, but the SEC's done a lot of work and they have
more than enough to initiate some form of contempt
proceedings and, you know, if -- Mr. Medoff, if you violated
the order and are still violating the order, one way or another,
it's got to stop.  (Tr. 10/23/23, p.26).

If you have a trial and if it's a jury trial, if you're facing the
prospect of a sentence of more than six months -- and there's
actually no maximum possible penalty, but you haven't killed
anybody.  (Tr. 10/23/23, p.27).

33. Lastly the Court seemed to acknowledge and dismiss mitigating evidence in

one breath:

And look, you explained to me that you had a drug problem.
You say you don't have one now and you seem to
be taking this seriously, which you should, because you know
what it's like to be in federal prison. So just take it
seriously this week, see what they've asked for in their
motion, decide what you want to agree on or not agree on, and
let me know tomorrow about the lawyer, I'll tell you, 4:00
tomorrow, Tuesday, October 24. And Thursday, 12:00 noon
either you have an agreement in principle or you don't. And
then I'll decide how to proceed, **and I've told you what my
inclination is**.  (Tr. 10/23/23, p.28)(Emphasis added).

34. It was not until a February 5, 2024 Status Report that the SEC first indicated

that criminal contempt may be the "most appropriate" course of action.

[ECF#786].

13

35. However, at the next hearing on February 9, 2024, the SEC reported to the

Court that it was satisfied with Mr. Medoff's compliance with discovery and

that Mr. Medoff had been deposed.  (Tr. 2/9/24, p.14).

36. The SEC's conversation with the Court was as follows:

> MR. MAWN: The relief, as requested from Mr. Medoff,
> was to cease the violative conduct. It was put in affidavit to the
> Court and to the SEC that he's halted the conduct.  Mr. Levy
> also put forth an affidavit to the Court and the SEC about Mr.
> Medoff's current business activities and his future business
> activities.
>
> THE COURT: Could you speak up a little, please?
>
> MR. MAWN: Mr. Levy put an affidavit to the Court and
> to the SEC that he has also spoken to the status of
> Mr. Medoff's business activities, so Mr. Medoff has halted the
> conduct. Mr. Medoff provided notice to the clients and the
> investors of Nova Capital that he used an alias and that there
> was a 2016 judgment against him, and he provided notice of
> that to them. He also provided, as part of discovery, rescission
> agreements for certain income and engagement for current
> clients. And then he provided the accounting as required.  (Tr.
> 2/9/24, p.19).

37. To which the Court dismissively responded:

> THE COURT: **So basically, he's been cooperative since
> he got counsel and came to court?**  (Tr. 2/9/24, p.9).

(Emphasis added).

14

# ARGUMENT

## A. THE RECORD IS REPLETE WITH EVIDENCE OF THE DISTRICT JUDGE'S BIAS AGAINST MR. MEDOFF.

The Court, *sua sponte,* has previously found itself sufficiently unbiased to

preside over this case:

> If a motion [to recuse] is filed, the memorandum shall address why
> this court is disqualified in view of the fact that the alleged criminal
> contempt does not involve disrespect or criticism of this judge. See
> Fed. R. Crim. P. §42 (a) (3); Feb. 12, 2024 Mem. & Order at 7,s
> *Securities and Exchange Commission v. Biochemics, Inc., et. al..* Civ.
> No. 12-12324 (Dkt. No. 786); Feb. 9, 2024 Tr. at 24, *Securities and
> Exchange Commission v. Biochemics, Inc. et. al.,* 12-cv-12324. If the
> motion to disqualify is based in whole or in part on 28 U.S.C. §455(a),
> which requires recusal if the judges' impartiality might reasonably be
> questioned, the memorandum shall also address the applicable
> standards. See *Litekey v. United States*, 510 U.S. 542, 555 (1994)
> ("[Judicial rulings alone almost never constitute a valid basis for a
> bias and partiality motion"); *Arkansas Teachers Retirement System v.
> State Street Bank and Trust Co*., 404 F.Supp.3d 486, 493- 98 (D.
> Mass. 2018) (Wolf, J.); *United States v. Sampson*, 148 F. Supp. 3d 75,
> 85-88 (D. Mass. 2015) (Wolf, J).

[ECF#22].  The defendant agrees that this contempt proceeding does not involve

disrespect or criticism of the District Judge pursuant to Fed.R.Crim.P., Rule

42(a)(3).

However, the defendant respectfully submits that the foregoing described

conduct and commentary clearly demonstrate that the distinguished District Judge

should disqualify himself under 28 U.S.C., § 455(a) where his impartiality is at best questionable.

Pursuant to 28 U.S.C. § 455(a), a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Liteky v. United States,* 510 U.S. 540,114 S.Ct. 1147, 1150, 127 L.Ed.2d 474 (1994); *United States v. Bertoli,* 40 F.3d 1384, 1412 (3d Cir.1994).  As the Court made clear, generally beliefs or opinions which merit recusal must involve an extrajudicial factor.  *Liteky,* 114 S.Ct. at 1157.  For example, if a judge has acquired a dislike of a litigant because of events occurring outside of the courtroom, a duty to recuse might ensue.  However, although such situations are not common, "opinions formed during a judicial proceeding may in certain instances give rise to a duty to recuse."  *Bertoli,* 40 F.3d at 1412.

Here, the Court seemed fixated on extrajudicial factors including a corporate defendant's, (Biochemics), alleged failure to pay an amount of money that had nothing to do with Mr. Medoff.  (Tr. 10/23/23, p.18).  The District Judge also focused on such extrajudicial factors as Mr. Medoff's prior criminal history including a 30 year old alleged failure to pay a $95,000 fine.  [ECF#786].  As the *Liteky* Court pointed out, if during "a lengthy trial ... the presiding judge for the

16

first time learns" of obscure factors that formulated its beliefs, the fact that the beliefs arose through a judicial proceeding does not negate the duty to recuse. *Id.* at 114 S.Ct. at 1154; *see also Bertoli,* 40 F.3d at 1412.

Although "[b]iases stemming from facts gleaned during judicial proceedings themselves must be particularly strong in order to merit recusal." *United States v. Antar*, 53 F.3d 568, 574 (3d Cir. 1995), <u>overruled on other grounds by</u> *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001), "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion **unless** they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Here, the record is clear that the District Judge was heavily invested in pursuing criminal contempt from his very first order and permeated every hearing and order issued afterwards. The fact that the Parties achieved a settlement of all claims in which the SEC attorney vouched for Mr. Medoff's compliance and the District Judge still initiated criminal contempt proceedings speaks volumes to the lack of impartiality.

In *United States v. Antar*, the defendant was the subject of both a civil SEC

action and a criminal contempt action for failing to comply with the court's order in the civil case regarding the return of money.  *Id.* at 574.  When imposing sentence in the criminal case, the judge stated that his object, "from day one . . . was to get back to the public that which was taken from it."  *Id.* at 573, 576.  The court held that this statement by the district judge unambiguously demonstrated that the judge had prejudged the case and lacked the impartiality required.  *Id.* Had the judge announced at the opening of the trial that this was his object, clearly he would be recused. The fact that he made this disclosure at the end of the trial makes no difference.  *Id.* at 576.

Similarly, the court in *Antar* focused on public perception of the remarks made by the judge and that any reasonable person hearing the remarks would conclude that the trial judge was bias.  *Id.*  The court opined:

> A reasonable observer in such a scenario would have serious reason to question whether prior rulings in the case were based on impartial considerations or on the judge's stated goal.

*Id.*  The same is true here.

000083

## B. COLLATERAL ESTOPPEL, JUDICIAL ESTOPPEL, PROMISSORY ESTOPPEL AND GENERAL PRINCIPLES OF ESTOPPEL MAY PRECLUDE THE COURT FROM ACTING OUTSIDE OF THE PARTY'S SETTLEMENT AGREEMENT AND INSTITUTING A CRIMINAL CONTEMPT PROCEEDING.[5]

As discussed, the SEC did not request nor institute criminal contempt proceedings against Mr. Medoff.  When the Parties appeared on February 9, 2024 and announced their settlement terms, the civil case was effectively settled without the need for further action by the Court against Mr. Medoff.  (Tr. 2/9/24, p.18). Moreover, the District Judge had previously advised Mr. Medoff that he should seek to comply with the SEC's requests **or** face criminal contempt.  Mr. Medoff certainly acted on these words from the Court.  (Tr. 10/23/23, p.24-25).

The Supreme Court has held that "matters which were actually litigated and determined in the first proceeding cannot later be relitigated.  Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel." *Commissioner v. Sunnen*, 333 U.S. 591, 598, 68 S. Ct. 715, 719, 92 L. Ed. 898 (1947).  It is unclear to the undersigned counsel whether the Court may exceed the scope of a settlement and what authority the Court has to go beyond a reported settlement and impose terms of its own and/or initiate a criminal contempt action.

---

[5] The defendant has contemporaneously a Motion to Continue the current trial date of April 22, 2024, in part to address these issues.

19

If indeed the Court is exceeding its own authority, this could constitute further

evidence of bias.  Further research is necessary to develop any issue of merit

regarding estoppel.

WHEREFORE, the District Judge is respectfully urged to recuse himself from the

instant case.

Respectfully submitted,

Peter Charles Horstmann, Esq.
BBO #556377
450 Lexington Street, Suite 450
Newton, Massachusetts 02466
(617) 519-9011
pete@horstmannlaw.com

**CERTIFICATE OF SERVICE**

I, Peter Charles Horstmann, Esquire, hereby certify that on March 20, 2024,
I have served an electronic copy of the instant motion upon all counsel of record
through the ECF filing system including AUSA Leslie Wright, Office of the
United States Attorney, J.W. McCormack Building & Courthouse, 1 Courthouse
Way, Boston, MA 02110.

Peter Charles Horstmann, Esq.

EXHIBIT 1

## United States District Courts — National Judicial Caseload Profile

| | | | 12-Month Periods Ending | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Dec 31 2013 | Dec 31 2014 | Dec 31 2015 | Dec 31 2016 | Dec 31 2017 | Dec 31 2018 |
| **Overall Caseload Statistics** | Filings [1] | | 398,640 | 386,267 | 379,038 | 387,716 | 374,293 | 389,226 |
| | Terminations | | 365,675 | 360,118 | 367,475 | 373,635 | 391,492 | 391,838 |
| | Pending | | 402,030 | 426,130 | 430,772 | 443,855 | 425,126 | 463,672 |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -2.4 | 0.8 | 4.3 | 0.4 | 4.0 | |
| | Number of Judgeships | | 677 | 677 | 677 | 677 | 677 | 677 |
| | Vacant Judgeship Months [2] | | 669.5 | 651.6 | 588.2 | 877.2 | 1,345.4 | 1,512.3 |
| **Actions per Judgeship** | Filings | Total | 589 | 571 | 561 | 573 | 553 | 575 |
| | | Civil | 433 | 429 | 410 | 432 | 406 | 412 |
| | | Criminal Felony | 119 | 105 | 105 | 102 | 107 | 122 |
| | | Supervised Release Hearings | 38 | 37 | 36 | 39 | 40 | 41 |
| | Pending Cases [3] | | 594 | 629 | 636 | 656 | 628 | 685 |
| | Weighted Filings [2] | | 518 | 494 | 483 | 487 | 489 | 513 |
| | Terminations | | 540 | 532 | 543 | 552 | 578 | 579 |
| | Trials Completed | | 19 | 18 | 17 | 17 | 16 | 16 |
| **Median Times (Months)** | From Filing to Disposition | Criminal Felony [2] | 7.3 | 7.5 | 7.5 | 7.6 | 7.6 | 6.9 |
| | | Civil [2] | 8.5 | 8.5 | 8.7 | 9.7 | 10.4 | 10.1 |
| | From Filing to Trial [2] (Civil Only) | | 26.5 | 26.3 | 27.2 | 26.4 | 27.0 | 27.5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 27,369 / 8.8 | 29,096 / 8.5 | 38,933 / 11.2 | 56,548 / 15.7 | 52,557 / 15.5 | 67,650 / 18.3 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.2 |
| | Jurors | Avg. Present for Jury Selection | 51.3 | 49.5 | 47.3 | 50.4 | 50.1 | 52.9 |
| | | Percent Not Selected or Challenged | 37.7 | 36.8 | 36.6 | 38.1 | 37.3 | 38.1 |

| 2018 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | |
|---|---|---|---|
| Total Civil | 278,721 | Total Criminal[1] | 82,675 |
| A-Social Security | 18,283 | A-Marijuana | 2,016 |
| B-Personal Injury/Product Liability | 39,896 | B-All Other Drugs | 21,107 |
| C-Prisoner Petitions | 53,961 | C-Immigration | 29,318 |
| D-Forfeitures and Penalties | 1,219 | D-Firearms and Explosives | 12,071 |
| E-Real Property | 7,191 | E-Fraud | 7,336 |
| F-Labor Suits | 17,509 | F-Violent Offenses | 2,684 |
| G-Contracts | 26,323 | G-Sex Offenses | 3,201 |
| H-Torts (other than Personal Injury/Product Liability) | 23,296 | H-Forgery and Counterfeiting | 347 |
| I-Copyright, Patent, and Trademark | 13,124 | I-Larceny and Theft | 1,184 |
| J-Civil Rights | 43,117 | J-Justice System Offenses | 793 |
| K-Antitrust | 544 | K-Regulatory Offenses | 830 |
| L-All Other Civil | 34,258 | L-All Other Criminal | 1,788 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, whereas filings "by nature of offense" do not.

[2] See "Explanation of Selected Terms."

```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2


 3
                                    )
 4    UNITED STATES OF AMERICA,      )
                                     )
 5           Plaintiff,              )
                                     )   Criminal Action
 6    v.                             )   No. 1:24-cr-10048-MLW
                                     )   Pages 1 to 64
 7    Craig Medoff,                  )
                                     )
 8           Defendant.              )
                                     )
 9


10


11            BEFORE THE HONORABLE MARK L. WOLF
                    UNITED STATES DISTRICT JUDGE
12


13                       MOTION HEARING


14


15                        April 9, 2024
                            2:30 p.m.
16


17          John J. Moakley United States Courthouse
                      Courtroom No. 2
18                    One Courthouse Way
                 Boston, Massachusetts 02210
19


20


21


22          Jessica M. Leonard, CSR, FCRR
                   Official Court Reporter
23          John J. Moakley United States Courthouse
                      One Courthouse Way
24               Boston, Massachusetts 02210
                 JessicaMichaelLeonard@gmail.com
25
```

```
 1    APPEARANCES:

 2    On Behalf of the Government:

 3         UNITED STATES ATTORNEY'S OFFICE
           By: Leslie Wright
 4         J. Joseph Moakley U.S. Courthouse
           1 Courthouse Way
 5         Suite 9200
           Boston, MA 02210
 6         617-748-3367
           Leslie.wright@usdoj.gov
 7
      On Behalf of the Defendant:
 8
           LAW OFFICES OF PETER CHARLES HORSTMANN
 9         By: Peter C. Horstmann
           450 Lexington St.
10         Suite 101
           Newton, MA 02466
11         617-519-9011
           Pete@horstmannlaw.com
12

13

14

15

16

17

18

19

20

21

22

23

24
                    Proceedings reported and produced
25                    by computer-aided stenography.
```

                    P R O C E E D I N G S

 2          THE CLERK:  Your Honor, this is criminal matter

 3    1:24-cr-10048, *United States v. Craig Medoff.*

 4          THE COURT:  Good afternoon, Would counsel please

 5    identify themselves for the Court and for the Record?

 6          MS. WRIGHT:  Good afternoon, Your Honor.  Leslie

 7    Wright for the US Attorney's Office.

 8          MR. HORSTMANN:  Good afternoon, Your Honor.  Pete

 9    Horstmann on behalf of Craig Medoff, who is also present in

10    court.

11          MR. MAWN:  Good afternoon, Your Honor.  Russell Mawn

12    and David London from the Securities and Exchange Commission

13    appearing pursuant to Your Honor's order.

14          THE COURT:  Speak up please, Mr. Mawn.

15          MR. MAWN:  It's Russell Mawn and David London from the

16    Securities and Exchange Commission appearing pursuant to Your

17    Honor's order.

18          THE COURT:  Thank you.  And I wanted you here because

19    there's some matters, if and when we get to scheduling trial,

20    that will relate to discovery that might implicate you.  We now

21    have our technology straightened out.  I apologize for the

22    delay in starting.

23          We're here in connection with the defendant's motion

24    for my disqualification.  I'd like to confirm and, perhaps,

25    clarify one or two things.

1          Mr. Horstmann, on pages 1 and 16, you say that your

2     motion is made pursuant to Section 455(a) which presents the

3     question of whether a reasonable person might question the

4     judge's impartiality; is that correct?

5          MR. HORSTMANN:  That's correct, Your Honor.

6          THE COURT:  And you're not proceeding under Section

7     455(b), which would be a contention that the Court's actually

8     biased or prejudiced, correct?

9          MR. HORSTMANN:  Not at this time, Your Honor.

10          THE COURT:  Not at this time?

11          MR. HORSTMANN:  Not at this time, no.

12          THE COURT:  Not based on anything that's transpired to

13     date?

14          MR. HORSTMANN:  To date.  To date, correct.

15          THE COURT:  Okay.  Thank you.  And, Ms. Wright, the

16     response to the motion is two pages long.

17          Well, actually I have one more question for

18     Mr. Horstmann that's explicit in his filing.  Is it correct

19     that, as stated on page 15, that the contempt proceeding -- you

20     agree the contempt proceeding does not involve disrespect or

21     criticism of the judge, right?

22          MR. HORSTMANN:  Yeah, under Rule 42, no, it does not.

23          THE COURT:  Yes.

24          MR. HORSTMANN:  But I think that there are many things

25     that happened that you could feel are disrespectful and it may

1    have colored your view of Mr. Medoff.  So with that caveat, I

2    am not proceeding under Rule 42, but I think there's some

3    overlap.

4         THE COURT:  Okay.  And, Ms. Wright, your submission

5    seems not to take a position on whether recusal's required

6    under Section 455(a), and you write that:

7         Because the Court itself referred the matter to the

8    Government for prosecution, the government defers to the Court

9    as to whether, in the unique circumstances in which the Court

10   has sua sponte initiated criminal contempt proceedings, the

11   various defense contentions in this case might meet the high

12   threshold required for recusal under 455(a).

13        So you're not taking a position; is that right?

14        MS. WRIGHT:  Somewhat of a tricky question.  I

15   wouldn't say that we're not taking a position.  I would say

16   that the reasons set forth in the defendant's motion do not

17   meet the standard for actual bias or prejudice.

18        THE COURT:  Well, that's 455(b).  That's not a 455(a)

19   question.

20        MS. WRIGHT:  Understood.

21        THE COURT:  It's not a relevant observation.

22        MS. WRIGHT:  Understood.  So looking, then, to the

23   appearance thereof, my review of the case law is that it's a

24   highly subjective inquiry and I -- with fear of speaking on

25   behalf of the entire office, I don't know that the office felt

1    entirely comfortable taking a hard-line position given the fact

2    that these proceedings were initiated by Your Honor and that

3    our office was then referred to prosecute the case.

4         THE COURT:  Well, A, it is not highly subjective.  Did

5    you read, for example, what I wrote in *United States v. Sampson*

6    and ordered?  It's an objective standard.  It doesn't matter

7    whether I'm actually biased or prejudiced if a reasonable

8    person might question my impartiality.  But what are the unique

9    circumstances?

10        MS. WRIGHT:  First, may I address your first point,

11   Your Honor?  Understood that the standard itself is that of a

12   reasonable person, and I did review that case.  However, the

13   analysis of what a reasonable person might think has come out

14   different ways in different circumstances, and because the

15   standard --

16        THE COURT:  Well, my view is I take these things very

17   seriously, and they've been raised.  I wrote *Sampson* in a case

18   brought by your office that was hotly litigated.  The

19   Department of Justice, I think, didn't authorize an appeal, is

20   what I would infer.

21        But in any event, it's an objective standard and

22   there's nothing unique -- for example, have you read the *Young*

23   case pursuant to which you were appointed, which provides that

24   I couldn't appoint the SEC as an interested party?  That it's

25   necessary to appoint the Department of Justice and only appoint

1   private counsel, which wouldn't be the SEC, if the Department

2   of Justice wasn't willing to prosecute.

3           MS. WRIGHT:  I may have reviewed that case earlier

4   when Your Honor first referred this matter.

5           THE COURT:  So what's unique?  Can you point me to

6   cases?  There are many cases -- I'll cite a few of them, but

7   there are many cases in which the Court has initiated contempt

8   proceedings, the United States is not a party -- how and why

9   would the United States initiate contempt proceedings if it's

10  not a party, request them?  And the rule in the Supreme Court

11  jurisprudence requires the appointment to the US Attorney.  So

12  what's unique?

13          MS. WRIGHT:  Well, I would say two things.  First, I

14  agree with Your Honor that, of course, it can't simply be a

15  matter of the court sua sponte initiating criminal contempt

16  proceedings, otherwise the judge would never be able to preside

17  over such a case.

18          But I think here -- I would also say, though, that

19  criminal contempt comes up a lot of times in the courts where

20  the Government is a party; for instance, in a trial where a

21  witness refuses to testify despite a grant of immunity, and, in

22  that case, the Government as a party may suggest that criminal

23  contempt proceedings are appropriate.

24          I think what makes this case unique -- and it kind of

25  overlaps with other filings that had been made or that defense

1    anticipates making -- is just the way the entire thing

2    progressed with the decision between civil and criminal

3    contempt proceedings, the defendant's cooperation, frankly,

4    with civil contempt proceedings, and Your Honor initiating

5    criminal contempt proceedings regardless and then appointing

6    us --

7         THE COURT:  This is a two-page memo.  You cite one

8    case that I, essentially, brought to your attention, the *Bulger*

9    case.  It appears you've done no research, and I cited numerous

10   cases going back to my first order, I think, in October 12,

11   but, certainly, successively.

12        Civil and criminal contempt serve different purposes.

13   Civil contempt is intended to coerce somebody into compliance.

14   Criminal contempt, if it's proven, is intended to punish

15   disobedience, to encourage enforcement or observation of court

16   orders, and to deter the defendant and others from disobeying

17   court orders.  They're not mutually exclusive.  And I explained

18   this on February 12.

19        If you and your office -- you just told me you

20   consulted in your office -- think this is unique, you're

21   ill-informed and it causes me to doubt whether your office has

22   the intention to properly prosecute this case because -- and

23   we'll see where this comes out, but I may order you to

24   communicate that to Mr. Levy personally, the US Attorney.

25        MS. WRIGHT:  Fair enough, Your Honor.  I just -- I

1   would say that a substantial amount of research went into this

2   and, although our filing is short, it was discussed and thought

3   through.

4           THE COURT:  With whom did you discuss it?

5           MS. WRIGHT:  I don't think I'm obligated to --

6           THE COURT:  Well, you just raised it.

7           MS. WRIGHT:  Well, because you suggested that there

8   was no research that went into this and I just wanted to

9   correct the record on that point.

10          THE COURT:  Well, speaking to somebody is not

11  research.  You said it was discussed.  I'm curious about who

12  you discussed this with.

13          MS. WRIGHT:  A great deal of research went into the

14  filing, despite its length, and that's the only point I wanted

15  to make.

16          THE COURT:  Well, it doesn't reflect it.  You may be

17  seated.

18          I'll say it now, because I don't want to get

19  distracted on this when we focus on the main motion, but I

20  don't think the US Attorney's Office has ever taken the

21  position, for example, if somebody robs a bank -- or, indeed,

22  in a securities case -- and then, once they're caught, pays a

23  lot of it back or all of it back, that the crime hasn't been

24  committed and there shouldn't be a prosecution.

25          And there's an analogy here.  If there's an

1    intentional willful disobedience of a court order, the SEC can

2    move to -- for civil contempt, and the SEC lawyers told me in

3    our first hearing -- you were there -- that they didn't have

4    the authority to request criminal contempt.  I suggest you read

5    the cases that I've cited previously -- and your colleagues,

6    whoever you discussed it with -- like *Marquardo*, about the

7    different purposes of civil and criminal contempt and how

8    somebody can be subject to both, because they serve different

9    purposes.

10         And I don't think I'll forget this at the end, but I'm

11   ordering that you order the transcript of this proceeding on an

12   expedited basis.

13         All right, Mr. Horstmann, would you like to speak to

14   your motion?

15         MR. HORSTMANN:  I would, Your Honor, thank you.  Let

16   me start off with a little housekeeping.  I did note that there

17   was some --

18         THE COURT:  Here, pull that microphone a little closer

19   to you since you're tall and it's hard to speak into it.

20         MR. HORSTMANN:  I've requested a headset before and I

21   was denied.  Just for housekeeping purposes, Your Honor, on

22   page 14 of my memo, there are two page references that are

23   wrong.

24         THE COURT:  Hold on just one second.

25         MR. HORSTMANN:  One is --

1           THE COURT:  Just one second.  Page 14?

2           MR. HORSTMANN:  Page 14.  The second cite to the

3    February 9 transcript where I say "page 19," that's erroneous;

4    it's page 14.  And the next one, the same problem:  "Page 9"

5    should be 14.  I'm sorry about that; that was -- it was

6    inadvertent, Your Honor.

7           Getting to the substance of the motion, I took a long

8    time thinking before I filed this.  I had hoped to go my entire

9    career without moving to recuse a judge, let alone a federal

10   judge, but I, sort of, felt that I had the ethical obligation

11   to do that here because of the volume of comments that Your

12   Honor had made on the record regarding something that neither

13   of the parties were seeking or introducing.

14          It was something that you initiated on your own, you

15   may have been doing it as a courtesy to Mr. Medoff at the time,

16   you may have been doing it simply prophylactically, but you

17   invited Ms. Wright and you invited my friend Mark Shea to

18   attend the first hearing, which speaks to your state of mind.

19          THE COURT:  I agree.  It speaks -- and I want to hear

20   you.  You have that very nice footnote, respectful footnote, on

21   the first talking about our long history, and I admire zealous

22   advocacy, but generally speaking, I think, in a way, you just

23   nailed it.  And I want to hear you, and I, of course, read

24   everything you wrote, and I've read a lot more than that.

25          MR. HORSTMANN:  If that was just it, Your Honor, I

1    don't think I would have filed the motion.  But then, sort of,

2    the beat goes on, and you continue to reintroduce it, and I

3    just want to set the tone for this because I did take a long

4    time sort of figuring out how to posture this with you because

5    I value my relationship with the Court.

6          THE COURT:  Look, this should go without saying:  I

7    admire zealous advocacy.  I don't admire frivolous arguments

8    that might -- but we'll see if yours has merit.  So, you don't

9    have to worry about offending me.  Your duty is to represent

10   your client.  But go ahead.

11         MR. HORSTMANN:  I mean, it happens.  I've been on the

12   other side of these motions in a civil context.  I don't relish

13   it.  I decided I was going to talk to you today as if I was

14   talking to a family member who had symptoms of COVID but

15   refused to take the test, and that's kind of where I am with

16   this case.

17         I think you're exhibiting symptoms of bias throughout

18   the transcript and that, at some point, you crossed the line.

19   And whether it was on October 23, whether it was on December 1,

20   whether it was in February, it's difficult to parse that out

21   because the First Circuit and the appeals courts really haven't

22   given us any guidance as to when a judicial officer's comments

23   cross the line.  But, I think, you know, as recently as

24   February 9, your -- I'm the reasonable man in this case.  I am

25   looking at this --

1     THE COURT:  No, actually, you're not the reasonable

2  man.  You're interested in the outcome of the case as a fully

3  informed objective observer.  It doesn't matter what the

4  litigants think, it doesn't matter what the judge thinks.  It's

5  an objective test despite Ms. Wright's evident mistaken belief

6  that it's subjective.  Go ahead.

7     MR. HORSTMANN:  I understand that, and I think looking

8  at the record cold, as I did, I have an informed opinion as to

9  what I'm seeing.  And I'm not going to run through the comments

10  that Your Honor made on October 23, because it's -- I've

11  already put that in my motion.  But the one that I would --

12  that bothered me the most was your comment regarding that he

13  could face detention where he could be deemed to be a danger to

14  the community.  I mean, that doesn't strike me as somebody

15  who's being unbiased.

16     THE COURT:  But the case law says that you have to

17  consider what's said in context.  Let's go to that part of the

18  transcript.  I've got it.  Let me get it.

19     MR. HORSTMANN:  I think it's page 23.

20     THE COURT:  I know, but hold on a second.  I kind of

21  messed up my nicely organized file.  So we're looking -- you're

22  talking about October 23?

23     MR. HORSTMANN:  Yeah.

24     THE COURT:  What page?

25     MR. HORSTMANN:  Page 23, last paragraph.

```
 1          THE COURT:  Okay, just a second.

 2          So I advised them that if I instituted criminal

 3  contempt proceedings, there would be, among other things, a

 4  detention hearing, right?  That's what you're talking about?

 5          MR. HORSTMANN:  Correct.  And at a detention hearing,

 6  it could be determined that he was a danger to the community.

 7          THE COURT:  Right.

 8          MR. HORSTMANN:  While that's an accurate statement

 9  of --

10          THE COURT:  Go ahead.

11          MR. HORSTMANN:  While that's an accurate statement of

12  fact and law, it seems hardly appropriate in a case involving

13  criminal contempt that somebody would be detained as a danger

14  to the community.

15          THE COURT:  Excuse me.  First of all, to just put it

16  in context.  So on page 23, starting, actually, on page 22 --

17  because I had issued an order saying that the information, the

18  detailed information, affidavits, that the SEC had provided in

19  its motion for civil contempt raised the question of whether

20  this should be a criminal contempt proceeding.  Then I

21  explained what a criminal contempt proceeding would involve.

22          MR. HORSTMANN:  But it didn't raise --

23          THE COURT:  Let me finish.  Let me finish.  The

24  protections of a criminal case:  You have a right to a lawyer,

25  if you can't afford one -- and he didn't ask me for a lawyer,
```

1    that's why I had Mr. Shea here, the duty day attorney, because

2    I thought he might ask for a lawyer, but he didn't.

3         And I explained to him what a criminal contempt

4    proceeding was because I didn't know -- I was inclined to do it

5    that day or soon after depending on what I heard.  And I

6    explained it.  And you just said it, in telling them all the

7    things that would happen if I instituted a criminal contempt

8    proceeding, including appointing the US Attorney to prosecute

9    it, I told him what I put in my February 12, 2024, order, that

10   there has to be a detention hearing under the rules and

11   statute.

12        And with regard to danger, this comes up in other

13   contexts.  Danger is not just danger of violence.  Danger is

14   the danger of continuing to commit crimes, and what the SEC had

15   put in affidavits in its initial submission told me that

16   Mr. Medoff signed a consent decree in May of 2016.  They were

17   focused on 2021 and, they said, probably earlier he started

18   violating it.

19        And after I granted many requests for more time,

20   before I did what I repeatedly said I was inclined to do --

21   which is institute criminal contempt proceedings -- there's

22   evidence that he started violating it in June of 2016, a month

23   later.  So I continue to be concerned that Mr. Medoff may be

24   dangerous.

25        MR. HORSTMANN:  I'm left with that response, Your

1   Honor.  I don't want to be in a position where I cross-examine
2   the Court, but this is a continuum of:  no one's asking for
3   criminal contempt.  You asked the SEC, sort of loosely, why
4   they weren't considering it, and all of a sudden --
5            THE COURT:  Do you know what they said?
6            MR. HORSTMANN:  I know what they said.
7            THE COURT:  They said they didn't have the authority.
8            MR. HORSTMANN:  I don't think that --
9            THE COURT:  That's what they said.
10           MR. HORSTMANN:  In looking -- I haven't talked to
11  them.
12           THE COURT:  It's on the transcript.
13           MR. HORSTMANN:  I understand that.  But I took those
14  comments to mean that we have an internal review mechanism and
15  we go through civil contempt first before we get to criminal
16  contempt.  That's how I took that comment.  And then, all of a
17  sudden, you're at a detention hearing talking about danger to
18  the community.
19           THE COURT:  Okay, you're repeating and I'm repeating.
20  Keep going.
21           MR. HORSTMANN:  So I've identified the rest of the
22  comments from October 23.  For reasons that are entirely due to
23  the amount of time that I had to put this together, I did not
24  see the December 1 transcript when I filed my motion, so there
25  are three references to criminal contempt at the December 1

1    hearing that I'd like to supplement the record with just

2    because --

3            THE COURT:  No, go ahead.

4            MR. HORSTMANN:  The argument is the same, it's Judge

5    Wolf is talking about criminal contempt and no one else is.

6            THE COURT:  No one else is.  Okay.  I mean, I think

7    we're -- really, the dispute here is whether a reasonable

8    person would think that my raising criminal contempt was a

9    manifestation -- would cause a person to question -- a

10   reasonable person -- could cause a reasonable person to

11   question my impartiality, because I didn't say it repeatedly.

12   But, you see, what I was aiming to do is to be fair, to put

13   Mr. Medoff on notice of what I had the authority to do and was

14   inclined to do.

15           And he had another lawyer at that time -- it wasn't

16   you -- who had a different strategy in this, which I said --

17   and I was, because I don't issue orders I don't intend to

18   enforce, and I don't say things that I don't mean --

19           MR. HORSTMANN:  You've made that clear.

20           THE COURT:  I said I'm open-minded.  It doesn't mean

21   I -- but I wanted to make it clear that, you know, if I gave

22   them time to talk to the SEC and they resolved the civil

23   contempt, that would not necessarily resolve the criminal

24   contempt, they couldn't depend on that.

25           And I think that's -- you should keep going.  You're

1   well prepared and I want to hear everything you want to say,

2   but I was consistent, I agree, but the repetition was an effort

3   to be clear, maybe not because I thought there'd be any

4   estoppel argument, which now you're talking about in other

5   places, but to make clear that it was without prejudice.  The

6   last time I gave them more time, I wouldn't do it unless they

7   added in the order that it was -- the proposed order that it

8   was without prejudice to a possible criminal contempt

9   proceeding.

10          MR. HORSTMANN:  And I think that's where the issue

11  lies, Your Honor, is how much repetition is too much, and

12  that's the argument I'm trying to make here.  Just if you'll

13  allow me to read from the -- or at least identify from the

14  transcript of December 1 where --

15          THE COURT:  Hold on a second, let me get it, please.

16  December 1?  What page, please?

17          MR. HORSTMANN:  I'm on page 5, Your Honor.  Line 7.

18  You're talking about the First Circuit, and then you --

19          THE COURT:  I'm sorry, page 5.

20          MR. HORSTMANN:  Line 7.  You're talking about the

21  First Circuit and civil and criminal contempt are for different

22  purposes, and you finish by describing criminal contempt --

23          THE COURT:  Try to keep your voice up.  I've got

24  microscopic print, for some reason, on my version.

25          MR. HORSTMANN:  I didn't mean to read verbatim from

1   it, but I wanted to identify where Your Honor is sua sponte

2   referencing criminal contempt when no up with else was.

3           THE COURT:  Right.  I'm the one who has a

4   responsibility for seeing that court orders are enforced.

5   That's not the SEC's responsibility.

6           MR. HORSTMANN:  I understand that, Your Honor.

7           THE COURT:  It was my responsibility to see that

8   orders were enforced.  I mean, sometimes a litigant will raise

9   it, and they can, and very often -- and I'll cite you a few

10  cases, but there are dozens of them where judges do it on their

11  own initiative.

12          MR. HORSTMANN:  You know, I'm -- I don't think I'm

13  hurting my argument by saying that it's appropriate to do it

14  once.  I'm not sure that this --

15          THE COURT:  But you would be arguing, because you want

16  to make an estoppel argument which, A, I think, is not -- I

17  don't see a legal basis for it, but I don't think there's a

18  factual basis for it.  But I'll listen to it if you ever make

19  it.

20          If I said on -- in my first order on October 7, I

21  think it was, that I'm inclined to initiate criminal contempt,

22  and then the parties asked me -- including your client and his

23  lawyer ardently asking me -- "Give us more time to work with

24  him," and I didn't say anything else, you would probably say,

25  "This is not fair, we were sandbagged.  We thought if we

1    resolved the civil contempt, we wouldn't have to face the

2    criminal contempt."  And that was not my state of mind, and I

3    was trying to be, as I always am, including today, transparent,

4    so nobody would say they wouldn't -- nobody could fairly say,

5    reasonably say, that they were misled.  That's what I was

6    attempting to do.

7         MR. HORSTMANN:  I mean, clearly at the outset, there's

8    some ambivalence on Your Honor's part.  I mean, you've got Shea

9    here, which means you thought about it.  Then you ask him to --

10        THE COURT:  Excuse me, hold on a second.  This is

11   another effort to be fair.  At that point, it was a civil

12   proceeding.  That was a civil proceeding.  He had no right to

13   counsel.  I was considering a criminal proceeding, and,

14   although he had no right to the appointment of counsel, if he

15   had provided an affidavit showing that he was indigent, I would

16   have appointed the duty day counsel Mr. Shea because I knew

17   that there was the risk that he would say something that would

18   tend to incriminate him, and his lawyer might advise him not so

19   say anything.

20        He didn't file the affidavit.  He wanted private

21   counsel; he didn't want Mr. Shea.  So that's what that was all

22   about and, again, I wasn't required to do it.  It was a civil

23   proceeding, but I told him that he might not want to say

24   anything about the merits of the case because he had a Fifth

25   Amendment right to say -- not to say anything that might tend

1    to incriminate him and anything he did say could be used

2    against him in a future proceeding.

3            I want to continue to listen to you, but I read what

4    you wrote and it was thorough --

5            MR. HORSTMANN:  I was not expecting you to be happy

6    with my presentation or to respond in the manner that you have

7    done so to each point, so I appreciate that.

8            THE COURT:  But, I mean, I think the real question

9    is -- I agree, I was consistent at each stage.  I told him I

10   was considering criminal contempt even though the SEC couldn't

11   ask for it or didn't ask for it and there was nobody else in

12   the case who could have asked for it; I agree.

13           I think the question is, would a reasonable person --

14   could a reasonable person question my impartiality because I

15   was consistent in saying I was considering initiating criminal

16   contempt?  That's the question.

17           MR. HORSTMANN:  I think that accurately summarizes it.

18   There are a few more references on December 1 on page 25.  You

19   again bring up the prospect of a criminal proceeding involving

20   Mr. Medoff and Nova.  At that point nobody --

21           THE COURT:  Hold on just one second.  Page 25?

22           MR. HORSTMANN:  Page 25, line 2.

23           THE COURT:  This is when I was questioning Mr. Levy.

24           MR. HORSTMANN:  I understand.

25           THE COURT:  Or when he was being questioned, I was

1    speaking to Mr. Levy.  And I --

2         MR. HORSTMANN:  Once again, my point is, who's

3    bringing up criminal contempt?  Judge Wolf.  Judge Wolf is

4    bringing up criminal contempt.

5         THE COURT:  Right, because he's here without a lawyer.

6    Mr. Medoff brings -- says, This is my treasurer -- as I recall

7    his background was in the music business.  And he says, This is

8    my treasurer.  And, I think -- and I've got to go back, need to

9    go back to the affidavit -- they're in business together.  They

10   were in business together when Mr. Medoff didn't obey -- this

11   doesn't seem to be the injunction he agreed to in 1993 or '95,

12   and now Mr. Levy is testifying and he didn't have a lawyer and

13   I wanted him to fully understand the importance of giving

14   honest answers.

15        Because he -- if you violate an injunction, anybody

16   who acts in -- this is Rule 65, it's a civil case, and it's the

17   way the injunctions are written.  Anybody who acts in concert

18   with the principal is also liable for violating the injunction.

19   So there were certain circumstances -- Mr. Medoff --

20        THE DEFENDANT:  Yes?

21        MR. HORSTMANN:  Don't respond.  Don't respond.

22        THE COURT:  There's certain circumstances in which

23   Mr. Levy could be prosecuted in a criminal contempt proceeding.

24   It could have been.  I didn't bring a charge against him for

25   acting in concert, but I was alerting him to the importance of

1  giving truthful testimony under oath.

2        MR. HORSTMANN:  I understand that, Your Honor.  But

3  once again, this is Mr. Medoff's witness and you're advising

4  him that Mr. Medoff is in trouble, and that's where --

5        THE COURT:  Is that inaccurate, that he was in

6  trouble?

7        MR. HORSTMANN:  Well, it depends on your definition of

8  "trouble."  There's civil contempt, which the SEC was pursuing,

9  and then there's criminal contempt.  So, I think, once again,

10  we're getting back to a record of comments regarding

11  criminality and the seriousness of what you perceived to be

12  Mr. Medoff's dilemma.  So that's -- the last one is page 37 and

13  that's where the word "trouble" is used with respect to

14  Mr. Medoff.

15        THE COURT:  Let's see.  Which line?

16        MR. HORSTMANN:  Sorry, lines 2 through 4.

17        THE COURT:  I said, starting on the last page, let

18  me -- so the SEC, Mr. Mawn, was questioning him about his

19  affidavit and asked if he discussed it with Ms. Kirshenbaum or

20  your own lawyer.

21        "Do you understand that you can go to your own

22  lawyer?"

23        Mr. Levy said, "I do," and I said the following.

24        "Let me tell you the following:  She, Ms. Kirshenbaum,

25  is not your lawyer.  I'm ordering that she give you the

1  document and discuss it with you, but she's Mr. Medoff's

2  lawyer.  She may have different interests.  He's in trouble at

3  the moment; you're not.  So do you understand you can get your

4  own lawyer if you want?"

5       That's what -- that's the comment you're talking

6  about?

7       MR. HORSTMANN:  I am, Your Honor.  And, you know, in

8  isolation, a sterile comment like that is not grounds for

9  recusal.  It's just a continuation of what I am arguing is Your

10  Honor's intention on the record.

11       THE COURT:  In my view, it was another effort to be

12  fair by somebody who wasn't represented by counsel.

13       MR. HORSTMANN:  I have no reason to doubt that other

14  than it's a continuum of Judge Wolf initiating criminal

15  contempt into the record of this case.  With respect to the

16  February 12 order, Your Honor, I think there's some references

17  in there that speak --

18       THE COURT:  Hold on just a second.  Okay.  Go ahead.

19       MR. HORSTMANN:  That speak to your level of,

20  respectfully, bias against Mr. Medoff.

21       THE COURT:  What page are you on?

22       MR. HORSTMANN:  I'm on page 2, second full paragraph.

23  You're quoting the agreement between the parties.

24       THE COURT:  Wait a minute.  Page 2.  Oh, I see.

25       MR. HORSTMANN:  Second full paragraph, starts with

1    "pursuant."

2         THE COURT:  "Pursuant to an agreement between the

3    parties on May 25, 2016, this Court entered a final judgment

4    against Medoff that, among other things, enjoined Medoff and

5    any entity owned or controlled by Medoff for a period of ten

6    years from participating in the issuance, offer, or sale of any

7    security.  In addition --"

8              And then it cites it.

9         "In addition, the final judgment ordered disgorgement

10   and pre-judgment interest totaling $14,370.20 and the payment

11   of $100,000 civil penalty."

12        MR. HORSTMANN:  Correct.

13        THE COURT:  What's problematic about that?

14        MR. HORSTMANN:  It's a pre-judgment comment by the

15   Court on the state of the record at that point.  It's accurate.

16        THE COURT:  It's accurate.

17        MR. HORSTMANN:  But why is it here?

18        THE COURT:  It's here because I'm required to give him

19   specific notice of what order he's alleged to have violated.

20   If I didn't put that in here, you would say he'd been deprived

21   of due process because he didn't have fair notice of what he

22   allegedly violated.  That's why it's in there.  And I think

23   any --

24        MR. HORSTMANN:  Understood, and it's clear by February

25   12 that Your Honor was pursuing the criminal avenue.

1        THE COURT:  No, this is the document that instituted

2    the criminal proceeding.  And in the document, I was legally

3    obligated to give him notice of what provisions of the -- or I

4    felt I was -- what provisions of the judgment he violated.

5        MR. HORSTMANN:  But this is three days after a hearing

6    at which the SEC told you that they're happy with their

7    resolution with Mr. Medoff.

8        THE COURT:  They told -- yes.  And that -- it just

9    goes back to the fundamentals.  If he -- well, first of all, he

10    hadn't fully complied -- he hadn't complied with the

11    injunction.  He hadn't made the payments.

12        And another point you made in your papers.  I talked

13    about the history in Biochemics, and you said that was

14    "irrelevant," I believe, was your word.  At that point, I was

15    talking about my disappointment with the SEC in this case, at

16    least, before this motion.  This is accurate.  Back in whatever

17    year it was, maybe 2018, they came in and they told me -- asked

18    me to enter a consent judgment ordering Biochemics to pay $18

19    million.

20        And I said, I don't intend to issue orders that are

21    not going to be observed or enforced.  Does Biochemics have $18

22    million?  And they told me no.  And I said, well, why would I

23    enter this order if it's not going to be obeyed?  I mean, maybe

24    they can close the case, send it to the enforcement division,

25    go do something else.

1          But if I enter an order, I'm consistent.  If a person

2     thinks that this shows the judge's bias, somebody else, I

3     think, is going to have to come to that conclusion.  But it

4     didn't -- it wasn't irrelevant.  I was trying to explain why I

5     was -- part of the reason I was considering criminal contempt,

6     because there was reason to be concerned -- which now there's

7     better reason to be concerned -- that Mr. Medoff, if I ordered

8     him to pay what he owed, he wouldn't be able to pay it.  And

9     that proved to be true.

10          MR. HORSTMANN:  And I understand that.  You've just

11     explained that.  But, from a practical standpoint, "irrelevant"

12     may be too strong a word.  It's tangential to the issue of

13     whether Mr. Medoff failed to make payments on his fine or

14     restitution or whatever it was.  I mean, it's another party to

15     the case.  It really has no bearing on Mr. Medoff.

16          And if it does, you didn't make that clear.  So I

17     apologize, Your Honor.  You may have information that I don't

18     have, but it's not Mr. Medoff's company, and it's not his fault

19     that they didn't make the payment, as far as I know.

20          With respect to the case law, Your Honor, I think a

21     combination of the *Bulger* case and the *Antar* case, which we

22     cited, which is out of the Third Circuit, this is, sort of, in

23     between those cases.  I think what jumps out at the *Bulger* case

24     is I think the First Circuit panel believed Judge Stearns.

25     They believed him that he could preside over the *Bulger* case

1    without any bias or animosity towards Bulger.  But the

2    appearance was such that --

3            THE COURT:  No, that -- hold on just a second.  I've

4    got *Antar* here but I've got to lay my hands on it.  Here's

5    *Antar.*  Go ahead.  Why don't you tell me how this case -- how

6    you think this case is analogous to *Antar*.

7            MR. HORSTMANN:  Well, it's factually not analogous.

8    But what I was arguing was that the First Circuit clearly

9    showed --

10           THE COURT:  No, *Antar* is Third Circuit.

11           MR. HORSTMANN:  I understand, but I was talking about

12   *Bulger* when you stopped me.

13           THE COURT:  Oh, okay.  Go ahead.

14           MR. HORSTMANN:  I was talking about Judge Stearns,

15   and, you know, quite clearly, the First Circuit, because

16   they -- their final comment on the matter specifically

17   mentioned it.  They say, "In sum, despite our respect for Judge

18   Stearns and our belief in his sincerity, we are nonetheless

19   bound to conclude that it is clear that a reasonable person

20   might question the judge's ability to preserve impartiality" --

21           THE COURT:  And what were the relevant facts in

22   *Bulger*?  Actually, it's one of the many cases, I haven't reread

23   today.  Does it include --

24           MR. HORSTMANN:  I don't remember what Judge Stearns'

25   position was within the US Attorney's Office, but it had to do

1   with his position.

2        THE COURT:  Right, and his close association with

3   Robert -- if I remember right, Robert Mueller.  I think it's in

4   there.

5        But whatever it is, let me tell you the following and,

6   if this gets reviewed, make it as vividly clear as I can:  I

7   know that the question under 455(a) is not whether I'm actually

8   biased or prejudice.  It's what a reasonable, well-informed

9   person, fully informed person, would think.  Would a

10  reasonable -- could a reasonable person question my

11  impartiality?  That's the issue.  I mean, I've written about

12  this over the years repeatedly.  I get it.

13       MR. HORSTMANN:  I know you have.  Which, you know,

14  creates a certain amount of irony here, but we are where we

15  are.  I'm compelled to raise the issue.  I think you talked

16  about criminal contempt too much and I think what the First

17  Circuit says in *Bulger* is illustrative of what the First

18  Circuit might do with this.  I can see them inserting Your

19  Honor's name, respectfully, in there as they say to Judge

20  Stearns here.

21       And as a practical matter, the *Antar* case, I think the

22  comments were much less illuminating as to the judge's intent

23  than they are here.

24       THE COURT:  Do you remember what the comment was?  In

25  *Antar*, the SEC was seeking to, I think, recover $52 million

    1    from Crazy Eddie's bankruptcy, and he had the money and he

    2    wasn't paying it, and then -- right?  Am I right so far?

    3         MR. HORSTMANN:  You're right that that sounds

    4    familiar.

    5         THE COURT:  And then there was also a criminal case

    6    against him.  It wasn't a contempt.  I think, maybe, a RICO

    7    case.  And the judge said in the civil case, I think, It's been

    8    my goal from day one to get the public back its money that it

    9    lost to Crazy Eddie's fraudulent activity.

   10         And then that, the Third Circuit said, raised a

   11    reasonable -- you know, could cause a reasonable person to

   12    question the judge's impartiality in the criminal case or

   13    whether he was going to make rulings that were improper in

   14    order to get money back in the civil case.

   15         In this case, I've been striving to do exactly the

   16    opposite.  I haven't been trying to get money back, I just

   17    transparently said what my inclinations or present intentions

   18    at the time were, although I was open-minded and, if they

   19    wanted time to try to persuade me not to proceed in criminal

   20    contempt, I would give it to them without prejudice, which they

   21    acknowledged, to my right to institute criminal contempt.  But

   22    go ahead.

   23         MR. HORSTMANN:  Well, I think you took it a step

   24    further than the judge in *Antar*.

   25         THE COURT:  What's that?

1      MR. HORSTMANN:  You took it a step further than the

2 judge in *Antar* by introducing this discussion about criminal

3 contempt as a punitive measure for past conduct.

4      THE COURT:  Well, what does that -- nobody's punished

5 for future conduct.  Every crime is punishment for past

6 conduct.

7      MR. HORSTMANN:  But the comment by the judge in *Antar*

8 was prospective.  It was, I want to get the public its money

9 back.  Here, you're saying, Because you haven't given the

10 public its money back or the victims their money back, I want

11 to pursue criminal contempt.

12      THE COURT:  No, that's not what I'm saying.  I'm

13 saying -- go ahead.

14      MR. HORSTMANN:  That's the way it reads, Your Honor,

15 I'm sorry.  That's --

16      THE COURT:  Go ahead.  That's the way it reads to the

17 defendant's lawyer.

18      MR. HORSTMANN:  To the defendant's reasonable lawyer.

19 That's the argument right here, Your Honor, and that's where we

20 find ourselves.  I'm not prepared to argue the promissory

21 estoppel effect of anything you might have said at in point in

22 time.  I need time to brief it, but I just want to highlight

23 for you --

24      THE COURT:  Well, you keep having time.  Look, one of

25 the things that the jurisprudence says -- for example,

1    then-Judge Breyer -- that:  In deciding motions to recuse,

2    judges should be careful not to permit litigants to use such

3    motions for strategic purposes and to perhaps get some

4    advantage.

5          More time -- defendants frequently want more time;

6    maybe the judge will die; maybe the prosecutor will go into

7    private practice.  Or to get a judge -- to manipulate the

8    system to get a judge more to their liking.  That's one of the

9    considerations.  They have to decide what a reasonable person

10   could do, but, you know, the Supreme Court has written about

11   this.  Judges are not like innocent infants and --

12         MR. HORSTMANN:  That's a great quote.

13         THE COURT:  It's a careful area.  Do you have more

14   that you'd like to say?

15         MR. HORSTMANN:  Yes.  My point is, with respect to the

16   promissory estoppel, is that -- and I appreciate Your Honor

17   ordering the transcript for today -- is that record is still

18   being made and it's not -- it's not being done for the purpose

19   of manipulating --

20         THE COURT:  How could there be any promissory estoppel

21   based on any -- first of all, you haven't cited a case.

22   Anyway, how could there be something that precludes prosecution

23   based on what's said on the basis of promissory estoppel?  On

24   something that's said after the prosecution's initiated.

25         MR. HORSTMANN:  Because you're explaining your prior

1    comments, Your Honor, and that's what I hope to elicit today.

2           And just so we're clear.  It's not just dismissal.

3    The appropriate remedy may be to suppress his deposition

4    transcript because he went into the deposition -- and this is

5    the argument; I think I've teed it up, I just haven't finished

6    my research -- is that he sat for a deposition and he agreed to

7    comply with the SEC based on the, you know, intimation that

8    Your Honor would look favorably on that.  And that's the

9    essence of promissory estoppel, and I would like more time to

10   brief that, respectfully.  I think I have to.

11          THE COURT:  Would the Government like to be heard on

12   this?

13          MS. WRIGHT:  No, thank you, Your Honor.

14          THE COURT:  I'll take a brief recess and I expect I'll

15   give you a decision.

16          (A recess was taken from 3:27-4:23 p.m.)

17          THE COURT:  For the reasons I'll explain in detail,

18   the defendant's motion for recusal is -- under Section 455(a),

19   not 455(b), is hereby denied.  As I'll explain, I find a

20   reasonable person properly informed could not question my

21   impartiality in this case.

22          Much of the chronology of this case is summarized in

23   my February 12, 2024, order instituting these criminal contempt

24   proceedings.  That's Docket 786.  However, I'll reiterate that

25   in 2012, Biochemics and the defendant Craig Medoff, and

1    others -- well, Biochemics, defendant Craig Medoff and others

2    were sued by the Securities and Exchange Commission for

3    allegedly committing securities fraud in violation of federal

4    law.

5            On May 25, 2016, I entered a joint motion for a final

6    judgment enjoining the defendant, Mr. Medoff, and any companies

7    associated with him from participating in securities sales for

8    ten years or from ever violating federal securities laws.

9            On September 27, 2023, the SEC filed a motion asking

10   that the defendant be required to show cause why he should not

11   be held in civil contempt for violating that injunction.  That

12   motion, supported by detailed affidavits and evidence, informed

13   me that the defendant had agreed to a similar injunction in

14   1993.  He did not make the required payments to the SEC.

15           In 1995, Medoff pled guilty to two counts of

16   conspiring to commit securities fraud.  He was sentenced to

17   probation.  However, he violated the conditions of his

18   probation by failing to make required payments and failing drug

19   tests.  He was incarcerated from 2011 to 2014 based on those

20   violations.

21           The SEC presented detailed evidence that, in violation

22   of the injunction in this case, Medoff engaged in the sale of

23   securities through Nova Capital that he allegedly owned.  The

24   evidence indicated that he had received hundreds of thousands

25   of dollars in that period.  Mr. Medoff nevertheless failed to

1    make the payments required by the 2016 consent decree in this

2    case.  That is disgorgement of $14,370 and payment of a

3    $100,000 penalty.

4         On October 13, 2024, I issued a memorandum and order,

5    Docket 741, stating that the SEC's motion, essentially for

6    civil contempt, raised the question of whether it would be

7    appropriate to initiate criminal contempt proceedings instead

8    of or in addition to civil contempt proceedings because of the

9    defendant's history of violating court orders prior to the

10   injunction in this case.  I explained the nature of criminal

11   contempt.

12        I scheduled an October 23, 2023, hearing to discuss

13   how the case should proceed, including my inclination to

14   institute criminal contempt proceedings.  I ordered an

15   Assistant United States Attorney to be present because, if

16   there were criminal contempt proceedings, the US Attorney's

17   Office would be appointed to prosecute, and, even though

18   Mr. Medoff had no right to a Criminal Justice Act lawyer in a

19   civil case, I offered to appoint one for him if he filed a

20   Criminal Justice Act affidavit establishing his indigency, his

21   inability to retain -- his financial inability to retain

22   counsel.

23        I was, as I said during the hearing, inclined -- as I

24   said during the hearing today, inclined to institute criminal

25   contempt proceedings and, although, as I said, he was not

1   entitled to it in the civil case, was going out of my way,

2   doing more than required, to try to assure that he had the

3   advice of counsel at that October 23 hearing.

4          Mr. Medoff appeared pro se on October 23.  I informed

5   him that he might not want to discuss the merits of the case --

6   that is, the motion for civil contempt -- because he had a

7   Fifth Amendment right not to incriminate himself.  The SEC

8   informed me that it did not have the authority to seek criminal

9   contempt.  I said at that hearing that, if I was going to

10  decide the matter that day, I would initiate criminal contempt

11  proceedings then.

12         The SEC asked for a brief period of time to resolve

13  the civil contempt motion, and Mr. Medoff asked for some time

14  to retain counsel.  He said that he would like a couple days to

15  try to retain counsel -- that is, get money from a trust of

16  which he's a beneficiary to retain counsel -- and to speak with

17  the SEC.

18         I said on pages 24 to 25, I believe, of that hearing,

19  that it would probably with simplest for me to initiate

20  criminal contempt proceedings immediately.  I said,

21  truthfully -- judges, I think, are understood to be truthful by

22  reasonable people -- that I was open-minded regarding whether a

23  violation had occurred, but there was more than enough evidence

24  to institute contempt proceedings immediately.  Mr. Medoff

25  said, quote, he would work with the SEC and stop these

1    activities, which indicated to me that he was acknowledging

2    that he had violated the injunction and would stop.

3          The defendant got money from the trustee of the trust

4    of which he's a beneficiary.  The SEC later obtained evidence

5    on the amount in that trust.  I didn't check it today, but I

6    think it was about $900,000.  He retained private lawyers, Alan

7    Rose, Jr., and Laura Kirshenbaum.  On October 25, they moved

8    for up to 30 days to reach -- try to reach a settlement with

9    the SEC in the motion for civil contempt.

10          I granted that motion.  I issued an order extending

11   their deadline, the parties' deadline to report, from October

12   26 to November 17, and I stated in the order that it remains

13   the Court's present intention to commence criminal contempt

14   proceedings against Medoff.  And I said that if the parties did

15   not reach a resolution or one that was satisfactory to me, I

16   would do so.

17          Though it's a little out of order, the ultimate

18   disposition of the civil contempt is not satisfactory in the

19   sense that the prior amounts have not been paid and, in any

20   event, as I explained and will reiterate, civil and criminal

21   contempt serve different purposes.  Civil contempt is to coerce

22   compliance with court orders that haven't been complied with.

23   Civil contempt is, if proven -- criminal contempt, if proven,

24   is to punish a willful failure to obey a court order in order

25   to serve several important purposes of the administration of

1    justice.

2        At the parties' request, I repeatedly extended the

3    time for discussions and discovery that the defendant requested

4    or agreed to in order to give the attorneys time to try to

5    resolve the civil contempt motion.  I also, as I said,

6    repeatedly explained that civil contempt and criminal contempts

7    are different purposes and are not mutually exclusive and that

8    allowing the parties to try to resolve the civil contempt would

9    be without prejudice to the Court's authority to initiate

10   criminal contempt proceedings.

11       That's reflected in the December 1 proposed order,

12   Docket 767, which I directed the party to include the language

13   that entry of this order was without prejudice to the Court's

14   authority to initiate criminal contempt proceedings for any

15   violation by Medoff of prior orders of the Court and/or this

16   order.

17       As stated in the February 12, 2024, memorandum and

18   order instituting these criminal contempt proceedings, I wrote

19   on page 2 something that I didn't anticipate would be one of

20   the grounds for arguing or asserting that a reasonable person

21   would question my impartiality.

22       I wrote that, pursuant to an agreement between the

23   parties on May 25, 2016, the Court entered a final judgment

24   against Medoff that, among other things, enjoined Medoff or any

25   entity owned or controlled by Medoff for a period of ten years

1  from participating in the issuance, offer, or sale of any

2  security.

3        And I cited the pertinent provisions of the final

4  judgment that was attached.  In addition, the final judgment

5  ordered disgorgement and pre-judgment interest totalling

6  $14,020 and a $100,000 civil penalty.  It was argued by

7  Defendant's counsel today that that was one piece of

8  information that would contribute to a reasonable person

9  questioning my impartiality.

10        As I responded today, it was an effort to comply with

11  the due process obligation to give the defendant notice of

12  the -- fair notice of the violation of the provisions of the

13  judgment he allegedly violated.  I also wrote that:

14        "After discovery was complete on February 5, 2024, the

15  SEC filed a Status Report ... supplementing earlier reports.

16  In essence, the SEC reported that Medoff had since 2016

17  controlled Nova and, through it, engaged in the offering and

18  sale of securities in violation of ¶V of the 2016 Final

19  Judgment.  Because an internet search would have revealed

20  Medoff's criminal history and injunctions against him, Medoff

21  used the alias 'Alexander Carlin' in connection with his work

22  with Nova.

23        "The SEC estimates that approximately $1,800,000 was

24  received by Nova in violation of the 2016 Final Judgment and

25  that the net benefit to Medoff was approximately $1,675,000.

1    Therefore, the SEC expressed its intention to move 'for a final

2    order of [civil] contempt as to ... Medoff that, among other

3    things, requires a specific amount of disgorgement of fees

4    received by Nova.'  The SEC requested four to six weeks to

5    obtain the required authorization to seek disgorgement from the

6    SEC commissioners."

7         In a February 7, 2024, order, I wrote that "[t]he

8    SEC's February 5, 2024 Status Report suggests that promptly

9    initiating criminal contempt proceedings for the alleged

10   violations of the 2016 Final Judgment by Medoff may be most

11   appropriate for several reasons, including but not limited to

12   the risk that an order of disgorgement, if Medoff is held in

13   civil contempt, may be futile."

14        Therefore, the Court ordered the SEC to file a

15   memorandum and affidavit addressing whether Medoff has the

16   ability to pay approximately 1,675,000 or any other substantial

17   sum if ordered to do so.  It also permitted but did not order

18   Medoff to do the same.

19        In its response to the February 7, 2024, order,

20   Dkt. No. 783, the SEC filed an affidavit stating that, among

21   other things, the following:  Medoff received about $200,000

22   annually for the work done through Nova from June, 2016, to

23   November, 2023.  Medoff has spent or distributed all that

24   money.  Medoff has a net worth.  He is a beneficiary of the

25   Lynn Medoff Irrevocable Inter Vivos Trust which has

1    approximately $920,000 cash in liquid assets and pays Medoff

2    $2,200 a month.

3          Medoff says in his affidavit that he received $2,500 a

4    month from the trust.  However, according to the SEC, Medoff

5    does not exercise any control or possession of the assets held

6    in trust, and any such trust assets are not included in his

7    estimated net worth.

8          Medoff also filed an affidavit on February 8, 2004,

9    Dkt. No. 784.  In it, he states, among other things, that "I am

10   deeply apologetic the Court that I failed to comply with the

11   2016 Final Judgment."  Medoff also states that he had then paid

12   $10,000 toward the disgorgement and civil penalties ordered in

13   that final judgment.

14         In addition, Medoff acknowledged that he does not have

15   the current ability to pay a substantial disgorgement or civil

16   penalty but that he is in the process of arranging three

17   separate revenue streams that, if successful, will enable him

18   to pay the disgorgement penalties over time.

19         After a hearing on February 9, I wrote, "[T]he Court

20   concludes that it is permissible and appropriate that Medoff be

21   ordered, pursuant to Fed. R. Crim P. 42, to show cause why he

22   should not be held in criminal contempt for violating ¶V of the

23   2016 Final Judgment.

24         Civil and contempt proceedings serve different

25   purposes.  See *United States v. Marquardo*, 149 F.3d, 36, 39

1    (1st Cir. 1998).  Sanctions for civil contempt, including

2    incarceration, are intended to coerce compliance with an order

3    of the court ... Criminal contempt is used to punish

4    disobedience of a judicial order ... Criminal contempt seeks

5    vindication of public rights by punishing a defendant for a

6    crime that has already been committed and to deter future

7    violations."  I also then cited *Yates,* 355 US 66 at 75.

8         "The court understands," I wrote, "that 'a judge

9    should resort to criminal sanctions only after he determines,

10   for good reason, that the civil remedy would be

11   inappropriate.'"  That's a quote from *Shillitani*, 384 US 364 at

12   371, note 9.  "This," I wrote, "is such a case.

13        "First, holding Medoff in civil contempt would be

14   futile.  He evidently does not have the means to pay the

15   $100,000 civil penalty which he agreed to in the 2016 Final

16   Judgment or the $1,675,000 he would likely be ordered to

17   disgorge.  Moreover, as several years in prison did not deter

18   Medoff from beginning in June, 2016 to violate the May 2016

19   Final Judgment, the court doubts that another order not to

20   participate in the offer or sales of securities would be

21   obeyed.

22        "Second, and more significantly, there is far more

23   than probable cause to believe that Medoff knowingly,

24   willfully, and repeatedly disobeyed the 2016 Final Judgment.

25   There is, therefore, reason to be concerned that Medoff may

1   continue to present a danger of committing crimes and that his

2   incarceration may be necessary to protect the public.

3        "In any event, it is important to the administration

4   of justice to demonstrate that court orders can not be violated

5   with impunity.  If proven or admitted, a criminal sanction for

6   contempt will be justified to punish Medoff, to protect the

7   public, and to deter him and others from engaging in comparable

8   conduct in the future," citing *Yates*, 355 US at 74.

9        "Because a sentence of more than six months in prison

10  might be necessary to serve the purposes of sentencing, Medoff

11  is entitled to a jury trial," citing *Codispoti*, 418 US 506 at

12  512 and 516-17.  "As the alleged contempt does not involve

13  disrespect or criticism of the judge, this court will preside

14  in the contempt proceedings ... The United States Attorney is

15  being appointed to prosecute the alleged contempt," citing Fed.

16  R. Crim. P. 42(a)(2).

17       "Simultaneous or sequential civil or criminal contempt

18  proceedings arising out of the same facts are permissible.  See

19  *Marquardo*, 149 F.3d at 41.  Therefore, the SEC may continue to

20  pursue authorization for disgorgement and civil contempt."

21  However, the Court intends to resolve the criminal charges

22  before conducting criminal contempt proceedings.

23       Then I issued an order specifying that Medoff's

24  charged with knowingly and willfully violating paragraph 5 of

25  the 2016 final judgment by engaging in the alleged offer and

1   sale of securities by his conduct related to Nova Capital

2   International LLC.

3       I appointed the US Attorney to prosecute the case.  I

4   said the trial would commence on April 1 at 9:30 a.m.,

5   approximately six weeks later, and I stated that, pursuant to

6   Federal Rule of Criminal Procedure 46 and 18 United States Code

7   Section 3142 and 3144, Medoff is released pending a decision

8   concerning whether he should be released on appropriate

9   conditions or detained pending trial.  I referred that issue to

10  the magistrate judge.

11      Mr. Medoff's lawyers moved to withdraw, saying that --

12  promptly moved to withdraw, and stated that their agreement was

13  to represent Mr. Medoff only in the civil matter and they

14  weren't experienced in criminal matters.  I allowed that motion

15  and appointed Peter Horstmann to represent Mr. Medoff on

16  February 21.

17      Although I have this noted elsewhere, Mr. Horstmann

18  promptly moved to continue the April 1 trial date because of a

19  conflict, as I recall -- or, in part, because of that, and I

20  allowed it.  So Mr. Horstmann confirmed today that the

21  defendant is moving for my recusal solely under 28 United

22  States Code Section 455(a) which requires recusal if a

23  reasonable person could question the judge's impartiality.  The

24  defendant does not allege that I'm actually biased or

25  prejudiced and that my recusal is required under Section

1  455(b).

2       I discussed the standards for recusal under 455(a) in

3  detail in several prior decisions, including *United States v.*

4  *Sampson*, 148 F. Supp. 3d, 75 at 85 to 88, and *Arkansas*

5  *Teachers*, 404 F. Supp. 3d, 486 at 494-98.  Those standards are

6  consistent with my reading of the *Bulger* case and consistent

7  with what I said earlier.

8       I understand that recusal -- even if a judge is

9  actually unbiased, not prejudiced, capable of being impartial,

10  recusal is required if a reasonable person could question his

11  impartiality.  In *Sampson*, with regard to that standard, I

12  wrote, "It is the duty of the presiding judge, rather than

13  another judge, to decide whether his disqualification is

14  required by Section 455(a)," and I'll leave out many of the

15  cites.  "As the First Circuit has explained:

16       "'It might seem odd that recusal issues should be

17  decided by the very judge whose recusal is in question, but

18  there are other considerations at work, including a desire for

19  expedition and a concern to discourage judge shopping.'"

20  That's what the First Circuit wrote in *Martinez-Catala* in 1997.

21       "In 1989, then-Judge Stephen Breyer wrote with regard

22  to a motion to disqualify under Section 455(a) that:

23       "'We draw our legal standards for review of a district

24  [Court's] decision not to disqualify himself from *In re United*

25  *States ...*  We there held (1) that "a charge of partiality must

1   be supported by a factual basis," (2) that "disqualification is

2   appropriate only if the facts provide what an objective,

3   knowledgeable member of the public would find to be a

4   reasonable"' -- Mr. Horstmann?

5           MR. HORSTMANN:  Sorry.  Having a housekeeping issue.

6   Sorry.

7           THE COURT:  "'We draw our legal standards for review

8   of a district [Court's] decision not to disqualify himself from

9   *In re United States* ...

10          'We there held (1) that "a charge of partiality must

11  be supported by a factual basis," ... that "disqualification is

12  appropriate only if the facts provide what an objective,

13  knowledgeable member of the public would find to be a

14  reasonable basis for doubting the judge's impartiality,' and

15  (3) that are this court of appeals will allow the district

16  judge "a range of discretion" in making these

17  determinations ...

18          "'Only if the District Court's decision to sit "cannot

19  be defended as a rational conclusion supported by reasonable

20  reading of the record" will we insist upon disqualification.'"

21  That was *In re Allied-Signal*.

22          "The standard for determining a motion for

23  disqualification ... is '[w]hether the charge of lack of

24  impartiality is grounded on facts that would create a

25  reasonable doubt concerning the judge's impartiality, not in

1    the mind of the judge himself or even necessarily in the mind

2    of the litigant filing the motion under ... Section 455, but

3    rather in the mind of a reasonable man.' ... Therefore, the

4    disqualification issues must be analyzed from the perspective

5    of 'an objective, knowledgeable member of the public,' rather

6    than from the perspective of a person involved in, or directly

7    affected by, the case.

8            "... The test asks 'whether a reasonable person, fully

9    informed of all the facts, would doubt [the judge's]

10   impartiality.' ... The proper perspective has been described as

11   that of 'the reasonable man in the street ... who knows the

12   full facts even if those facts are not known on the street.'

13           "... The conduct that has prompted the motion for

14   recusal is not to be considered in isolation.  Rather, the

15   record as a whole must be considered," as the First Circuit

16   wrote in *In re Cargill.*

17           In dealing with a motion to recuse under Section

18   455(a), "'the district court is not to use the standard of

19   "Caesar's wife," the standard of mere suspicion.' ... Rather,

20   as Justice Anthony Kennedy has written, and the First Circuit

21   has reiterated:

22           "'Section 455(a) is triggered by an attitude or state

23   of mind so resistant to fair and dispassionate inquiry as to

24   cause a party, the public, or a reviewing court to have

25   reasonable grounds to question the neutral and objective

1    character of a judge's rulings or findings.  I think all would

2    agree that a high threshold is required to satisfy this

3    standard.

4         "'Thus, under Section 455(a), the judge should be

5    disqualified only if it appears that he or she harbors an

6    aversion, hostility, or disposition of a kind that a

7    fair-minded person could not set aside when judging the

8    dispute.'

9         "... The 'high threshold' required for recusal under

10   455(a) recognizes certain realities," the First Circuit wrote

11   in quoting *Liteky.*  "As the First Circuit has stated, '[i]n the

12   real world, recusal motions are sometimes driven more by

13   litigation strategies than by ethical concerns.  [C]ourts

14   cannot afford to spawn a public perception that lawyers and

15   litigants will benefit from undertaking such machinations.' ...

16   Therefore, as then-Judge Breyer wrote:

17        "'[W]hen considering disqualification, the district

18   court is not to use the standard of Caesar's wife, the standard

19   of mere suspicion.  This is because 'the disqualification

20   decision must reflect not only the need to secure public

21   confidence through proceedings that appear to be impartial, but

22   also the need to prevent parties from too easily obtaining the

23   disqualification of a judge, thereby potentially manipulating

24   the system for strategic reasons, perhaps to obtain a judge

25   more to their liking...'"  Again, that's *In re Allied-Signal*.

1    And as I said, I believe the *Bulger* case is consistent

2    with that standard, it doesn't vary the standard.  And as I'll

3    address later, the facts in this case are very different than

4    they were in *Bulger*.

5    But, as the Supreme Court wrote in *Liteky,* "Also not

6    subject to deprecatory characterization as 'bias' or

7    'prejudice' are opinions held by judges as a result of what

8    they learned in earlier proceedings.  It has long been regarded

9    as normal and proper for a judge to sit in the same case upon

10   its remand," or "to sit in successive trials involving the same

11   defendant."

12   Consistent with this, the First Circuit has long held

13   that it is "well established ... that participation in prior

14   proceedings involving the same or similar facts or parties does

15   not in itself constitute grounds for disqualification."  That's

16   *United Union of Roofers*, 823 F.2d 652 at 659, a 1987 case

17   citing a number of examples -- Kelly 712 F.2d, 84 at 889-91;

18   *Parilla Bonilla*, 626 F.2d 177 involving participation in prior

19   proceedings; *Cepeda Penes*, 577 F.2d 754 at 757-58, prior

20   rejection of the defendant's nolo pleas; *Cowden*, 545 F.2d 257

21   at 265-66 where the judge presided over an earlier trial of

22   alleged conspirators.

23   Hold on just a second.

24   In the context of those facts and others I'll mention

25   and the standards I've just explained, the motion to recuse is

1    not meritorious.  Generally, what is claimed as evidence of

2    bias would, I believe, by a reasonable disinterested person, be

3    viewed as evidence of an effort by me to be fair to Mr. Medoff.

4         I put him on prompt notice that it appeared to me that

5    criminal contempt proceedings would be appropriate and

6    explained the nature of criminal contempt proceedings.  I

7    repeatedly granted requests for more time for him and his

8    then-lawyers to work with the SEC to try to resolve the civil

9    contempt and to develop evidence that a criminal contempt

10   proceeding was not necessary or appropriate.

11        That evidence also, realistically, could have been

12   and, if Mr. Medoff is convicted, may prove to be part of an

13   argument for a lesser sentence that otherwise would be imposed,

14   as I said, if he's convicted of criminal contempt.  His efforts

15   after the civil contempt matter was raised by the SEC.

16        I repeatedly informed the defendant that the effort to

17   resolve the criminal contempt was without prejudice to possible

18   prosecution for criminal contempt.  And the evidence developed

19   in the discovery that the defendant agreed to during the civil

20   aspect of this case reinforced, strengthened, my view that

21   criminal contempt proceedings are necessary and appropriate.

22        They showed that after signing the -- agreeing to the

23   consent judgment, filing a motion that it be entered -- and it

24   was entered in May, 2016, the next month, in June, 2016, using

25   an alias to frustrate any effort to find that he had -- he was

1   violating the injunction -- begun to violate it.  That's what

2   the evidence indicated.

3          Ultimately, a jury will decide if that is proven, but,

4   as I say, although it didn't -- rather than altering my initial

5   inclination to think that criminal contempt was necessary and

6   appropriate, it magnified my sense that criminal contempt

7   proceedings were necessary and appropriate.

8          The Court initiating criminal contempt proceedings sua

9   sponte is not improper or uncommon, let alone unique, as the

10   Government characterized it.  The SEC stated at the first

11   hearing attended by the prosecutor in this case that it was not

12   authorized to request criminal contempt.  In any event, as the

13   Supreme Court wrote in *Young*, 481 US 787 at 800, "Thus, while

14   the prosecution of in-court and out-of-court contempts must

15   proceed in a different manner, they both proceed at the

16   instigation of the court."

17          As the Court also said at 79 to 800, criminal contempt

18   is necessary to enable the court to enforce its judgments and

19   orders necessary to the due administration of justice and the

20   protection of suitors.

21          District Courts often initiate criminal contempt

22   proceedings.  There are innumerable cases in the First Circuit

23   and elsewhere that could be cited for this proposition.  I'll

24   just mention a few.

25          *Donziger*, 38 F.4th 290, 294 and 304-305, a Second

1    Circuit 2022 case; *In re Grand Jury Proceedings*, 875 F.2d 927

2    at 930, a 1989 First Circuit case;

3    *AngioDynamics*, 946 F. Supp. 2d 205 at 215, D.Mass, 2013;

4    *MacNeil,* 236 F.2d 149 at 151 is another.

5         It was argued that the pace of the proceedings is an

6    indication -- well, would cause or contribute to a reasonable

7    person believing that I'm not impartial in this case.  I could

8    have initiated criminal contempt proceedings in October, 2023.

9    I repeatedly granted the defendant more time to attempt to

10   demonstrate that doing so would not be appropriate.

11        On February 12, 2024, when I ordered criminal contempt

12   proceedings, the defendant was represented by counsel he had

13   chosen and paid.  That counsel was fully familiar with the

14   evidence in this case, that counsel was in a position to give

15   informed advice as to -- immediately as to whether the

16   defendant would be wise to go to trial or not and, if

17   necessary, to prepare for an April 1 trial about six weeks in

18   the future.

19        The standards, as I understand them -- and I don't

20   have the case at my fingertips, but -- for proving criminal

21   contempt are straightforward:  The Government will have to

22   prove beyond a reasonable doubt that there was an order, the

23   defendant knew the order, and that he willfully violated the

24   order.  As I said earlier, the defendant has, essentially,

25   admitted in violating the order intentionally.

1    His statements I expect, will be admissible at trial,

2    but a jury will be the fact finder, I will not, because it may

3    be that, if he's convicted, proven guilty beyond a reasonable

4    doubt, that a sentence of more than six months will be

5    necessary and most appropriate.

6    I allowed the defendant's retained counsel to

7    withdraw, although I considered appointing Ms. Kirshenbaum

8    under the Criminal Justice Act.  On February 21, I appointed

9    Mr. Horstmann.  I had scheduled the trial -- on February 12, I

10   scheduled the trial for April 1.  He moved promptly for

11   continuance of that trial, and I allowed that motion to provide

12   more time for him to prepare.

13   On March 14, I stated my intention to start trial on

14   April 22.  The pendency of this motion may have frustrated my

15   ability to do that and, therefore, to manage my docket and my

16   other obligations, which are many.  But trial on April 22

17   should have been ample time for Mr. Horstmann to prepare.  I

18   have limited availability after that date.

19   Nothing I have said or done, I believe, would cause or

20   contribute to a reasonable person questioning my impartiality.

21   Advising the defendant that, if criminal contempt proceedings

22   were instituted, there would be a detention hearing is not

23   evidence of animus or bias as argued, it's required by Rule 46

24   and the statute, Sections 3142 and 3144.  So, while

25   Mr. Horstmann's brief says that that was a shocking statement,

1   it was advice to the defendant of what the law requires.

2        I have made references, including today, to the

3   evidence, that just evidence of possible guilt that has

4   actually increased since the initial filing by the SEC, but, as

5   I said, I'm not going to be the fact finder.  I will continue,

6   as I was from the time of the first hearing, to be determined

7   to provide Mr. Medoff all the protections that every criminal

8   defendant in a criminal case is entitled to, and the jury will

9   decide if he's been proven guilty beyond a reasonable doubt.

10        In essence, this case is similar to case *Whitehead*,

11   2017, WL 6343588 at 5, a Central District of California case.

12   There's another *Young*, 45 F.3d 1405, Tenth Circuit, case.  And,

13   as I noted, in *Union Roofers*, judges -- it's been found

14   permissible under 455(a) for judges to sit even when they've

15   presided in prior cases, criminal cases, involving a defendant.

16        That's what *Liteky* was generally -- well, was

17   referring to when the Supreme Court wrote, "Also not subject to

18   deprecatory characterization as 'bias' or 'prejudice' are

19   opinions held by judges as a result of what they learned in

20   earlier proceedings.  It has long been regarded as normal and

21   proper for a judge to sit in the same case upon its remand, and

22   to sit in successive trials involving the same defendant."

23        As I said during the hearing, the references I made to

24   the SEC asking me to enter an $18 million judgment against

25   Biochemics were not irrelevant.  I asked in 2018, I think it

1    was, whether Biochemics had $18 million.  The SEC said no, and

2    I said I don't intend to issue orders I can't enforce or

3    won't -- or likely can't be obeyed or won't be obeyed, and that

4    was the same concern I had initially and continue to have about

5    any order of disgorgement or of $1,600,000 regarding

6    Mr. Medoff.

7            This case is not, as the defendant contends, analogous

8    to the Third Circuit's decision in *Antar*, 353 F.3d 568.  In

9    *Antar*, there was a civil case where the SEC was seeking, I

10   think, $52 million that the defendant, a company called Crazy

11   Eddie, was refusing to pay.  The judge said that his object

12   from day one was to get money fraudulently obtained back to the

13   public, and the Third Circuit held that a reasonable person

14   might wonder if the judge would make -- was making rulings in

15   the related criminal case to achieve that goal and not giving

16   the defendant a fair trial.

17           Here, the evidence would indicate to a reasonable

18   person that I'm not trying to use criminal contempt to coerce

19   Mr. Medoff into paying money he owes to the SEC.  As I've said,

20   that would be futile and it's not the reason for this at all.

21   A reasonable person would understand that, if the defendant is

22   found to be guilty, he should be punished for violating a court

23   order willfully, he should be deterred from continuing, and a

24   message should be sent to others not to disobey injunctions.

25           As I said at the outset, I admire zealous advocacy.

1   However, as Mr. Horstmann has indicated that this decision may

2   be appealed, a decision that I understand will be reviewed for

3   abuse of discretion, I'll say the following respectfully:

4           This motion to recuse appears to me to be frivolous.

5   It appears to me to be an effort to delay the trial, further

6   delay the trial.  It is, in my view -- and I'm not the ultimate

7   arbiter if there's an appeal, but -- an effort to manipulate

8   the system for strategic purposes, perhaps to obtain another

9   judge who would have to do a great deal of work to prepare and,

10  as I say, at a minimum, to further delay this matter.

11          I'll also say, as I said at the outset, that I'm

12  concerned by the prosecution's -- the US Attorney's two-page

13  filing that took no position on the motion -- and even if it

14  thought it was meritorious, I would have wanted to hear that --

15  and characterizing the initiation of criminal contempt

16  proceedings by the Court sua sponte as unique.  It's not

17  unique; it's common.  And, indeed, the SEC felt it couldn't do

18  it in this case.

19          So I've ordered you to order the transcript of this on

20  an expedited basis.  As I said, I previously expressed my

21  intention to start trial on April 22.  But if it's not April

22  22, it's going to be April 29 to give you a little more time to

23  do -- make the filings that are necessary.  Has the Government

24  talked to the SEC to assure that it has all material

25  exculpatory information?

1      MS. WRIGHT:  We did confer with the SEC.  It's been a

2   while.  We did get a download of information and documents from

3   them --

4      THE COURT:  Hold on, could you speak me the microphone

5   please.  I see the CSO is standing, is there a reason?  It's

6   distracting.  All right.  Speak in the microphone, please.

7      MS. WRIGHT:  I did confer with the SEC folks, but it

8   has been a while now.  I got downloaded information from them

9   and documents, which we have, but prior to trial I will, of

10   course, go back to them and make sure that we have --

11      THE COURT:  Well, what have you been doing in this

12   case since February 7?

13      MS. WRIGHT:  Well, it's not my only case, Your Honor.

14      THE COURT:  I was inclined to start the trial on April

15   22.

16      MS. WRIGHT:  And I assure you I would have been

17   prepared for that trial if we had gone forward on that date.

18      MR. HORSTMANN:  Can I be heard briefly on the trial

19   date if now is a good time?

20      THE COURT:  Go ahead.

21      MR. HORSTMANN:  I do appreciate another week.

22   Obviously time benefits the defendant here.  I don't think it's

23   enough.  I just don't.  I have pretrial motions that need to be

24   filed, including what I consider to be a substantial motion --

25      THE COURT:  Well, I'll give you time -- I'll ask the

1    same question to you.  You've been appointed since February 21,

2    I've been telling you what the standards as I understand them

3    are for a recusal under 455 and for estoppel.  Do you have a

4    case that you think helps you beyond the one that you mentioned

5    in your brief?

6           MR. HORSTMANN:  I do.  I do.

7           THE COURT:  Okay, well I'll give you a date to file.

8    I'm going to give you a date to file.

9           MR. HORSTMANN:  I'd ask for May 1 to file.

10          THE COURT:  It's not possible.  I'm sorry, May 1,

11   what?

12          MR. HORSTMANN:  To file the motion.

13          THE COURT:  No.  Look, I've got --

14          MR. HORSTMANN:  I also need to find witnesses, Your

15   Honor.  I don't know what's out there that --

16          THE COURT:  We'll see.  Try.  Have a seat.  It's 5:20.

17          MR. HORSTMANN:  Well -- okay.  Your Honor, may I be

18   heard on a very brief matter?

19          THE COURT:  What's that?

20          MR. HORSTMANN:  May I be heard on a brief matter?

21          THE COURT:  Let me give you the schedule --

22          MR. HORSTMANN:  Mr. Medoff is very ill and can he be

23   excused from this part of the process?

24          THE COURT:  Yes.

25          MR. HORSTMANN:  I'll tell him --

1          THE COURT:  No, that's fine, he can go.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Please, feel better.

4          MR. HORSTMANN:  Thank you, Your Honor.

5          THE COURT:  Look, Mr. Horstmann, I believe that -- I

6     ordered Mr. Medoff's prior counsel to cooperate in the

7     transition to you.  Did they give you all the documents they

8     had?

9          MR. HORSTMANN:  I don't know that they gave me

10    everything, but I got a lot.

11         THE COURT:  You got a lot.

12         MR. HORSTMANN:  I got a lot.  I have not read

13    everything, but I'm pretty close.

14         THE COURT:  All right, but I ordered you -- you've

15    read a lot.

16         MR. HORSTMANN:  You can't order me on how to

17    prioritize my time.  I did my best, okay?  That was not --

18         THE COURT:  Okay, have a seat, it's almost 5:30.

19         Okay, you've got the order.  I'll issue it tomorrow,

20    the pretrial order.  The Government shall disclose to the

21    defendant what's required by 4(a) and 4(b), which is all

22    material exculpatory evidence, and that's why I wanted the SEC

23    here.  You can meet now, make sure if there's anything -- I'm

24    telling the SEC -- that would tend to negate guilt or undermine

25    the credibility, challenge the credibility of any witness, you

1  need to give it to the Government and the Government needs to

2  give it to Mr. Horstmann, and that needs to be done by this

3  Friday.  So today is the 9th; that's the 12th.

4          MR. HORSTMANN:  Understood, Your Honor.

5          THE COURT:  The parties shall, by April 16, file

6  proposed voir dire questions, proposed jury instructions; and

7  any motions in limine with supporting memoranda, any responses

8  are due April 22.  The Government by April 22 shall provide the

9  defendant with the names and addresses of its witnesses.  If

10 the Government -- and then supplement it if necessary and

11 provide the defendant with its exhibits.

12         The defendant shall do the same by April 24.  And

13 we'll have another pretrial conference on April 26 at 11:00

14 a.m. and trial will begin on the 29th at 9:00.  This may seem

15 like a short period of time from today.

16         MR. HORSTMANN:  It is a short period of time.

17         THE COURT:  I know, until the trial date.  But this

18 case didn't start, Mr. Horstmann, on the day you appeared, and

19 it was February 21 -- we're talking two and a half months.  And

20 you did your usual energetic job filing what I find to be a

21 surprisingly unmeritorious motion to recuse, and I'm sure it's

22 not the only thing you've done in this case.  I haven't given

23 you the date -- that's number three.

24         You know, you're welcome to continue to talk and see

25 whether Mr. Medoff wants to go to trial or not.  You said it

1    would be a one or two-day trial.  It will take a while to

2    select the jury, but I think that's right.  I do have some time

3    that week.  I have no time the following week for a combination

4    of reasons -- one of which is I'm scheduled to be a fact

5    witness in a high-profile court case in state court against

6    Mayor Walsh and Felix Arroyo and others -- and then I have

7    other cases.  I have to manage my docket.

8             So take a deep breath.  It's -- I'm sure it's

9    Mr. Medoff's first choice that this would go away, but it's not

10   going to go away and if you go to the First Circuit -- and in

11   my order I'll write that I hope they take it up very quickly

12   and resolve the matter, but -- I hope you won't do that to try

13   to delay the progress of this.  As I said.

14            Is there anything further in this matter for today?

15            MR. HORSTMANN:  I would just like to say that there's

16   no judge shopping going on here.  There's absolutely none.

17   There's very few judges that I would want in this building over

18   Your Honor -- except for this guy.

19            THE COURT:  What's that?

20            MR. HORSTMANN:  Except for this guy, Mr. Medoff.

21            THE COURT:  I can't -- say it again.  I'm having

22   trouble --

23            MR. HORSTMANN:  Except for Mr. Medoff.

24            THE COURT:  Except what?

25            MR. HORSTMANN:  I'm not judge shopping in the

1   classical sense of, "Jeez, there's 14 better judges out there."

2   With respect to this gentleman, the comments that you made --

3   I'm not shopping for a better judge.

4           THE COURT:  Okay, maybe for delay, but --

5           MR. HORSTMANN:  Maybe.  Maybe righteous delay.

6           THE COURT:  I think that if you'd put the energy into

7   preparing for trial since February 21 that you put into that

8   motion that I just decided, you'd be ready for trial.

9           MR. HORSTMANN:  We'll take that as a compliment, Your

10  Honor.

11          THE COURT:  It's intended as a compliment.  And,

12  look -- as I said, I respect zealous advocacy but -- and you're

13  the lawyer, not the client, so perhaps nothing is entirely up

14  to you, but we're going to have a trial soon in this case.

15          MR. HORSTMANN:  29th, right?

16          THE COURT:  What's that?

17          MR. HORSTMANN:  The 29th, right, not the 22nd?

18          THE COURT:  Not the 22nd.  I'm giving you another

19  extension.  And you can do it.

20          MR. HORSTMANN:  These are only gifts because you

21  shortened the field by so much.

22          THE COURT:  No, you shortened the field.  But anyway,

23  it's too late to be having this conversation.  Court is in --

24  with great thanks to the two court reporters, who both seem to

25  be functioning nicely, and to my staff, court is in recess.

1                   (Whereupon the hearing was adjourned.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Jessica Leonard, Certified Shorthand Reporter

4    and Federal Certified Realtime Reporter for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 13th day of April, 2024.

10

11

12              /s/ Jessica M. Leonard

13              Jessica M. Leonard, CSR, FCRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | ) | Cr. No. 24-10048 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CRAIG MEDOFF, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                             April 10, 2024

For the reasons described in detail at the April 9, 2024
hearing, defendant Craig Medoff's Motion to Recuse the District
Judge, pursuant to 28 U.S.C. §455(a) only (the "Motion"), is being
denied because a reasonable person could not question my
impartiality in this case.

At the hearing defendant's counsel indicated that defendant
may appeal this decision. Any appeal may delay the April 29, 2024
date, which has already been delayed once at his request and a
second time by the unmeritorious motion to recuse. Therefore, for
the benefit of the First Circuit primarily, I am reiterating and
amplifying my comments at the conclusion of the hearing.

If defendant wishes to seek immediate appellate review of the
denial of the Motion he must seek a writ of mandamus. See, e.g.,
In re Bulger, 710 F.3d 42, 45 (1st Cir. 2013). "Before the writ
will issue, the petitioner must satisfy the burden of showing that

[his] right to issuance of the writ is clear." Id. (citation and internal quotation marks omitted). He must also demonstrate that he will be irreparably harmed if the writ is not issued. Id.

> This standard is difficult to meet, and rightly so. Absent
> such deferential review, any defendant with a spurious
> accusation might seek to trigger immediate mandamus review of
> recusal proceedings that would burden the Government and
> delay his trial.

Id. at 46 (emphasis added).

As I noted in providing the reasons for denying the Motion, Apr. 9, 2024 Tr. at 46,[1] the First Circuit has written that:

> "[I]n the real world, recusal motions are sometimes driven
> more by litigation strategy than by ethical concerns.. . .
> [C]ourts cannot afford to spawn a public perception that
> lawyers and litigants will benefit by undertaking such
> machinations." In re Cargill, Inc., 66 F.3d 1256, 1262-63
> (1st Cir. 1995).

x x x

> The disqualification decision must reflect not only the need
> to secure public confidence through proceedings that appear
> to be impartial, but also, the need to prevent parties from
> too easily obtaining the disqualification of a judge, thereby
> potentially manipulating the system for strategic reasons,
> perhaps to obtain a judge more to their liking.

In re Allied-Signal Inc., 891 F.2d 967, 970 (1st Cir. 1989) (emphasis in original).

As I said at the hearing:

> I admire zealous advocacy.. . . [However] this motion to
> recuse appears to me to be frivolous. It appears to me to be
> an effort to . . . further delay the trial. It is, in my view—
> and I'm not the ultimate arbiter if there's an appeal—[] an

---

[1] The court is quoting a draft transcript and is estimating what the page numbers will be in the final transcript.

2

effort to manipulate the system for strategic purposes, perhaps to obtain another judge who would have to do a great deal of work to prepare and . . . at a minimum, to further delay this matter.

Apr. 9, 2024 Tr. at 53. Defendant's counsel denied that the Motion was filed in the hope of getting another judge, but acknowledged that "maybe" it was filed to obtain "righteous delay." Id. at 59.

Accordingly, if defendant seeks a writ of mandamus, I believe that the interests of justice would be served if the First Circuit could decide it promptly enough to allow trial to proceed without further delay on April 29, 2024, if the defendant has not shown that his "right to issuance of the writ is clear and indisputable." In re Bulger, 710 F.3d at 45.

In view of the foregoing, it is hereby ORDERED that:

(1)  The Motion (Dkt. No. 24) is DENIED.

(2)  If defendant petitions for a writ of mandamus, the Clerk shall provide this Order to the First Circuit for its consideration in deciding whether or not to grant the writ.

(3)  The parties shall order an expedited transcript of the April 9, 2024 hearing.

UNITED STATES DISTRICT JUDGE

1

                    UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF MASSACHUSETTS

3

4                                    )
     Securities and Exchange         )
5    Commission,                     )
                                     )
6            Plaintiff,              )
                                     )   Civil Action
7    v.                              )   No. 1:12-cv-12324-MLW
                                     )   Pages 1 to 30
8     Biochemics, Inc et al,         )
                                     )
9            Defendant.             )
                                     )
10

11

12            BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE
13

14                    MOTION HEARING

15

16                  October 23, 2023
                         2:30
17

18        John J. Moakley United States Courthouse
                    Courtroom No. 2
19                 One Courthouse Way
               Boston, Massachusetts 02210
20

21

22

23              Jessica M. Leonard, CSR
                  Official Court Reporter
24        John J. Moakley United States Courthouse
                    One Courthouse Way
25             Boston, Massachusetts 02210
              JessicaMichaelLeonard@gmail.com

```
 1

 2    APPEARANCES:

 3    On Behalf of the Plaintiff:

 4          SECURITIES And EXCHANGE COMMISSION
            By: Martin F. Healey
 5          33 Arch Street, 23rd Floor
            Boston, MA 02110
 6          617-573-8952
            Healeym@sec.gov
 7

 8    On Behalf of the Plaintiff:

 9          Securities and Exchange Commission - MA
            By: Russell Mawn, Jr
10          33 Arch Street
            23rd Floor
11          Boston, MA 02110-1424
            205-243-3277
12          Mawnru@sec.gov

13    On Behalf of the Defendant:

14          PRO SE
            By: Craig Medoff
15          25 Hancock Street
            Boston, MA 02114
16          978-717-5000
            Craigmedoff@yahoo.com
17

18

19

20

21

22

23

24
                      Proceedings reported and produced
25                     by computer-aided stenography.
```

```
 1              P R O C E E D I N G S

 2         THE CLERK:  Your Honor this is civil matter

 3    1:12-cv-12324, Securities and Exchange v. Biochemics, Inc.

 4         THE COURT:  Good afternoon.  Would counsel for the

 5    SEC, Mr. Medoff, and the representative of the US Attorney

 6    please identify themselves for the Court and for the record?

 7         MR. HEALEY:  Good afternoon, Your Honor.  For the SEC,

 8    Martin Healey and Russell Mawn.

 9         MS. WRIGHT:  Good afternoon, Your Honor.  Leslie

10    Wright for the US Attorney's office.

11         MR. SHEA:  Good afternoon, Your Honor.  Mark Shea for

12    Mr. Medoff.

13         THE COURT:  No, you're not.  You're just here to

14    observe.  This is not a criminal matter yet.  He hasn't applied

15    for the appointment of counsel.  I just wanted you to become

16    present in case this becomes a criminal matter.  In fact, you

17    can go sit back in the gallery I think would be most

18    appropriate.

19         MR. SHEA:  Well, Judge, respectfully, I understand

20    what you're saying, but I'm concerned that I've been brought

21    here to supposedly help someone --

22         THE COURT:  No, you haven't been brought here to help

23    someone.  You've been brought here out of what the Government

24    sometimes calls an abundance of caution so you would know what

25    this is about if it turns out that you're appointed to
```

1    represent Mr. Medoff.  This is not a criminal matter at this
2    point.  If you just go back and do what I told you, I think
3    you'll have a better understanding of why I was -- I wanted
4    somebody here and I had no duty to have anybody here for him.
5    If it's a civil matter, he has no right to the appointment of
6    counsel.  If it's a criminal matter, he didn't obey my order to
7    file a CJA affidavit, so you don't even have to stay if you
8    don't want to.
9           MR. SHEA:  Well, it's not that.  It's that my
10   understanding was that it was referred for criminal contempt.
11          THE COURT:  Well, you're wrong.  It hasn't been.  Do
12   you want to be held in contempt?  I'm ordering you to go back
13   there, and when you hear what this is about, you'll understand
14   better.  Nor have I appointed the US Attorney.  She can go back
15   there, too, but thank you for coming.
16          MR. MEDOFF:  Your Honor, my name is Craig Medoff.
17          THE COURT:  Thank you.  All right.  You may be seated.
18          All right, we're here pursuant to the orders I issued
19   on October 13 and October 20, 2023, Dkt. Nos. 741 and 747.
20   With regard to the chronology, on September 27, the SEC filed a
21   motion requesting that Mr. Medoff, a defendant in this case
22   that was concluded long ago, that he should be required to show
23   cause why he should not be held in civil contempt for, among
24   other things, violations of the 2016 order and the final
25   judgment concerning him that required, among other things, that

1    he not participate in the securities business for ten years,

2    and the SEC filed a supporting memo and declarations concerning

3    that motion.  In the memorandum and declarations, the

4    Government -- the SEC -- provided evidence of Mr. Medoff's

5    violations of a 1995 order not to participate in the securities

6    business and a guilty plea to conspiring to commit securities

7    fraud that ultimately resulted in him being imprisoned from

8    2011 to 2014, including at the inception of this case.

9              In my October 13, 2023, order, I questioned whether,

10   in view of the defendant's history of not obeying orders to

11   stay out of the securities business and his guilty plea to

12   committing securities fraud, whether issuing another order that

13   could be violated would be futile.  And I informed the parties

14   that I was considering instituting criminal contempt

15   proceedings.  I scheduled the hearing for today to address

16   whether civil or criminal contempt proceedings should be

17   initiated.  I ordered the defendant to file any motion to

18   continue by October 17.  I ordered the -- an Assistant United

19   States Attorney or the US Attorney to cause somebody to file an

20   appearance by October 19 if this case became a criminal matter,

21   so he or she would know what this is about.  And I ordered

22   Mr. Medoff to cause an attorney to appear for him by October 19

23   or to file ex parte and under seal -- meaning just for the

24   Court, not available to the SEC or the public -- the affidavit

25   required for the appointment of Criminal Justice Act counsel

1    providing accurate and complete financial information of

2    indigency in case this became a criminal matter so counsel

3    could be appointed promptly.

4         On October 19, two days late, the defendant filed a

5    motion for at least a 60-day continuance on October 19.  He had

6    previously informed the SEC of the information that was in that

7    motion and contacted the Court's docket clerk by e-mail and she

8    informed him that he had to file a motion, I had ordered it.

9         On October 17, the SEC filed an opposition to the

10   request for a continuance of at least 60 days.  It didn't

11   include an affidavit.  Mr. Medoff's motion didn't include an

12   affidavit, either, as required by Local Rule 7.1(b)1.  But the

13   SEC was basically addressing the information that was in the

14   e-mail it received on October 17, I believe.

15        On October 19, the assistant United States Attorney

16   did file an appearance.  No counsel for Mr. Medoff filed an

17   appearance, nor did he file the financial affidavit as ordered

18   required for the appointment of CJA counsel if this matter

19   becomes a criminal matter.  The defendant has a right to

20   counsel in a criminal case but not in a civil case.  That's the

21   distinction.

22        On October 20, after learning that the motion for

23   continuance had been filed two days late the day before, I

24   denied the motion to continue for at least 60 days without

25   prejudice.  I wrote that it would be the first matter discussed

1    at today's hearing.  I ordered Mr. Medoff and the SEC to file

2    by 4:00 p.m. on the 20th, today's Monday, that was last

3    Friday -- to file by 4:00 p.m. on October 20, sworn affidavits

4    verifying the allegations and their submissions regarding the

5    motion to continue.  The SEC did that; the defendant did not.

6    In fact --

7              MR. MAWN:  I filed this afternoon --

8              THE COURT:  Listen.  You want to be quiet and listen.

9    When it's your turn to talk, I'll tell you, you'll stand up.

10   If you filed it this afternoon, this is just what I'm beginning

11   to say.  I haven't seen it.  You filed it at 4:00 on Friday, I

12   would have seen it.  Is it filed, John?

13             THE CLERK:  Yes.

14             THE COURT:  Mr. Medoff, stand up and be sworn, please.

15             (The defendant was sworn.)

16             THE COURT:  I'm just going to ask you -- would you

17   please state your true full name?

18             MR. MEDOFF:  Craig Medoff.

19             THE COURT:  Do you understand you just took an oath to

20   answer the question I'm going to ask you truthfully, and a

21   failure to do that could be a prosecutable criminal offense?

22             MR. MEDOFF:  I understand.

23             THE COURT:  An affidavit, a sworn affidavit is a

24   statement made under the pains and penalties of perjury.  What

25   you write here is:  I do hereby certify that the content of the

1    motion listed below is true and correct.  Do you now state

2    under the pains and penalties of perjury that everything in

3    there is true and correct?

4            MR. MEDOFF:  Yes.

5            THE COURT:  Okay, you may be seated.  It's not

6    docketed yet, but we'll make it Exhibit 1 of today.  And at the

7    bottom of this, it is just an "s," but I think the answer I

8    just got is -- satisfies the requirement that there be a sworn

9    affidavit.  All right.  But when I was preparing for this

10   hearing earlier today, this had not been filed.  So basically,

11   there have been violations of my October 13 and 20th orders

12   that could also be addressed as civil or criminal contempt, but

13   that's not the focus for today.

14           I have not instituted civil or criminal contempt

15   proceedings for the alleged violation of the 2016 orders that

16   are in my final judgment, to which Mr. Medoff consented.  Among

17   other things, he agreed not to participate in the securities

18   business for ten years, and I ordered that.  If I institute

19   civil or criminal contempt proceedings, the defendant will be

20   given even more specific notice and a reasonable time to

21   prepare.  If it's a criminal case and there's a satisfactory,

22   accurate, and complete financial affidavit submitted under oath

23   indicating -- showing that he cannot afford to retain a lawyer,

24   then a lawyer will be appointed to represent him.

25           But I said I would start by hearing from the parties

1    on the motion to continue this hearing for at least 60 days.

2    And I'm going to give you a chance to speak to your motion,

3    Mr. Medoff, but I want to caution you about something.  When

4    you talk about the reasons for wanting a continuance of at

5    least 60 days, you may not -- it's up to you, but you may not

6    want to discuss the merits of the allegations against you.

7    You've got a Fifth Amendment right not to say anything that

8    might tend to incriminate you, and anything you do say could be

9    used against you in a future criminal or civil proceeding.

10         So that's up to you, what you want to say in support

11   of your request to continue this hearing, which is intended to

12   give me more information as to whether this should be a civil

13   matter or a criminal matter.  It's likely to be one or the

14   other.  In any event, what, if anything, would you like to say?

15         MR. MEDOFF:  Should I stand?

16         THE COURT:  Yes -- in further support of your request

17   for a 60 day at least continuance.

18         MR. MEDOFF:  I don't have the money.  I'm trying to

19   borrow the money to hire private criminal or civil securities

20   counsel.  So I prefer to use someone privately for this

21   hearing.  And the basic -- my basic motion listed specific

22   dates, and I feel that I didn't have sufficient notice.  I was

23   notified on the 27th of September about this case.

24         THE COURT:  You say you were notified?

25         MR. MEDOFF:  By the SEC, I was notified on September

1   27.

2           THE COURT:  Sorry, they say they first notified you on

3   September 21.

4           MR. MEDOFF:  We had a phone call and an e-mail.  So,

5   yeah.  But, I mean, he is -- during the conversation, it seemed

6   like he was trying to find out whether he should file or not.

7   So I guess I'm saying the formal notification was on the 27th.

8           THE COURT:  When the motion was filed?

9           MR. MEDOFF:  Yeah.  In any case, I believe --

10          THE COURT:  Let me ask you this.  What have you done

11  to try to get a lawyer to represent you since either -- well,

12  let's say September 21, but at least September 27?

13          MR. MEDOFF:  Well, what I've done is looked up some

14  law firms here in Boston that are good at securities issues

15  that are maybe a bit larger and more expensive.  Like Cleary

16  Gottlieb or DLA Piper.

17          THE COURT:  Have you talked to anybody in those firms?

18          MR. MEDOFF:  I haven't yet, because they're all going

19  to ask for a retainer of $25,000 to $50,000.  So part of this

20  time I've spent trying to borrow that money because I don't

21  have it readily available.

22          THE COURT:  Who have you tried -- I mean, how much

23  money are you trying to borrow?

24          MR. MEDOFF:  The entire thing, $25,000 to $50,000.

25          THE COURT:  Twenty-five to $50,000?

1          MR. MEDOFF:  As the initial retainer.  That doesn't

2    mean that would cover all the costs, but that would be the

3    initial cost, I believe.  And so who -- I'm trying to borrow it

4    from my cousin George Krupp who's very wealthy --

5          THE COURT:  Your cousin George Krupp?  K-R-U-P-P?

6          MR. MEDOFF:  Yeah, he has a family wealth office here

7    in Boston.  And I'm also talking to George because he's the

8    trustee of the Medoff Family Trust, to which I'm a beneficiary,

9    and trying to ascertain if the trust could lend me the money.

10         THE COURT:  And have you talked with George Krupp

11   about this?

12         MR. MEDOFF:  I just sent him a couple of e-mails.

13   He's pretty busy.

14         THE COURT:  Did you get a response?

15         MR. MEDOFF:  We were supposed to talk today or

16   tomorrow.  Yeah, he said we need to talk.  I have to meet with

17   him in person.

18         THE COURT:  Where does he live?

19         MR. MEDOFF:  He lives in Newton.  But his family

20   wealth office is right here in Boston.  Berkshire -- I think

21   it's Krupp family wealth office and Berkshire realty is George.

22   So I'll find out later this afternoon when he can meet with me

23   to have this discussion.  If I fail in that endeavor, then I

24   would have to file your affidavit.  I apologize for not coming

25   to a determination quicker.  I don't have a good excuse except

1    to say it's very stressful, this case, to me.  Having spent

2    over two years in federal prison.  And there is one inaccuracy

3    in your summation, which is that I cooperated with the SEC, the

4    Justice Department, and the FBI from 1994 through 2006.

5         So when I went to prison, I was sent to prison for

6    probation violations related to 1994.  And my probation

7    violations were using drugs.  Because at the time, I was a drug

8    addict.  And I was a drug addict at the time of your

9    adjudication in 2016 on Biochemics.  When I'm not a drug

10   addict --

11        THE COURT:  Let me ask you this question, because this

12   case started in 2012.  I happen to remember it.  Did you -- and

13   the SEC may know this, were you in prison when you agreed to

14   the consent judgment in this case?

15        MR. MEDOFF:  No.  I wasn't in prison from 2011 to -- I

16   think it was 2013 through 2015 I was in prison.  I was put

17   there for a year, I came out for three to six months and then

18   the judge put me in again for the same violation.

19        THE COURT:  Using drugs?

20        MR. MEDOFF:  Yes.  As I recall, yeah, freebase

21   cocaine.  As I recall -- it's well documented, I've been to 12

22   inpatient rehabs and six outpatient rehabs, et cetera, et

23   cetera.  But as I recall, I was not in prison in 2016 but I was

24   not in my right mind and to be quite -- well, that's all I have

25   to say about that.

1          THE COURT:  Are you in your right mind now?

2          MR. MEDOFF:  Yes, I'm sober.  Yes.

3          THE COURT:  All right.  You may be seated.  Now I'd

4     like to hear from the SEC about this request for a continuance

5     and what your position is and what your concerns are --

6     although I think I can intuit them -- about a lengthy

7     continuance?

8          MR. HEALEY:  Your Honor, whenever we initiate a

9     case -- and obviously there's a case that precedes this, but

10    this is the initiation of a new action.  Whenever we do that,

11    certainly my practice, and I think our office's practice, is to

12    be reasonable in terms of time, and that's why we took no

13    position in the preemptive papers that we filed about whether

14    or not a short continuance would be appropriate.  And that

15    remains our position.  As I said, it's consistent with what we

16    do generally.  We file a complaint, somebody asks for an

17    extension of time to file an answer, it would be an

18    extraordinary circumstance not for us to go along with that

19    request.  So I view it similarly here.  60 days, I suspect we

20    would not do that in most instances.  That seems a little

21    extreme.

22          I've had a couple conversations with Mr. Medoff.  The

23    colloquy has been similar with what the Court has had in terms

24    of his attitude and willingness to engage, and that informs my

25    view as well.

1          THE COURT:  Well, you provided me declarations and a
2     memorandum that provide substantial reason to be concerned that
3     Mr. Medoff's in the securities business now.  I'm being
4     somewhat colloquial but violating the order in several ways.
5     And you filed that on September 27.  It communicated to me --
6     and you can confirm or clarify or correct this -- that he's
7     still in the securities business.  Is that the SEC's view?
8          MR. HEALEY:  I don't have any indication that the
9     information we had on September 27 has changed.
10          THE COURT:  Because that's -- I mean, that's a serious
11     concern.  Let me ask you this:  The SEC moved for civil
12     contempt and generally -- the First Circuit among others have
13     held that they can be simultaneous or sequential civil and
14     criminal contempt proceedings.  One case in which the First
15     Circuit said that is *Marquardo*, 149 F.3d 36, 41.  But
16     ordinarily I would start with civil contempt proceedings before
17     going to criminal contempt proceedings.  But, as the Supreme
18     Court said in the case I cited in my October 13 order --
19     *Shillitani*, 384 US 364, 370, n.9 -- if a judge has good reason
20     to be concerned that it would be fruitless, futile to start
21     with civil contempt proceedings, you can start with criminal
22     proceedings.
23          And so reading what you submitted, which informed me
24     that there was a prior consent decree, 1995, that it -- and,
25     again, correct me if I misunderstand this, that it was

1    violated, that there was also a guilty plea to engaging in

2    securities fraud, although Mr. Medoff says maybe that was

3    before the consent decree.  But whatever it is, he ended up as

4    a result of that guilty plea doing time in federal prison.  And

5    it wasn't sufficient, according to what you've submitted, or

6    the deter him from doing it again.  I'm open minded about this

7    as to whether it was actually done, but I think there's ample

8    evidence to institute contempt proceedings, civil or criminal.

9    But I don't issue orders that I don't expect are going to be

10   obeyed and my concern is -- and you can tell me more about the

11   order you're requesting -- that if I just order him not to --

12   not engage in the securities business, I don't know why I would

13   have any confidence he's going to obey the order the third time

14   when he, according to you, didn't obey the 2016 order at all.

15              And if he's in the securities business, he's

16   continuing to present a danger.  One reason, if he's

17   convicted -- which would require proof beyond a reasonable

18   doubt that he violated the order willfully -- would be to

19   protect the community from the danger, continuing danger, to

20   send Mr. Medoff a message don't keep doing this -- if he's

21   doing it, don't keep doing this and to try to send that message

22   to others.  You signed a consent decree.  If you've got a court

23   order, don't violate the order.

24              So you know that I'm concerned that issuing an order

25   that's comparable to the order that you provide in a

1   substantial basis to be concerned is being violated, why should

2   I think that wouldn't be futile or fruitless?

3         MR. HEALEY:  I'm going to try to unpack that a little

4   bit.  There's a short answer, and the short answer is our

5   authority extends to civil contempt and so our motion for an

6   order to show cause that the Court issue the requested order,

7   that's where our authority ends.

8         THE COURT:  Wait a minute.  You can't move for

9   criminal contempt proceedings?

10        MR. HEALEY:  No.

11        THE COURT:  Really?

12        MR. HEALEY:  I don't believe so.  I haven't found any

13   authority for that, Your Honor.

14        THE COURT:  I don't know what the authority is for

15   moving for civil contempt.  You've got 18 United States Code

16   Section 401.  There are many parts of it that govern criminal

17   contempt, but it applies to all orders and anybody -- any

18   person, any party can apply -- can move for criminal contempt

19   or the Court can do it on its own initiative if there's been

20   disobedience of the court order.  That's interesting.

21        MR. HEALEY:  That was the short answer.

22        THE COURT:  That was the short answer.  Okay, so let's

23   assume, regardless of what you have the discretion or the

24   authority to move for, I can sua sponte, on my own, institute

25   criminal contempt proceedings.  Is there a reason I shouldn't

1   be seriously concerned that just getting another order to not

2   participate in the securities business will be obeyed?

3          MR. HEALEY:  The SEC shares that concern.  We have

4   had -- we don't bring a lot of contempt motions, and when we

5   do, there is a whole range of sanctions that are much more

6   targeted than -- even in this instance where we've got a

7   conduct-based injunction where the requested sanctions are much

8   more targeted and, for instance, they have expiration dates of

9   certain actions have to be done by X, certain actions have to

10  be done by Y.  And obviously civil contempt is a coercive

11  approach.  And I've had civil contempt matters where people

12  have been jailed under civil contempt as a coercive step to

13  satisfy the Court that they are adhering to orders that have

14  been entered.

15         THE COURT:  Well, I've jailed people for civil

16  contempt.  But typically, you have to exhaust the less onerous

17  means to coerce, although I don't know what other means there

18  would be.  But there could be.

19         MR. HEALEY:  We've at least referenced some in our

20  motion, Your Honor.

21         THE COURT:  Well, I'm looking at them.  But you want

22  an order requiring that Medoff immediately halt the violative

23  conduct and provide evidence satisfactory to the Court that

24  such conduct has ceased by a certain date.  It seems to me it's

25  the type of thing that, even if I was persuaded that it

1   stopped, it could resume.  Judges have many, many cases, and

2   this one took an uncommonly long time to resolve with regard to

3   everybody.  And it's a case in which I found the SEC -- I

4   remember this vividly, I don't think you were here, but some of

5   the lawyers sitting in the back were -- my eyes are good enough

6   to recognize them -- this doesn't relate to Mr. Medoff, it

7   related to Biochemics.  I think I was asked to sign an order

8   directing them to pay a judgment of $16 million and I said, "Do

9   they have $16 million?"  And the answer was no.  So I said what

10  I just said today, "I don't issue orders I don't intend to

11  enforce," and then you worked out an agreement where they would

12  pay a million dollars and more over time, and that generated a

13  shell game that required years of litigation, including

14  proceedings I conducted with a bankruptcy judge.

15          MR. HEALEY:  Your memory for the specifics is better

16  than mine, but I do know that it was a torturous path.

17          THE COURT:  They got the million dollars by probably

18  engaging in fraudulent conveyance of property and then they

19  borrowed money in a separate entity, supposedly separate

20  entity, and didn't pay the rest of the money and then the

21  people who lent the money for an IPO that the SEC wouldn't let

22  go forward.  Lost their money and sued.  I mean, it was very

23  complicated.  And I thought concluded.  But, you know,

24  Mr. Medoff wasn't part of any of that.  But it's --

25          MR. HEALEY:  Your Honor, I share your concerns.  I

1   prosecuted a lot of criminal cases, and I'm not reluctant to

2   ask the Court or suggest together the US Attorney's office in

3   conversation that certain conduct is appropriate for criminal

4   prosecution.  I am hopeful that a civil contempt motion here,

5   with targeted relief, could accomplish in the short term what

6   we're hopeful to accomplish.  If I'm wrong, then the recourse

7   to criminal contempt remains.

8          THE COURT:  So I'm looking at page 12 of your motion,

9   Docket 737.  You want an order requiring that Medoff

10  immediately halt the violative conduct and provide evidence

11  satisfactory to the Court that such conduct is ceased by a

12  certain date.  Then you want an order requiring that Mr. Medoff

13  provide curative notice of his disciplinary history in

14  association with Nova to clients, former clients, and investors

15  related to any conduct violating the 2016 judgment.

16         Then you want an order requiring that Medoff, in any

17  entity subject to the 2016 final judgment, provide an account

18  of all assets and liabilities and financial transactions in

19  which they were involved related to the issuance, offer, or

20  sale of any security since the date of the 2016 final judgment.

21  Why do you want that order?

22         MR. HEALEY:  First of all, to know what income

23  Mr. Medoff may have generated as a result of violating the

24  order.  And then, obviously, an additional discouragement order

25  can be sought from the Court.

1          THE COURT:  Right.  But here he's telling me that he

2     can't afford a lawyer.  He doesn't have $25,000 or $50,000

3     which he thinks a retainer would cost.  It sounds like --

4     again, it sounds like, to me, all of this work would prove to

5     be a hollow exercise because --

6          MR. HEALEY:  Judge Wolf, you may well be correct.  I

7     can't disagree with much of what you're saying.  But our first

8     request is an attempt at coercive steps.

9          THE COURT:  And then you want an order providing for

10    expedited discovery in preventing the destruction alteration of

11    any documents.  That order -- I'm going to issue that today

12    while this is pending.  I'm going to order that Mr. Medoff and

13    anybody acting in concert with him not destroy, alter, conceal

14    any documents, texts, e-mails or other records or information

15    relevant to the SEC's motion for contempt.  In fact, I'm giving

16    you that order orally right now.  You'll get it in writing,

17    Mr. Medoff.  But you don't want to violate that order.

18          Then you want an order requiring to disgorge all money

19    obtained in violation of provisions of the final judgment.

20    Again, as I said, maybe he's hiding assets, but I think when he

21    says he doesn't have enough money to hire a lawyer, if he had

22    assets --

23          MR. HEALEY:  I'm not going to invade that colloquy,

24    but I am going to reference the materials we filed with the

25    Court which indicate substantial flows of money in accounts

1    that Mr. Medoff, if he doesn't have control over them, he

2    certainly has access to them.

3            THE COURT:  What does that mean?

4            MR. HEALEY:  He's getting money from them.

5            THE COURT:  That are paying his -- explain what you're

6    referring to.

7            MR. HEALEY:  Well, there were a number of analyses of

8    bank accounts that we included in -- as attachments in our

9    motion.  And they indicate rent that's been paid, they indicate

10   ATM deposits, that there's strong circumstantial evidence that

11   they relate to Mr. Medoff.  There were actual payments that are

12   made to Mr. Medoff or entities that he's involved with.  So

13   there's a very strong indication that money is flowing to

14   Mr. Medoff through this entity Nova Capital.

15           THE COURT:  But there's also evidence that he was

16   putting a lot of money into Nova.

17           MR. HEALEY:  Again, that begs the question, that comes

18   from where?

19           THE COURT:  It was over $400,000 according to the SEC.

20   Mr. Medoff, it's -- here, stand up please.  It's my

21   understanding that you would like to try to hire counsel

22   privately.  Correct?

23           MR. MEDOFF:  Yes.

24           THE COURT:  And your last best hope of getting money

25   to do that is from George Krupp, the trustee?

```
 1              MR. MEDOFF:  Yes.
 2              THE COURT:  And when do you -- and when are you going
 3    to talk to him?
 4              MR. MEDOFF:  Today or tomorrow.
 5              THE COURT:  You see, if -- I wanted to have this
 6    hearing to decide whether -- I am going to institute contempt
 7    proceedings.  That's just the beginning.  If they're criminal
 8    proceedings, it will have to be proven beyond a reasonable
 9    doubt that you willfully violated my order.  If it's a civil
10    proceeding, they'll have to be clear and convincing evidence
11    that you violated it.  And depending on how long a potential --
12    if it's a criminal case, depending on the potential sentence,
13    you may have a right to a jury trial.
14              If you face the potential of being sentenced to more
15    than six months in prison, you would have a jury trial and you
16    would have a right to a lawyer, if it's a criminal case, but
17    not if it's a civil case.  But if it's a criminal case -- just
18    so you understand this, and these are legal requirements and
19    they're matters of fairness -- I would, as required by federal
20    rule of criminal procedure 42, tell you the time and place of
21    the trial and tell you whether it's likely to be a jury trial
22    or not and I would allow you a reasonable time to prepare.  I
23    feel like I gave you a reasonable time to come here today and
24    my availability is limited, so today is when I could have seen
25    you, starting about ten days ago.  Just to get a sense of which
```

1    have way to go.

2             But you'll have a reasonable time to prepare your

3    case.  I would be eligible to be the judge because this is an

4    issue of whether you disobeyed an order I issued.  You haven't

5    criticized me or been disrespectful, so I would be eligible to

6    preside in the case myself.  And if it's a civil case and you

7    wanted a lawyer, you'd have to find your own lawyer and pay for

8    your own lawyer.  If it's a criminal case, you'd have a right

9    to a court-appointed lawyer if you couldn't afford to hire a

10   lawyer.

11            But you would have to fill out -- accurately and

12   completely -- the affidavit that I attached to the October 13

13   order.  And you would be swearing under oath, under the pains

14   and penalties of perjury that the information you put there was

15   accurate and complete.  The Government, if it's a criminal

16   case, would be represented by the US Attorney and they wouldn't

17   see your affidavit.

18            I'll tell you another thing, too, and that is, if it's

19   a criminal case then either I or a magistrate judge would

20   decide whether you should be released or detained prior to

21   trial.  It's like any other criminal case.  There would be a

22   question of whether you're dangerous and whether there's some

23   combination of conditions that would protect the community from

24   any danger you might present.  And danger is not just physical

25   danger.

1          If it's a civil case, again, I issue an order that
2     specifies what the allegations that would need to be proved are
3     and I would give you a reasonable time to prepare for the
4     hearing with a lawyer or without one.  And then we'd have a
5     hearing, that would be before a judge, and if it's proven by
6     clear and convincing evidence that you violated the order, 2016
7     order, there would be some sanctions.  You know what the SEC is
8     asking for.  That's not the limit of what I could order.  But
9     that would be intended to coerce you to do something, not to
10    punish you for something you did.
11         Criminal contempt, if proven -- well, the purpose of a
12    criminal contempt proceeding is to determine whether you should
13    be punished for what you did.  And it can be both.  It could be
14    civil, and it could be criminal.  That's the case I mentioned,
15    *Marquardo* and many other cases.
16         So why don't you wait here for just a few minutes.
17    I'm going to take a brief recess.  I'll tell you where we are
18    and where we're going.
19         (A recess was taken from 3:25 to 3:35 p.m.)
20         THE COURT:  The discussion today has been helpful.
21    I'll tell you that based on what I know now, if I was going to
22    decide this matter today, I would initiate criminal contempt
23    proceedings.  However, it seems to me that what the SEC has
24    asked for is modest in the circumstances.  But Mr. Medoff,
25    would you like a couple days -- and it will be a couple days --

```
 1    to try to determine whether you can reach some agreement with
 2    the SEC to resolve its motion for civil contempt?
 3              MR. MEDOFF:  Okay.
 4              THE COURT:  Could you stand up, please?  Would you
 5    like a couple days to talk -- you've been talking to the SEC --
 6              MR. MEDOFF:  Just once.
 7              THE COURT:  Just once?  I'm not ordering you to talk
 8    to them, unless you want to.  It would be probably simplest for
 9    me to just initiate the criminal contempt proceedings.  But
10    what I'm thinking of is having you report tomorrow after you
11    talk to George Krupp, the trustee, as to whether he's going to
12    give you the money to hire a lawyer.  If the answer is no and
13    you don't want to talk with the SEC to try to resolve this,
14    I'll issue an order initiating criminal contempt proceedings.
15    But if you tell me by Thursday at noon that you've reached an
16    agreement to resolve this and ask me to enter another order,
17    I'll do that and defer deciding whether to institute criminal
18    contempt proceedings.
19              I'm trying to be fair to you.  I'm not trying to
20    threaten you into doing anything you don't want to do.  You
21    don't have to talk to them, and I can launch this formal
22    process and if you give me an accurate and complete financial
23    affidavit and it shows that you don't have access to funds to
24    hire a lawyer, then I'll appoint a lawyer for you.  It might be
25    Mr. Shea, it might be somebody else depending on the timing of
```

1    the appointment.

2              MR. MEDOFF:  Yeah, I'll talk to the SEC.

3              THE COURT:  What's that?

4              MR. MEDOFF:  Yes, I'll talk to the SEC.

5              THE COURT:  You'll talk to the SEC?  Mr. Healey, what

6    do you think about this approach?

7              MR. HEALEY:  I think it's fine, Your Honor.  I'm happy

8    to talk to Mr. Medoff.  The one thing I will caution is that

9    we've got SEC process here, and even if I -- sorry about that.

10   Anyway, we could go back to the Court -- if it's fruitful, we

11   have good discussions, we could come back to the court and

12   advise about that.

13             THE COURT:  Well, that's not quite my order.  Maybe

14   you need final approval, and you can talk to people.  Who needs

15   to approve it?

16             MR. HEALEY:  DC.

17             THE COURT:  Well, maybe you'll get final approval.

18   But why don't you have the head of your office talk to DC?  My

19   availability after this Friday is very limited for a good chunk

20   of time.  But here's the point.  I'm like a jury, I continue to

21   keep an open mind until I hear all the evidence, but the SEC's

22   done a lot of work and they have more than enough to initiate

23   some form of contempt proceedings and, you know, if --

24   Mr. Medoff, if you violated the order and are still violating

25   the order, one way or another, it's got to stop.

1          If you have a trial and if it's a jury trial, if
2    you're facing the prospect of a sentence of more than six
3    months -- and there's actually no maximum possible penalty, but
4    you haven't killed anybody.
5          MR. MEDOFF:  It will stop.
6          THE COURT:  What?
7          MR. MEDOFF:  I'll work with the SEC and stop these
8    activities.
9          THE COURT:  All right.  And since this isn't a
10   criminal lawyer, I can't appoint a lawyer to assist you now and
11   if Mr. Krupp will give you money to hire a lawyer --
12         MR. MEDOFF:  You want an answer by Thursday afternoon?
13         THE COURT:  No, I want an answer on the lawyer by
14   tomorrow afternoon.  And then an answer with regard to the
15   SEC -- whether you've reached an agreement, even if it's
16   subject to approval by the SEC -- by 12:00 noon on Thursday
17   because there are compelling reasons why that's a firm
18   deadline.  All right?
19         MR. MEDOFF:  Okay.
20         THE COURT:  All right.  I'm going to put all this in
21   writing.  And one of the things that I'm going to put in
22   writing is what I told you orally.  Now I'm orally ordering you
23   and if you've got a question and you don't understand this,
24   tell me.  But I'm ordering that, Mr. Medoff, neither you nor
25   anybody working with you in any way shall destroy, alter, or

1    conceal any documents or texts or e-mails or other records or

2    information in any form that's relevant to the SEC's motion

3    filed on September 27, 2023.  So if you do that, you'll have

4    violated this order, too.  That can be a criminal contempt

5    proceeding, and the more counts there are in any charge, the

6    higher the potential sentence would be.  So I just don't want

7    to have a problem.  Do you understand that order?

8            MR. MEDOFF:  Yes, I understand.  We haven't touched

9    any documents or e-mails or texts.

10           THE COURT:  And I'm not saying that you have.  But

11   that's something that they have in their motion, and I feel I

12   need to rule on that immediately.

13           MR. MEDOFF:  I'm saying even before this.  Like since

14   September 21 or whatever.  We haven't altered or touched or

15   destroyed anything.

16           THE COURT:  And look, you explained to me that you had

17   a drug problem.  You say you don't have one now and you seem to

18   be taking this seriously, which you should, because you know

19   what it's like to be in federal prison.  So just take it

20   seriously this week, see what they've asked for in their

21   motion, decide what you want to agree on or not agree on, and

22   let me know tomorrow about the lawyer, I'll tell you, 4:00

23   tomorrow, Tuesday, October 24.  And Thursday, 12:00 noon either

24   you have an agreement in principle or you don't.  And then I'll

25   decide how to proceed, and I've told you what my inclination

1    is.

2           MR. HEALEY:  Judge, with respect to the Thursday at

3    noon, do you want just a statement that an agreement has been

4    released?

5           THE COURT:  No, I want to know what you agreed on.

6           MR. HEALEY:  Fair enough, just wanted to make sure.

7           THE COURT:  All right, thank you very much.  You can

8    sit down.  And I'll thank Ms. Wright or Mr. Shea.  I don't know

9    whether your services are going to be necessary.  Well, it's

10   always nice to see you, Mr. Shea, and I appreciate your zealous

11   advocacy always.  I'm not going to listen to it until you have

12   a client and I expect you understand better now what I was

13   trying to communicate earlier.  Court is in recess.

14          (The hearing recessed at 3:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Jessica Leonard, Certified Shorthand Reporter

4    for the United States District Court for the District of

5    Massachusetts, do hereby certify that the foregoing transcript

6    is a true and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter, to the

8    best of my skill and ability.

9              Dated this 2nd day of November, 2023.

10

11

12              /s/ Jessica M. Leonard

13              Jessica M. Leonard, CSR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2


 3


 4    SECURITY AND EXCHANGE            )
      COMMISSION,                      )
 5                      Plaintiff,     )
                                       )
 6                                     )  Civil Action
      vs.                              )
 7                                     )  No. 12-12324-MLW
                                       )
 8    BIOCHEMICS, INC., JOHN J.        )
      MASIZ, CRAIG MEDOFF and          )
 9    GREGORY S. KRONING,              )
                        Defendant.
10


11
      BEFORE:  HONORABLE MARK L. WOLF
12


13
                         MOTION HEARING
14


15


16

            John Joseph Moakley United States Courthouse
17                        Courtroom No. 2
                         One Courthouse Way
18                        Boston, MA 02210

19

20                        December 1, 2023
                            11:00 a.m.
21


22


23                       Valerie A. O'Hara
                       Official Court Reporter
24     John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                       Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

APPEARANCES:

<u>For the Plaintiffs</u>:

          Securities and Exchange Commission - MA,
by RUSSELL MAWN, JR., ESQ., and MARTIN F. HEALEY, ESQ.,
33 Arch Street, 23rd Floor, Boston, Massachusetts 02110-1424;

<u>For the Defendants</u>:

     Rose Law Partners LLP, by LAURA B. KIRSHENBAUM, ATTORNEY,
One Beacon Street, 23rd Floor, Boston, Massachusetts 02108.

I N D E X

WITNESS

CRAIG MEDOFF                              16
MARK SPENCER LEVY                         24

EXHIBITS                         FOR I.D.  IN EVIDENCE

  1                                 14

1          PROCEEDINGS

2          THE CLERK:  All rise.  United States District Court is

3     now in session, the Honorable Mark L. Wolf presiding.  Today's

4     date is December 1st, 2023, the case of Securities and Exchange

5     Commission vs. BioChemics, Civil Action 12-12324 will now be

6     heard before this Court.

7          Would counsel please identify themselves for the

8     record, starting with the plaintiff.  You may be seated.

9          MR. MAWN:  Good afternoon, your Honor, Russell Mawn

10:59AM 10     and Martin Healey for the SEC.

11          THE COURT:  Actually, could you repeat that, please.

12          MR. MAWN:  Russell Mawn and Martin Healey for the SEC.

13          MS. KIRSHENBAUM:  Good morning, your Honor,

14     Laura Kirshenbaum on behalf of Craig Medoff.

15          THE COURT:  Mr. Medoff is present, and I believe we

16     have by video conference, is it Mark Levy or Levy?

17          MR. LEVY:  Levy.

18          THE COURT:  Thank you, Mr. Levy.  And do you have

19     counsel?

11:00AM 20          MR. LEVY:  No.

21          THE COURT:  Thank you.  All right.  You may be seated.

22     We're here today pursuant to my November 22, 2023 order.  The

23     parties informed me that they have reached an agreement to

24     resolve the SEC's motion for civil contempt.  I ordered them to

25     file a proposed order that would implement their agreement and

schedule this hearing to discuss it.  The parties filed the
proposed order, Docket Number 764.

As I directed, it states that entry of this order is
without prejudice to the Court's authority to initiate criminal
contempt proceedings for any possible violation of defendant
Craig Medoff's prior orders of the Court and/or this order.

As the First Circuit has explained, civil and criminal
contempts are for different purposes.  Civil contempt is used
to coerce compliance with an order of the Court.  Criminal
contempt is used to punish disobedience of a Court Order and
vindicate the authority of the Court.

There can be simultaneous or consequential civil or
criminal contempt proceedings, as the First Circuit discussed
in *Marquardo*, 149 F.3d 36 at 39 and 41.

I've previously expressed an inclination to institute
criminal contempt proceedings, but I remain open-minded
regarding whether that's appropriate.

In addition to requiring that the defendant,
Mr. Medoff, take certain actions, the proposed order requires
that a principal of Nova Capital International file sworn
affidavits providing certain information, therefore I ordered
that previously unnamed principal to participate in this
hearing.

Mr. Levy, who I have been told is the president of
Nova, has been identified as that principal now, and I allowed

1    his motion to participate by Zoom from California.

2            I want to assure that the parties and Mr. Levy have a

3    clear and common sense, a clear and common understanding of the

4    proposed order and are willing and able to comply with it, so I

5    want to hear from counsel and then Mr. Medoff and Mr. Levy.

6            As discussed at the October 23rd, 2023, anything said

7    by or on behalf of the defendant could be used against him if

8    there's a criminal proceeding, but I think it's most

9    appropriate to start with the SEC and have them explain the

11:03AM 10   agreement as memorialized in the proposed order.

11           MR. MAWN:  Thank you, your Honor.  So the agreement as

12   proposed in the order that we submitted to is the sort of first

13   steps in compliance, bringing Mr. Medoff in compliance with

14   your 2016 final judgment.

15           So the hope is that this is substantially all of the

16   relief we have requested and we would have sought had there

17   been a civil contempt order, and if Mr. Medoff is able to

18   comply with what is required of him here, that Mr. Levy is able

19   to comply with what is required by this order, and then as you

11:04AM 20   see under point 6, if we're able to verify that information and

21   reach an appropriate discord of the number, we will then submit

22   an additional order to your Honor to implement that as well.

23           THE COURT:  To resolve the civil contempt?

24           MR. MAWN:  To resolve the civil contempt.

25           THE COURT:  Okay.  Why don't you review -- why don't

1  you review what's required by the order so then we can see if

2  Mr. Medoff and Mr. Levy are willing and able to comply with it

3  because it's essential.

4       I don't issue orders I don't intend to be obeyed, and,

5  among other things, time in court, the initial time is limited

6  and precious, so if this is going to be a futile exercise, we

7  shouldn't embark on it.  If it's going to be a successful

8  exercise with regard to the matters at issue in the civil

9  contempt, I'll enter the order.

11:05AM 10       MR. MAWN:  It's certainly our hope this is not a

11  futile exercise.  I'm happy to walk through the key points.

12       THE COURT:  Go ahead.

13       MR. MAWN:  One thing I'll note before I do that is one

14  update that has happened since we filed this, and

15  Ms. Kirshenbaum, I think, can speak to this further.

16  Mr. Medoff has represented that he's made a $10,000 payment

17  towards the civil penalty entered in the 2016 judgment, so that

18  would be his first payment towards the monetary penalty in that

19  judgment, so I think all parties are hopeful that that is a

11:06AM 20  step in the right direction that will continue.

21       So I'll note that, but I'm happy to walk through point

22  by point if you have any questions.

23       THE COURT:  Go ahead.

24       MR. MAWN:  So point 1 goes to Mr. Medoff's

25  representing that he has halted the violative conduct, so

1   that's an affidavit by Mr. Medoff under penalty of perjury that

2   he has halted any violative conduct related to the 2016 final

3   judgment; and then, secondly, there would be an affidavit again

4   under penalty of perjury from Mr. Levy detailing Mr. Medoff's

5   relationship with Nova's current business status and what, if

6   any, the current and future relationship Medoff would have with

7   Nova and whether and how Mr. Medoff's current and future

8   relationship with Nova does not involve any violative conduct,

9   so I think that speaks for itself, but bringing in Mr. Levy and

11:07AM 10   having him submit an affidavit under penalty of perjury we hope

11   provides extra assurance to not just the SEC but to your Honor

12   that there will be compliance with the 2016 judgment.

13          THE COURT:  Your motion to show cause said that

14   Mr. Medoff was working in Nova with two people that he worked

15   with previously at Hercules, which was the subject of the

16   earlier injunction.  Was Mr. Levy one of those?

17          MR. MAWN:  Mr. Levy we understand and believe was one

18   of the individuals that worked with Mr. Medoff previously -- he

19   can speak to this -- at Hercules Capital, and I believe he had

11:08AM 20   an affiliation with Mercury Capital, which was the entity --

21          THE COURT:  Right.

22          MR. MAWN:  -- that was the subject of BioChemics.

23          THE COURT:  And the show cause order stated or alleged

24   that whoever you were calling associate 1 had been the chairman

25   of both of those organizations, I think.  Is that Mr. Levy?

1          MR. MAWN:  That's not Mr. Levy.  Associate 1 is an

2     individual named Michel Clerin.

3          THE COURT:  Could you spell that?

4          MR. MAWN:  Michel, I believe, I might have to double

5     check, M-i-c-h-e-l, and the last name is C-l-e-r-i-n.

6          THE COURT:  But Mr. Levy worked at Hercules and at

7     Mercury, which was involved in this case?

8          MR. MAWN:  I don't want to speak to his complete

9     affiliation with Mercury.  That wasn't -- there was no action

10     brought against Mr. Levy.

11          THE COURT:  I see.

12          MR. MAWN:  And he has no disciplinary history, I'll

13     note.  But we understand from discovery in that matter and

14     previous testimony given by Mr. Medoff and Mr. Levy's own

15     resume' that was posted on the Nova Capital website, which we

16     submitted to you as Exhibit D, that he was affiliated with each

17     of those entities.

18          THE COURT:  But not his chair?

19          MR. MAWN:  No, your Honor.  He is -- for clarity, we

11:09AM 20     have anonymized him in the submission to the Court, but he was

21     Associate 2 in the Vasta declaration.

22          THE COURT:  Okay, go ahead.

23          MR. MAWN:  So that's point 1, if there's no questions

24     there.

25          Point 2 would require Mr. Medoff to identify all Nova

1    clients, former clients and investors that he dealt with, and

2    then for each client, former client, and investor provide

3    evidence of the relationship with each, including engagement

4    letters and/or investor agreements.

5            And then, C, and this is an important part, provide

6    curative notice of his disciplinary history, and association

7    with Nova to those list of individuals, and then, finally,

8    provide evidence to the Court in the form of an affidavit that

9    he's provided those curative notices.

11:10AM 10        THE COURT:  And all that's to be done by December 8th,

11   next Friday?

12            MR. MAWN:  That's correct, your Honor.

13            THE COURT:  Go ahead.

14            MR. MAWN:  If there's no questions there, the third

15   point would be for Mr. Medoff to provide an affidavit again

16   under penalty of perjury with an accounting of his current

17   assets and liabilities and a list and explanation for all

18   payments and/or benefits provided by Nova to Medoff.

19            So that, obviously, is an accounting that goes to his

11:10AM 20   ability to pay the prior judgment and to help us establish

21   what, if any, disgorgement would be needed here for violation

22   of the 2016 judgment, so any payments, in kind payments, rent

23   payments that he may have received from Nova Capital.

24            THE COURT:  So here, let me -- you just said something

25   I hadn't thought of.  This is intended to -- he has a judgment,

1  well, in, 2016, he had a judgment against him for about

2  $114,000, right?

3         MR. MAWN:  That's correct.

4         THE COURT:  And I assume it's been accruing interest

5  in some fashion, or at least part of it.  But in addition to

6  having to pay that judgment, unless he proves he's unable to

7  pay it, the SEC would also be seeking disgorgement for anything

8  that he received as a result of any violation of the order?

9         MR. MAWN:  That's correct, your Honor.  You know, to

11:12AM 10  the extent -- our motion to show cause laid out, I think,

11  significant evidence that Mr. Medoff continued in a course of

12  conduct that he had been previously and was in violation of

13  your 2016 judgment, and so any violative conduct would be

14  subject to disgorgement, and that's what point 6 of the

15  proposed order gets to is the final accounting to reach a

16  number that would be an appropriate disgorgement going forward.

17         THE COURT:  Okay.

18         MR. MAWN:  So that's sort of 3 is achieving that dual

19  purpose.

11:12AM 20         And then point 4 of the proposed order is again, you

21  know, back stopping what Mr. Medoff provides us with

22  information from Mr. Levy, and that's an accounting of Nova's

23  current assets and liabilities, a list of fees and payments

24  from clients, an explanation for those payments, and payments

25  made to Mr. Medoff.

1          And subject to both 3 and 4, the SEC reserves the

2     right to request backup of any information provided there, so

3     if the affidavits are unclear or if they conflict with

4     information already in our possession, we would certainly do

5     our diligence to ensure that that information is accurate and

6     complete.

7          THE COURT:  Do you have idea how long -- have you

8     discussed how long it would take to get those documents?

9          MR. MAWN:  The backup documents?

11:13AM 10          THE COURT:  Right.

11          MR. MAWN:  I think at this point, we're not sure what

12     they'll be composed of, so, for example, we don't know if it's

13     going to be, you know, extensive bank records, if it's going to

14     be rent payments, if it's credit cards, so I think it's

15     difficult for us to speak to what or how long that may take or

16     if it would be necessary, even if what he provides is, you

17     know, consistent with the information we have, it may be

18     unnecessary, but at this point, I think it's too early to

19     decide.

11:14AM 20          THE COURT:  Have you discussed with defendant's

21     counsel what those records would be composed of and how long

22     they would take to produce?

23          MR. MAWN:  I haven't had a discussion.

24          MR. HEALEY:  We've had preliminary discussions, your

25     Honor.  Our hope is that most or all of it is available by

1   December 8th.

2        THE COURT:  That's my hope, too.  Well, I don't know

3   how he's going to give you the affidavit if he doesn't look at

4   the documents, and if he provides an affidavit that's accurate

5   and complete, the documents should be available to be produced,

6   if requested, on or after December 8th.

7        MR. HEALEY:  But, again, I don't want to speak for

8   Ms. Kirshenbaum, but we've talked about it, at least

9   preliminarily.  We decided on December 8th based on the

11:14AM 10   agreement, so, again, I'm hopeful, we're hopeful that

11   December 8th is a date when we get all, ideally, but at least

12   most of the information.

13        THE COURT:  Well, you didn't get all of the

14   information.  We talked about this.  They agreed to do it, this

15   is what I'm saying.  If they agreed to December 8th, they

16   obviously or evidently think that's a reasonable deadline.

17        Okay.  Why don't we keep going, including with regard

18   to what's required of Mr. Levy because we're going to have to

19   question him to make sure he understands.

11:15AM 20        MR. MAWN:  Sure, so that's point 4.  If there's no

21   further questions there, point 5 is just restating that the no

22   destruction order is still in effect.

23        And then point 6 goes to hopefully wrapping up the

24   motion, so that would be looking at Mr. Medoff and Nova's

25   submissions on their assets and liabilities and potentially

1    submitting an order after verification of that information

2    about potential disgorgement.

3            THE COURT:  Well, did we discuss paragraph 4 and

4    Mr. Levy's obligations under it?

5            MR. MAWN:  I'm happy to return to paragraph 4.  So

6    Mr. Levy is the individual who would have to provide the

7    accounting for Nova Capital or he would have to sign off on it

8    with an affidavit under the penalty of perjury.

9            THE COURT:  He'd have to account for all of Nova's

11:16AM 10   current assets and liabilities, a list of fees and payments

11   received from all clients since the 2016 final judgment, a list

12   of an explanation for all payments or benefits provided by Nova

13   to Medoff and documents, supporting documents, if requested,

14   right?

15           MR. MAWN:  That's correct, your Honor.

16           THE COURT:  Okay.  And then with regard to 6, once you

17   have all the financial information, you'll subsequently file

18   the motion for additional disgorgement of all monies obtained

19   in violation of the final judgment, right?

11:17AM 20           MR. MAWN:  That's correct, your Honor.

21           THE COURT:  Then the last paragraph is the provision I

22   ordered be in there, so there was no confusion, it says, "Entry

23   of this order is without prejudice to the Court's authority to

24   initiate criminal contempt proceedings for any possible

25   violation by Medoff of prior orders of the Court and/or this

1   order."

2          Is there more you'd like to say by way of explanation?

3          MR. MAWN:  I think that sums it up, your Honor.

4          THE COURT:  All right.  And, Ms. Kirshenbaum, what

5   should I know from the defendant's perspective?

6          MS. KIRSHENBAUM:  So we've reached an understanding

7   with SEC's counsel about these terms.  I think we have a good

8   understanding of them.  I would add on the second paragraph in

9   terms of the curative notice, we've reached agreement about

11:18AM 10   what language will be used in that curative notice, and

11   Mr. Medoff is working very diligently to try to collect all of

12   the documentation and put together the affidavits, which will

13   verify the documentation.

14          And we remain very willing to cooperate with the SEC

15   if they need additional documents in order to verify

16   everything.  Mr. Medoff is working very hard to be cooperative

17   and comply, but I think as far as this proposed order, we're in

18   agreement with it, we understand it, and are willing to comply

19   with it.

11:19AM 20          THE COURT:  All right.  Actually, there's another

21   question I meant to ask the SEC before I ask some questions to

22   Mr. Medoff.  In the joint report, not the joint report, yeah,

23   in the joint report, Docket 761, page 4, it states if the

24   defendant complies, the SEC will recommend no further

25   sanctions.  What does that mean?

1    MR. MAWN:  I think there may have been some confusion

2  there, and I apologize if that was unclear to the Court.  What

3  we were referring to there is with respect to civil contempt.

4  So part of our original motion contemplated that there may be

5  penalties or other sanctions entered by your Honor to enforce

6  the 2016 judgment.  This is just speaking to any further civil

7  contempt.

8    THE COURT:  All right.  As I said, I continue to

9  be -- all right.  That's helpful.  We'll leave it right there

11:20AM 10  for now.

11    I have some questions for Mr. Medoff, but I think he

12  should stand and be sworn.

13    (CRAIG MEDOFF WAS SWORN.)

14    THE CLERK:  Thank you.

15    THE COURT:  Mr. Medoff, do you understand you have

16  just taken an oath to answer the questions I'm going to ask you

17  truthfully, and any failure to do that could be a separate

18  criminal offense?

19    MR. MEDOFF:  Yes, I do.

11:21AM 20    THE COURT:  And do you understand if you're confused

21  by any of my questions or unsure about what an honest and

22  accurate answer would be, I'll give you a chance to speak to

23  your attorney so we can clear up any confusion and you can give

24  me a reliable response?

25    MR. MEDOFF:  Okay.

1    THE COURT:  Have you read the joint report telling me

2  about your agreement with the SEC, the proposed order that if I

3  enter it would implement that agreement?

4    MR. MEDOFF:  Yeah, yeah, I've read it twice.

5    THE COURT:  And did you discuss it with your lawyer?

6    MR. MEDOFF:  Yes, every section.

7    THE COURT:  And do you feel you understand it?

8    MR. MEDOFF:  Yeah, I mean, the most difficult aspect

9  is the accounting, which Mark and I have been going over

11:22AM 10  diligently for the last several weeks to make sure those

11  numbers are accurate.

12    We actually have already uploaded all the bank

13  statements to the data room of our attorney, of my attorney, so

14  that that supporting documentation will be made available to

15  the SEC, you know, by December 8th.

16    THE COURT:  Okay.  Do you understand it's essential

17  that the information you provide in your affidavit, which will

18  be under oath, be accurate and complete?

19    MR. MEDOFF:  Yes, yes, I understand that.  Mark has

11:22AM 20  always handled the accounting, and so most of the numbers are

21  supported by QuickBooks, but, of course, we had to go through

22  and differentiate between revenues generated by a client where

23  securities were being offered and revenues generated by a

24  client where there was no violation, so there's particular

25  requests that the SEC made that make it a little more arduous

1   to comply, but we are getting those numbers together.  I expect
2   we'll have all the numbers done by Monday.
3       THE COURT:  Okay.  And do you understand that under
4   this agreement and the proposed order, you are obligated to
5   provide any documents requested by the SEC?
6       MR. MEDOFF:  Yes, yes, we've uploaded every engagement
7   agreement, for example, with every compliant.  But I did notice
8   something different in the discussion today that I wasn't
9   aware.  He mentioned investor agreements.  Does that mean he
11:23AM 10  wants all the subscription agreements related to the investors?
11      THE COURT:  I don't know what paragraph that is.
12      MR. MAWN:  I think we're in paragraph 2, pardon me,
13  line 3.
14      MR. MEDOFF:  Nova clients, past clients, investor
15  agreements.
16      MR. MAWN:  We can speak about this separately if it's
17  easier, but investor agreements, just for the record, is
18  supposed to be a broad bucket and not limited, but subscription
19  agreements would be among those agreements, but it's agreements
11:24AM 20  sufficient sort of to identify status of investors and how they
21  relate to Nova Capital would be the information we would like.
22      MS. KIRSHENBAUM:  So my understanding was sort of an
23  exemplary document explaining what the relationship looked like
24  as opposed to every single document that shows what the
25  relationship was, so as long as we uploaded an engagement

1    agreement, for example, for a particular client relationship,

2    that would suffice for that client relationship, and we

3    wouldn't have to upload subscription agreements that were

4    generated in the course of that relationship.

5            THE COURT:  Does the SEC understand that?  I'm not

6    sure at the moment I do.

7            MR. MAWN:  I think that's fine.  I think the point is

8    to be able to identify who the investors are and their

9    relationship to Nova Capital or its clients, so documents

11:25AM 10   sufficient to do that.

11           THE COURT:  What's a subscription agreement?

12           MS. KIRSHENBAUM:  So that would have been one of the

13   investor documents generated in the course of an issuance of a

14   security, so my understanding is the purpose of this provision

15   is so that the SEC can understand the nature of the

16   relationship between Nova and a particular client, for example,

17   whether it was a securities-related client or if it was just

18   simple business advice separate from any issuance of a

19   security, and as long as the engagement agreement identifies

11:25AM 20   that, that's all the SEC needs.

21           THE COURT:  And what's a subscription?

22           MR. MEDOFF:  A subscription agreement is what the

23   company and the investor fill out when they make their

24   investment.  So there's reps and warranties that the company

25   makes to the investor, and then the investor makes reps and

1   warranties to the company to comply with the Reg. D Rule 506 --

2   504 to 506(b) in an equity private placement, and then along

3   with a subscription agreement, they would provide a credited

4   investor questionnaire because none of these offerings took

5   nonaccredited investors.

6           THE COURT:  But the subscription agreement would show

7   what representations were made to investors?

8           MR. MEDOFF:  No, not exactly.  The investor deck --

9           THE COURT:  What's that?

11:26AM 10          MR. MEDOFF:  There's something called an investor

11  deck.  We used to have private placement memorandums, private

12  offering memorandums.  Now we use investor decks the last eight

13  or so years, so the investor deck represents the reps made

14  to...

15          THE COURT:  And are they required to be produced by

16  this order?

17          MR. MEDOFF:  That was not made clear to me.

18          MR. MAWN:  So the investor decks and the PPMs are not

19  required to be produced.  The purpose of I think B here is to

11:27AM 20  provide the agreements and the engagement letters that are

21  sufficient to identify the clients, former clients and

22  investors.

23          And taking a step back, the purpose of all of this is

24  to determine whether actions Mr. Medoff took with respect to

25  these buckets of individuals or entities is to determine

1  whether that was violative conduct or not, so it's information

2  that allows us to make that determination.

3  MR. HEALEY:  Your Honor, if I may, Ms. Kirshenbaum and

4  I talked pretty specifically about this, and I think a concept

5  Mr. Medoff understands, they represented that what we're

6  looking for, the documentation they provide will set that out.

7  They understand that if for some reason it doesn't, we may be

8  back to them, and the order contemplates that documentation

9  from Nova.  We may be going back and saying what you thought

11:28AM 10  was going to be sufficient for our purposes isn't, and we need

11  additional documentation.

12  THE COURT:  Is that right, Ms. Kirshenbaum?

13  MS. KIRSHENBAUM:  That's my understanding, yes.

14  THE COURT:  All right.  And, Mr. Medoff, do you

15  understand that in 2016 you agreed to pay a fine and to

16  disgorge an additional amount that comes to 114,000 something

17  as of 2016, and you still have an obligation to make those

18  payments as well as any additional accrued interest unless you

19  prove you're unable to pay?  Do you understand that?

11:29AM 20  MR. MEDOFF:  Yes, I understand that.

21  THE COURT:  And do you understand that you may also be

22  required to disgorge, pay to the SEC any amounts you obtained

23  in violation of the 2016 final judgment?

24  MR. MEDOFF:  Yes, I understand that.

25  THE COURT:  And, actually, there's another question I

1    meant to ask the SEC, are you aiming to get information about

2    the Medoff Family Trust that Mr. Medoff referenced at the

3    October 23rd hearing as the possible source of funds to hire a

4    lawyer?

5           MR. MAWN:  In terms of the proposed order, that's not

6    contemplated unless and to some extent that relates to

7    Nova Capital.  What this order is --

8           THE COURT:  Unless it relates to what?

9           MR. MAWN:  Nova Capital.

11:29AM 10      THE COURT:  I see.

11          MR. MAWN:  This order is just contemplating payment

12   from Nova Capital.

13          THE COURT:  Well, this goes to Mr. Medoff's capacity

14   to pay the fine.  I ordered a fine, I expect it to be paid.  If

15   there are resources to pay it when he wanted money to hire a

16   lawyer, he said he was going to talk to the trustee,

17   George Krupp, and a couple of days later, he said had hired a

18   lawyer.

19          MR. MAWN:  I should correct.  Paragraph 3 may call for

11:30AM 20   that if that is part of his current assets and liabilities.

21          MR. MEDOFF:  It's not.  I'm a beneficiary, I don't

22   control those assets.  It's an irrevocable trust.  In fact,

23   it's not accessible to the Justice Department, it's not

24   accessible to the IRS, and it's not accessible to the SEC.

25          THE COURT:  What do you mean accessible?

1        MR. MEDOFF:  It's not my money, therefore, those

2   entities can't access it.  I'm a beneficiary, I don't control

3   those assets.  This is just the fact, by the way, and when I

4   was convicted of two security fraud felony convictions in the

5   '90s, I had the same discussion with the IRS and the Justice

6   Department, and they agreed, so, I mean, to the extent George

7   is willing to make distributions to payments, I would pay, but

8   he's the trustee.

9        THE COURT:  I understand that distinction.  I expect

11:31AM 10  that if and when you comply with this order, if I enter it,

11   you, through your lawyer, may argue that I shouldn't institute

12   criminal contempt proceedings or that the potential penalties

13   should be limited.

14        So I'm just saying that when I entered that order, I

15   expected that the fine would be paid.  I had this problem on an

16   issue on a larger scale with the SEC because they wanted me to

17   sign an order, consent judgment that BioChemics would pay

18   $18 million, but they knew BioChemics didn't have it.  All

19   right.  I understand your position, and it's useful to do that.

11:32AM 20       We'll go one step at a time.  All right.  Is there

21   anything further that either counsel thinks should be asked of

22   Mr. Medoff?

23        MR. MAWN:  Not from the SEC.

24        THE COURT:  Okay.  You may be seated.

25        MR. MEDOFF:  Thank you, your Honor.

1          THE COURT:  Has the SEC spoken to Mr. Levy?

2          MR. MAWN:  No, we have not.

3          THE COURT:  So you have no basis for believing whether

4  or not he understands his obligations; is that right?

5          MR. MAWN:  Beyond conversations with counsel for

6  Mr. Medoff, I don't think we have any other basis.

7          THE COURT:  All right.  Mr. Levy, I'm going to have

8  the clerk administer the oath to you, and I'm going to ask you

9  some questions, okay?

11:33AM 10          MR. LEVY:  Yes.

11          (MARK SPENCER LEVY WAS SWORN.)

12          THE COURT:  Okay.  So would you please state your true

13  full name?

14          MR. LEVY:  Mark Spencer Levy.

15          THE COURT:  Mr. Levy, do you understand you've taken

16  an oath to answer the questions I'm going to ask you

17  truthfully, and any failure of that could be a prosecutorial

18  criminal offense?

19          MR. LEVY:  Yes.

11:34AM 20          THE COURT:  And I think you told me you don't have a

21  lawyer.  Have you consulted any lawyer in connection with this

22  matter?

23          MR. LEVY:  No.

24          THE COURT:  All right.  And who have you spoken to

25  leading up to this hearing about this matter?

1          MR. LEVY:  Craig Medoff's attorney, Laura Kirshenbaum.

2          THE COURT:  All right.  And do you understand that

3     there may later be a criminal proceeding involving Mr. Medoff

4     and Nova?

5          MR. LEVY:  I do now.

6          THE COURT:  Okay.  And do you understand that in some

7     circumstances, it's possible that you could be a defendant in

8     that proceeding?  I'm not saying you would be, I'm just trying

9     to make sure you understand the environment?

11:35AM 10          MR. LEVY:  Yeah, I do now understand the environment.

11          THE COURT:  And do you understand that you may have a

12     Fifth Amendment right not to say anything today that may

13     incriminate you, although it's not my intention today to have

14     discussion or extensive discussion of the activities of Nova.

15     Do you understand?

16          MR. LEVY:  Yes.

17          THE COURT:  So if the answer to some question from the

18     lawyers or from me you think may tend to incriminate you via a

19     link in a chain of evidence tending to show that you committed

11:36AM 20     a crime, you can tell me that, and then I'll decide whether you

21     have a Fifth Amendment right or whether it's not necessary to

22     answer the question, okay?

23          MR. LEVY:  Okay.

24          THE COURT:  All right.  Would the SEC please question

25     Mr. Levy, and I think you may not be able to -- well, I think

1    you can see him now, to try to assure that he understands his

2    obligations under the agreement.

3         MR. MAWN:  Mr. Levy, can you hear me all right?

4         MR. LEVY:  Yeah.

5         MR. MAWN:  This is Russell Mawn of the SEC.

6         MR. LEVY:  Hello.

7         THE COURT:  Do you have a copy of the proposed order

8    that we're discussing today?

9         MR. LEVY:  No.

11:37AM 10         THE COURT:  No?

11         MR. LEVY:  No.

12         MR. MEDOFF:  Well, Mark, I do --

13         THE COURT:  Excuse me, Mr. Medoff, you can't speak.

14    Ms. Kirshenbaum, has anybody sent him the proposed order?

15         MS. KIRSHENBAUM:  I believe he's received a copy by

16    e-mail.

17         MR. LEVY:  Okay, then I stand corrected.  I didn't

18    read it.

19         THE COURT:  You did not read it?

11:38AM 20         MR. LEVY:  Yeah, I did not read it, and I didn't

21    realize I received it, but if he sent it, then I did.

22         THE COURT:  Go ahead.  We'll read you the pertinent

23    parts, and I regret now that I didn't order that you get on the

24    plane and be here.  Go ahead.

25         MR. MAWN:  Bear with me as I'm sure I'm reading all

1   the pertinent parts.

2        THE COURT:  I'm going to make the proposed order,

3   which is Docket 764-1 Exhibit 1 of today's date, and we'll read

4   you the pertinent parts.  Go ahead.

5        (Exhibit No. 1 was marked for identification.)

6        MR. MAWN:  Mr. Levy, I'm reading from the proposed

7   order, I'm reading from paragraph 1.  Paragraph 1 states that,

8   "Medoff shall immediately halt any conduct that violates the

9   terms of the 2016 financial judgment -- final judgment.

11:39AM 10   Further, Medoff shall file with the Court the following no

11   later than December 8th, 2023:"

12        "A, an affidavit executed by Medoff under pains and

13   penalty of perjury stating unequivocally that he has halted any

14   conduct that violates the terms of the 2016 final judgment."

15        Mr. Levy, have you received a copy of the 2016 final

16   judgment?

17        MR. LEVY:  I don't believe so.

18        MR. MEDOFF:  He has, too.

19        THE COURT:  What's that?

11:39AM 20        MR. MEDOFF:  He has that, too, the 2016.

21        THE COURT:  He has the final judgment?

22        MR. MEDOFF:  The 2016, yes, I cc'd.

23        THE COURT:  Why don't you stand up.  I'll ask you some

24   questions.

25        MR. MEDOFF:  I cc'd and forwarded all the

1   correspondence with Ms. Kirshenbaum and the other lawyer,

2   Alan Rose, and correspondence from the SEC I forwarded to him,

3   and although SEC is going to read this order, I've been over

4   each one of these issues with Mark twice.

5          THE COURT:  You have been?

6          MR. MEDOFF:  So that he understood what we had to

7   produce from an accounting standpoint.

8          THE COURT:  Okay.  You say you sent him the 2016 final

9   judgment.  When did you do that?

11:40AM 10        MR. MEDOFF:  I would say it was October 23rd, after

11  our hearing.  I never sent it to him originally in 2016 though.

12         THE COURT:  All right.  So were you working with

13  Mr. Levy in 2016?

14         MR. MEDOFF:  Yes.

15         THE COURT:  And the final judgment was entered on --

16         MR. MEDOFF:  At the time I just told him --

17         THE COURT:  Excuse me, wait until I ask a question.

18         MR. MEDOFF:  Okay.

19         THE COURT:  It was entered on May 5th, 2016.  Did you

11:41AM 20  tell Mr. Levy about that judgment?

21         MR. MEDOFF:  All I said was I settled with the SEC, I

22  didn't provide him with any details nor did I provide him with

23  the order.

24         THE COURT:  Did you discuss it with him?

25         MR. MEDOFF:  The settlement with the SEC?

1          THE COURT:  Yes.  What was required?

2          MR. MEDOFF:  Well, I discussed that I had a fine and I

3     settled, but I didn't provide him any details.  He's not an

4     investor banker.  I guess, as I mentioned to you, I

5     misinterpreted part of the order that said stay out of the

6     securities business because of my experience with the Feds in

7     the '90s and early 2000s.

8          THE COURT:  Well, I don't recall your saying that to

9     me.

11:42AM 10          MR. MEDOFF:  I was barred from the industry --

11          THE COURT:  No, I know you were barred from --

12          MR. MEDOFF:  -- for 10 years.  They looked at half of

13     my clients over those eight or ten-year period, and I was

14     allowed to be involved with the offer and sales of securities,

15     and when I read your 2016 order, as I said, in those days, I

16     was an active drug addict, I interpreted it as exactly the same

17     as being barred from the securities industry, but it's

18     different.

19          Being barred from the securities industry doesn't

11:43AM 20     actually prevent you from being involved in the offer and sales

21     of securities, it prevents you from being a registered FINRA

22     broker basically.

23          THE COURT:  Did you have a lawyer at the time of the

24     final judgment in 2016?

25          MR. MEDOFF:  Yeah, Ron Fischetti, I had a very good

1  lawyer.

2      I mean, not yours, no, I'm thinking about the Feds,

3  no, I did not have legal representation during your suit

4  against --

5      THE COURT:  I think you ought to check that.

6      MR. HEALEY:  Your Honor, I think Mr. Medoff I believe

7  initially was pro se, and it went on a long while, as your

8  Honor is aware of, he was initially pro se, then he was

9  represented by counsel.  Some time moderately before the actual

11:44AM 10  settlement with the SEC, he became pro se again, so at the time

11  of the actual final judgment, my understanding is that he was,

12  in fact, pro se in this proceeding.

13      THE COURT:  So, Mr. Medoff, you say you didn't give

14  Mr. Levy a copy of the final judgment?

15      MR. MEDOFF:  No.  I mean, he just has his name on the

16  accounts, and he's an accounting guy.

17      THE COURT:  He's an accounting guy?

18      MR. MEDOFF:  He's not actually involved in the

19  business, he doesn't do anything other than move money around

11:44AM 20  and accounting.  He doesn't deal with investors.  He doesn't

21  deal with clients.  He doesn't do any documents.

22      THE COURT:  But he worked with you in your business;

23  is that right?

24      MR. MEDOFF:  Yes, yes, but he basically leaves this up

25  to me as the theoretical expert.  He doesn't get involved with

1   any of the details.  I'm not even sure that he understands all

2   the time all the details of these transactions.

3          THE COURT:  All right.  Let's go back to Mr. Levy.

4   Let me ask you this.  So, Mr. Levy, at some point, did you

5   learn that Mr. Medoff had settled the claims against him in the

6   case of Securities and Exchange Commission against BioChemics

7   and others, including him?

8          MR. LEVY:  Say that one more time.

9          THE COURT:  Yes.  Did you know that the SEC had sued

11:46AM 10   Mr. Medoff prior to 2016?

11          MR. LEVY:  Not really, all I know is that he had a

12   situation with the SEC and he settled it.

13          THE COURT:  How did you know that?

14          MR. LEVY:  Because that's what he said, and I thought

15   it had to do with his past '90s situation, I didn't know about

16   it had anything to do with BioChemics.

17          THE COURT:  You didn't know that there was a new case

18   brought against him in about 2012?

19          MR. LEVY:  I'm sorry.

11:47AM 20          THE COURT:  Go ahead.  Go ahead.

21          MR. LEVY:  I knew that BioChemics -- I know the guy at

22   BioChemics did not, was not honest in how he represented

23   whatever it is he represented and that Craig was not aware of

24   that, whatever, you know, the person at BioChemics had done.  I

25   remember we were surprised and that he was involved to whatever

1    degree, and that's pretty much all I know.

2         THE COURT:  And what was the source of your

3    information?

4         MR. LEVY:  Just Craig.

5         THE COURT:  Did he tell you anything about the terms

6    on which he resolved the SEC action against him?

7         MR. LEVY:  No.  I didn't even realize it was, you

8    know, that he was a substantial part of that proceedings, just

9    that he had settled with the SEC, and I thought that, you know,

11:48AM 10   BioChemics was completely at fault and it was their, you know,

11   their essential issue, problem.

12        THE COURT:  So tell me briefly about your training and

13   experience.  I'll be more precise, what's your educational

14   background?

15        MR. LEVY:  Two years of college.

16        THE COURT:  And when did you finish those two years of

17   college?

18        MR. LEVY:  1980 perhaps, right around there.

19        THE COURT:  And did you go to work after that?

11:49AM 20   MR. LEVY:  No, I worked for myself.

21        THE COURT:  Doing what?

22        MR. LEVY:  Booking bands at clubs.

23        THE COURT:  And for about how long did you do that?

24        MR. LEVY:  Many years in one form or another working

25   for myself mostly.

1    MR. MEDOFF:  You worked for record labels, too, right?

2    THE COURT:  Mr. Medoff.

3    MR. MEDOFF:  Yes, sorry.

4    THE COURT:  I'm ordering you not to say anything.

5    MR. MEDOFF:  Okay.

6    THE COURT:  Unless I direct a question to you.  And

7    when did you first meet Mr. Medoff?

8    MR. LEVY:  Maybe 2000.

9    THE COURT:  Okay.

11:50AM 10    MR. LEVY:  I'm not really good at dates, to be honest

11    with you.

12    THE COURT:  Did there come a time when you began

13    working together?

14    MR. LEVY:  Yes.

15    THE COURT:  And approximately when was that?

16    MR. LEVY:  Approximately 20 years ago probably.

17    THE COURT:  And what did you begin doing together?

18    MR. LEVY:  I just always did accounting, wire money

19    here, wire money there.  That's the extent of my job is that.

11:51AM 20    THE COURT:  Well, were you employed by a business with

21    Mr. Medoff initially?

22    MR. LEVY:  No, I believe we just started one.  He did

23    the work, and I did the accounting, and that's what I've done

24    the whole time.

25    THE COURT:  And what was the name of that first

1   business?

2   MR. LEVY: I would say Mercury because you brought it

3   up, I don't remember exactly, but Hercules and Nova.

4   THE COURT: Before you began working with Mr. Medoff,

5   did you have any background in accounting?

6   MR. LEVY: No. I mean, the extent of my accounting is

7   downloading the information into Quicken and categorizing it

8   and wiring money; primarily that's what I did. That's what

9   I've always done.

11:52AM 10   THE COURT: And have you discussed the order that

11   Mr. Medoff and the SEC proposed I enter that would impose

12   certain obligations on you to do certain things by next Friday,

13   December 8th?

14   MR. LEVY: Provide whatever accounting numbers I have,

15   that's what I'm able to do.

16   THE COURT: Have you discussed what's required of

17   Mr. Medoff?

18   MR. LEVY: As far as he has to provide agreements and

19   explanations of his relationship with the different companies

11:53AM 20   and I'm helping him with the accounting, you know, whatever

21   came in, whatever went out.

22   THE COURT: And do you have that understanding as a

23   result of talking to Mr. Medoff?

24   MR. LEVY: Yes.

25   THE COURT: And I'm going to order his lawyer,

1  Ms. Kirshenbaum, to send you the proposed order again today and

2  unless there's an objection to discuss it with you, okay?

3  Because I wanted to make sure you understand it because if

4  there's a violation of this order or if there's an affidavit,

5  it's got to be under oath, so any intentional false statement

6  or omission could be a prosecutorial offense.  I don't want any

7  misunderstanding, do you understand?

8          MR. LEVY:  Yes, I'm clear about to do whatever I'm

9  supposed to do.

11:54AM 10          THE COURT:  All right.  Ms. Kirshenbaum, you'll do

11  that?  I'm ordering you to do that.

12          MS. KIRSHENBAUM:  Yes, absolutely.

13          THE COURT:  All right.  Now the SEC is going to go

14  through the order with you, and then later Ms. Kirshenbaum will

15  go through the order with you, too.  Go ahead.

16          MR. MAWN:  Thank you, your Honor.  Mr. Levy, I'll pick

17  up reading the order where I left off.

18          THE COURT:  I think what you ought to do is read the

19  parts that focus on his obligations, which I think start in

11:55AM 20  paragraph 1, I mean, B, if I'm not mistaken.

21          MR. MAWN:  I'll start with 1B, Mr. Levy.  It begins,

22  the first clause is, "Further, Medoff shall file with the

23  Court -- "

24          THE COURT:  Slowly.

25          MR. MAWN:  "-- the following, no later than

1    December 8th, 2023," and bullet B is "an affidavit executed by

2    a principal of Nova under pains and penalty of perjury

3    detailing Medoff's previous relationship with Nova, Nova's

4    current business status, what, if any, current and future

5    relationship Medoff has with Nova, and whether and how Medoff's

6    current and future relationship with Nova, if any, does not

7    involve any conduct that violates the terms of the 2016 final

8    judgment."

9          THE COURT:  Did you hear that, Mr. Levy?

11:56AM 10    MR. LEVY:  Yes, I did.

11          THE COURT:  Do you think you understand it?

12          MR. LEVY:  Yes, I do.  He's not allowed to do

13    securities, and that's the order, and I provide whatever I

14    have, like we've uploaded all the bank statements and working

15    on reports of all of the money, where it went.

16          MR. MAWN:  And, Mr. Levy, we'll get to that, but on

17    that point, do you agree to review the 2016 final judgment

18    before you submit that affidavit?

19          MR. LEVY:  Yes, definitely.

11:56AM 20    THE COURT:  And discuss it with Ms. Kirshenbaum or

21    with your own lawyer.  Do you understand you can go get your

22    own lawyer?

23          MR. LEVY:  I do.

24          THE COURT:  Let me tell you the following.  She's not

25    your lawyer.  I'm ordering that she give you the document and

1 discuss it with you, but she's Mr. Medoff's lawyer.  She may

2 have different interests.  He's in trouble at the moment,

3 you're not, so do you understand you can get your own lawyer if

4 you want?

5 MR. LEVY:  Yes.

6 THE COURT:  All right.  That's entirely up to you, but

7 you have to understand the order, you have to comply with the

8 order if I enter it.  Go ahead.

9 MR. MAWN:  Mr. Levy, I'm going to read from

11:57AM 10 paragraph 4 of the proposed order which also pertains to you.

11 Paragraph 4 states, "Medoff shall no later than December 8th,

12 2023 provide to the SEC in an affidavit executed by a principal

13 of Nova under pains and penalty of perjury, A, an accounting of

14 all of Nova's current assets and liabilities."

15 THE COURT:  Why don't we go one step at a time.  So do

16 you understand that you're going to have to put in an affidavit

17 under oath a description of all of Nova's current assets and

18 liabilities?

19 MR. LEVY:  Yes.

11:58AM 20 THE COURT:  Go ahead.

21 MR. MAWN:  And, "B, a list of fees and payments

22 received from all clients since the date of the 2016 final

23 judgment."  Do you understand that?

24 MR. LEVY:  Yes.

25 THE COURT:  Go ahead.

1    MR. MAWN:  And, "C, a list of and explanation for all

2    payments and/or benefits provided by Nova to Medoff, including

3    without limitation wages, bonuses, cash withdrawals, personal

4    services, and rent and payments or deposits made by Medoff to

5    Nova since the date of the 2016 final judgment."  Do you

6    understand that?

7    MR. LEVY:  I do.

8    MR. MAWN:  And then the final provision is, "Further,

9    if necessary, and upon request by SEC, such affidavits shall be

11:59AM 10    supplemented by original documentation, statements, and backups

11    sufficient to verify the accounting and explanations."  Do you

12    understand that?

13    MR. LEVY:  Yes.

14    MR. MAWN:  I believe that's all the provisions

15    relating to Mr. Levy.

16    THE COURT:  Well, paragraph 5, do you understand that

17    I previously issued an order to Mr. Medoff and anybody working

18    with him, that would include you, not to destroy any documents

19    that relate to this matter.  Do you understand that?

11:59AM 20    MR. LEVY:  Absolutely.

21    THE COURT:  And these are a number of things that if I

22    issued this order, you are required to do by next Friday.  Are

23    you willing and able to do that do you believe?

24    MR. LEVY:  Yes.  We've been working on it, and I

25    understand that it has to be due on the 8th, yes.

1    THE COURT:  All right.  Is there anything else that
2  you think should be asked of Mr. Levy?
3    MR. MAWN:  We have no questions.
4    THE COURT:  Do you have any questions,
5  Ms. Kirshenbaum?
6    MS. KIRSHENBAUM:  No questions.
7    THE COURT:  All right.  Well, this has been helpful,
8  and I will issue the order.  It's going to be necessary for the
9  SEC to report shortly after December 8th as to whether it's
12:01PM 10  been complied with and whether there's any request for
11  documents or what the next steps should be, particularly with
12  regard to the fine, well, not particularly but including the
13  fine and disgorgement.
14    December 8th is a Friday.  Would the following Tuesday
15  be too early for that report?
16    MR. HEALEY:  Mr. Mawn and I talked about the
17  possibility of a Wednesday.
18    THE COURT:  That's fine, December 13th.  That's fine.
19  I don't want this to get dragged out, but I do want you to have
12:02PM 20  time to consider what you see, so I'm ordering, and I will
21  memorialize it that you report by December 13th, 2023 whether
22  you believe the order has been complied with, whether you need
23  more documents, and how long after conferring with Mr. Medoff's
24  counsel you think that will take and the situation with regard
25  to the fine.

1          MR. HEALEY:  Your Honor, I'm sure the order will

2     address this, but is the notion that we would file with the

3     Court a status report that addresses various items?

4          THE COURT:  Yes, essentially, yes.

5          MR. HEALEY:  Okay.

6          THE COURT:  And I will defer deciding whether to

7     institute criminal contempt proceedings, but I'm not assuring

8     you of how long I'll wait to make that decision.  I'm not going

9     to make that decision now.  Is there anything further in this

12:03PM 10     matter for today?

11          Well, I have one further thing, I'm ordering that you

12     order the transcript of today's proceeding, okay?  The Court is

13     in recess.

14          THE CLERK:  All rise.

15          (Whereupon, the hearing was adjourned at 12:03 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3   UNITED STATES DISTRICT COURT )

 4   DISTRICT OF MASSACHUSETTS ) ss.

 5   CITY OF BOSTON )

 6           I do hereby certify that the foregoing transcript,

 7   Pages 1 through 41 inclusive, was recorded by me

 8   stenographically at the time and place aforesaid in Civil

 9   Action No. 12-12324-MLW, SECURITIES AND EXCHANGE COMMISSION vs.

10   BIOCHEMICS, INC., JOHN J. MASIZ, CRAIG MEDOFF and

11   GREGORY S. KRONING, and thereafter by me reduced to typewriting

12   and is a true and accurate record of the proceedings.

13           Dated December 4, 2023.

14

15                      s/s Valerie A. O'Hara

16              _____

17               VALERIE A. O'HARA

18               OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                 )
 4    Securities and Exchange     )
      Commission                  )
 5              Plaintiff,        )
                                  )   Civil Action
 6    v.                          )   No. 1:12-cv-12324-MLW
                                  )   Pages 1 to 30
 7    Biochemics, Inc. et al,     )
                                  )
 8              Defendant.        )
                                  )
 9

10

11            BEFORE THE HONORABLE MARK L. WOLF
                  UNITED STATES DISTRICT JUDGE
12

13                           HEARING

14

15                       February 9, 2024
                            2:00 p.m.
16

17         John J. Moakley United States Courthouse
                       Courtroom No. 2
18                   One Courthouse Way
                 Boston, Massachusetts 02210
19

20

21

22             Jessica M. Leonard, CSR, FCRR
                   Official Court Reporter
23         John J. Moakley United States Courthouse
                     One Courthouse Way
24             Boston, Massachusetts 02210
               JessicaMichaelLeonard@gmail.com
25
```

```
 1   APPEARANCES:

 2   On Behalf of the Plaintiff:

 3       SECURITIES AND EXCHANGE COMMISSION - MA
         By: Russell Mawn, Jr.
 4       33 Arch Street
         23rd Floor
 5       Boston, MA 02110-1424
         205-243-3277
 6       Mawnru@sec.gov

 7
         SECURITIES AND EXCHANGE COMMISSION - MA
 8       By: Martin F. Healey
         33 Arch Street
 9       23rd Floor
         Boston, MA 02110-1424
10       617-573-8952
         Healeym@sec.gov
11

12   On Behalf of the United States Attorney's Office:

13       US ATTORNEY'S OFFICE - MA
         By: Leslie Wright
14       J. Joseph Moakley U.S. Courthouse
         1 Courthouse Way
15       Suite 9200
         Boston, MA 02210
16       617-748-3367
         Leslie.wright@usdoj.gov
17

18   On Behalf of the Defendant:

19       ROSE LAW PARTNERS LLP
         By: Laura B. Kirshenbaum
20       One Beacon Street, 23rd Flr.
         Boston, MA 02108
21       617-536-0040
         Lbk@rose-law.net
22

23

24
                   Proceedings reported and produced
25                  by computer-aided stenography.
```

```
 1               P R O C E E D I N G S

 2        THE CLERK:  This is civil matter 1:12-cv-12324.

 3        THE COURT:  Good afternoon.  Would counsel please

 4   identify themselves for the Court and for the record?

 5        MR. MAWN:  Russell Mawn and Martin Healey for the SEC.

 6        MS. KIRSHENBAUM:  Laura Kirshenbaum for Mr. Medoff.

 7        THE COURT:  I apologize for the delay in starting, but

 8   there were some more things I wanted to go over.  We're here

 9   pursuant to my February 6, 2024, order.  As I understand it,

10   the process of discovery upon which the parties have agreed is

11   complete.  The SEC has requested four to six weeks to get

12   authorization from the commissioners of the SEC to move for

13   civil contempt of the May, 2016, final judgment.

14        As I understand it from prior submissions -- well,

15   from everything that's been submitted, the SEC would be seeking

16   another injunction prohibiting Mr. Medoff from engaging in the

17   securities business and violating the anti-fraud provisions of

18   the securities laws and disgorgement, about $1,675,000 in

19   addition to the hundred-thousand dollar fine imposed by the

20   final judgment.

21        At the outset of this case, I indicated, based on the

22   very first filing of the SEC, that criminal contempt might be

23   more appropriate than civil contempt, but I deferred deciding

24   that issue.  And I issued my February 6 order, scheduling this

25   hearing so the parties would have an opportunity to address
```

1  whether I should, indeed, institute criminal contempt

2  proceedings.  I have the SEC's response that was required by

3  the February 6 order, and Mr. Medoff was permitted, I said, but

4  not ordered, to file an affidavit.  He did.

5          I tell you that I am inclined to institute criminal

6  contempt proceedings.  It would not prevent the SEC under the

7  case law from seeking authorization for a -- for civil contempt

8  proceedings, but I haven't yet made up my mind because I do

9  want to hear from you.  So I think -- although the SEC is not

10 asking for it because Mr. Healey told me months ago that he's

11 not authorized to seek criminal contempt, but I think I want to

12 make sure I understand certain things.  So why don't I --

13 unless you want to be heard generally, Mr. Healey, why don't I

14 put some questions to you and then hear from Mr. Medoff's

15 counsel.

16         MR. HEALEY:  Your Honor, I'm going to let Mr. Mawn

17 address that, except for one item; and the Court is correct.

18 When we convened, I think it was in October, I opined that --

19 and I still think it's the case that, certainly without

20 authorization from DC, which we don't have, that the SEC

21 doesn't have the authority to seek criminal contempt.  I did

22 some additional digging, and there were two instances that I

23 was able to find:  one in this district, actually, about ten

24 years ago, and one in Ft. Worth, where -- slightly different,

25 factually.  In this district, there had been discussions

 1  between the SEC and the US Attorney's Office on someone who was

 2  a serial --

 3          THE COURT:  Actually, where's Ms. Wright?

 4          ATTORNEY: Right here, Your Honor.

 5          THE COURT:  Come in and identify yourself for the

 6  record, please.  You want to be near enough to be sure you can

 7  hear from me.

 8          MS. WRIGHT:  For the record, Leslie Wright appearing

 9  for the US Attorney's Office.

10          THE COURT:  Go ahead.

11          MR. HEALEY:  There was an instance about ten years ago

12  before Judge Woodlock where there had been a referral from the

13  SEC to the US Attorney's Office suggesting, proposing,

14  recommending that someone be charged with criminal contempt,

15  and the then-US Attorney's Office took the position that, in

16  order for them to consider that, that that order had to come

17  from the Court.

18          THE COURT:  Right.  And actually, I don't need a

19  motion from anybody.

20          MR. HEALEY:  Oh, I understand.

21          THE COURT:  I know you understand.  It's okay.  Rule

22  42(a)(1) -- no, actually, (a)(2) -- says that if I initiate

23  criminal contempt proceedings, unless there's some compelling

24  reason, I appoint a US Attorney.  That's why Ms. Wright is

25  here.

```
 1          MR. HEALEY:  I wanted to make clear, Your Honor, that
 2     there have been a couple instances where the SEC has weighed
 3     in, but they've -- they've been unusually factual.  In the Ft.
 4     Worth case --
 5          THE COURT:  I don't need to know about the Ft. Worth
 6     case.  I don't need to know, okay?
 7          MR. HEALEY:  Okay, fair enough.
 8          THE COURT:  Let's get to this case.
 9          MR. HEALEY:  I'll let Mr. Mawn address where we are in
10     this case, although I previewed a little bit by the fact that
11     we don't have authorization.
12          THE COURT:  That's to move for civil contempt?
13          MR. HEALEY:  No, we do have authorization, and we did
14     move for civil contempt. In order --
15          THE COURT:  I thought you said you needed four to six
16     weeks for civil contempt.
17          MR. HEALEY:  That's for the disgorgement --
18          THE COURT: Oh, I see.
19          MR. HEALEY: -- required to get authorization for a
20     specific number.
21          THE COURT:  This is helpful.  I missed that nuance.
22     But -- all right.  So for the purpose of the civil contempt,
23     then, what, specifically, are the alleged violations of the
24     final judgment?
25          MR. MAWN:  The violations of the final judgment were
```

1    laid out in our September motion.  The violations --

2          THE COURT:  I know.  It's not perfectly clear to me,

3    because -- but go ahead.

4          MR. MAWN:  So there are specific instances of business

5    activity that Mr. Medoff undertook through Nova Capital that

6    constitute participation in the issuance, offer, or sale of

7    securities.

8          THE COURT:  So the heart of it, the gravamen, is

9    participation in the offering or sale of securities through

10   Nova?

11         MR. MAWN:  Through Nova Capital, and Mr. Medoff laid

12   out and conceded that certain income and work done for Nova

13   Capital was in violation of that part of the injunction.

14         THE COURT:  Well, "that part of the injunction" is,

15   what, parts -- Roman numerals I-IV, I think?

16         MR. MAWN:  So we're talking specifically about part

17   5 --

18         THE COURT:  Hold on a second.  Part 5. Okay.  Where it

19   says:  "Defendant, any entity owner controlled by him, his

20   agents, servants, employees, attorneys, et cetera, are

21   restrained and enjoined for a period of ten years from

22   participating in the issuance, offer, or sale of any security

23   provided, however nothing shall prevent Defendant from

24   purchasing or selling securities for his own account."  That's

25   the heart of it?

1        MR. MAWN:  That's correct, Your Honor.

2        THE COURT:  Do you allege other provisions were

3  violated?

4        MR. MAWN:  We have not many made other allegations.

5  This is just what I would characterize as a conduct-based

6  injunction, so it doesn't relate to specific violations of the

7  securities laws, which would require other proof.

8        THE COURT:  I see.

9        MR. MAWN: So this is purely -- he was -- it's

10  sometimes called a fencing injunction.  Basically, you can't be

11  in the area.  So it doesn't have to do with whether he

12  violated, say, 10b-5 or 17(a); it's just, purely:  You're not

13  allowed to be in this area, and that's the alleged violation.

14        THE COURT:  And then -- I think I know this, but how

15  do you allege he violated the injunction particularly?

16        MR. MAWN:  So there's various services -- and I can be

17  more specific if you give me a moment.  For certain clients, he

18  would be retained to help them with, say, a Regulation D

19  offering of securities.  And in that, he would provide various

20  services to help them offer those securities.  This is one,

21  sort of, broad category, but it has to be with the bulk of the

22  work that he did, and we believe that all of this work would be

23  a violation.  So that work would be something like drafting a

24  private placement memorandum -- finding investors, drafting an

25  equity valuation report; it would be that type of work that we

1   believe constitutes participating in the issuance, offer, or

2   sale of a security.

3           THE COURT:  Okay.  And did you discover that he did

4   that under an alias -- Alexander Carlin?

5           MR. MAWN:  That's correct, Your Honor.

6           THE COURT:  When did you learn that?

7           MR. MAWN:  The exact date I don't have in front of me.

8   It was when Mr. Medoff, I believe, filed in a declaration to

9   this Court and said he used an alias, Alexander Carlin.  He

10  then submitted a subsequent declaration to the Court explaining

11  when he had used that alias and then, as a result of that --

12  or, related to that, we took testimony from Mr. Medoff and from

13  Mr. Levy, as Your Honor knows, last week.  And one of the

14  points we addressed was the use of that alias.

15          THE COURT:  When did he start using it?

16          MR. MAWN:  He stated he had started using the alias in

17  2015, I believe around the time he got out of prison, and the

18  purpose was to conceal his identity because he had a lengthy

19  disciplinary history of drugs, of criminal convictions, of SEC

20  convictions that would prevent him from being able to do

21  business if people knew who he was.

22          THE COURT:  Okay.  And you've got documents and

23  testimony as evidence of the alleged violations; is that right?

24          MR. MAWN:  That's correct, Your Honor, and my

25  understanding -- and Ms. Kirshenbaum will correct me if I'm

1   overstating, but I believe Mr. Medoff is conceding his

2   violations of the 2016 judgment.

3          THE COURT:  In the affidavit that he filed yesterday,

4   he apologizes for violating.  And in your response yesterday,

5   you tell me that from June, 2016, the month after the final

6   judgment in November, 2023, in the course of this litigation,

7   Mr. Medoff averaged annually more than $200,000 in income,

8   right?

9          MR. MAWN:  That's correct, Your Honor.

10          THE COURT:  And that virtually all of that's been

11   spent or otherwise distributed?

12          MR. MAWN:  That's correct, Your Honor.

13          THE COURT:  And it appears that it's not available to

14   pay any monetary penalty or sanction now, right?

15          MR. MAWN:  That's correct.

16          THE COURT:  And that he's got a negative net worth?

17          MR. MAWN:  That's correct.  Negative net worth of

18   approximately negative $200,000.

19          THE COURT:  And that's -- $200,000 is roughly what he

20   says he owes to Mr. Levy for a loan?

21          MR. MAWN:  That's the bulk of what constitutes the

22   negative net worth.

23          THE COURT:  When was the loan?

24          MR. MAWN:  The loan is not a singular loan.  I will

25   characterize it as something that looks sort of like a

1    revolving line of credit.  So individual expenses were put on a

2    credit card sort of paid by Mr. Levy.  There's also some larger

3    loans in there, so it's sort of a mix of a lot of small loans

4    over time.

5          THE COURT:  And so Mr. Medoff says he has no assets to

6    pay -- to pay the fine previously imposed or any order of

7    disgorgement now, right?

8          MR. MAWN:  That's my understanding, Your Honor.

9          THE COURT:  And with regard to the Lyn Medoff trust,

10   you say -- or, Kerry Vasta says in the declaration that he has

11   no ability -- he gets -- you thought it was about $2,200, I

12   think he says it's $2,500 a month from that trust.  Although

13   the trust has $920,000 in it, Mr. Medoff does not exercise any

14   control or possession of the assets.  Did you examine that?

15         MR. MAWN:  We did not take separate discovery about

16   whether Mr. Medoff has the ability to control his trust.  We

17   asked him about the trust in his deposition, and he told us

18   that he does not have the ability to direct the trust.  We

19   don't have the trust instrument, though.

20         THE COURT:  You don't have the trust instruments?

21         MR. MAWN:  We don't have the trust instrument.

22         THE COURT:  Do you know if he's the only beneficiary

23   of the trust?

24         MR. MAWN:  Off the top of my head, I'm not sure.

25         THE COURT:  Do you know who the trustee is?

1          MR. MAWN:  I believe George Krupp is the name of the

2     trustee.

3          THE COURT:  Do you know if Mr. Krupp's related to

4     Mr. Medoff?

5          MR. MAWN:  I think, my understanding is, he is perhaps

6     an uncle.

7          THE COURT: His uncle?

8          MR.  MAWN: Cousin, sorry.

9          THE COURT: What's that?

10         MR. MAWN: He's a cousin, I'm hearing from Mr. Medoff.

11    Your Honor, Mr. Healey just reminded me that at the point of

12    collections for the initial judgment -- so back in 2016 --

13    there's a separate collections team at the SEC and they looked

14    at the trust back then, and my understanding is that it was not

15    able to satisfy the judgment at that point.

16         THE COURT:  This is paragraph 11 of the Vasta

17    declaration.  It says, "I understand from testimony and

18    documents produced that Mr. Medoff and Mr. Levy have

19    incorporated a new entity that could be used in the future for

20    certain consulting services."  If Mr. Levy was involved in the

21    violations alleged of the final judgment in this case -- do I

22    recall correctly that Mr. Levy was involved in the activities

23    that violated the injunction from 1995?

24         MR. MAWN:  So I think, what I can say to, sort of,

25    fairly characterize his involvement is he was involved with the

1    entities that were involved with the activities that

2    constituted those violations.  Our -- we explored this a little

3    bit in testimony.  Our understanding is those entities have

4    largely followed the same structure.  Mr. Levy is president, he

5    takes about a 10 percent cut of income and manages the books,

6    and then otherwise, they're sort of entities that are

7    controlled by Mr. Medoff, but it's -- that characterization has

8    been true for the series of entities.

9          THE COURT:  And is there more you'd like to say at

10   this point?

11         MR. MAWN:  At think at this point, the only thing I

12   would sum up is that we have received from Mr. Medoff all of

13   the relief we have sought in our initial civil contempt motion.

14   The single piece remaining that, as Your Honor knows we're

15   waiting on, is that disgorgement number.  So that's sort of the

16   SEC's perspective on where we are right now.

17         THE COURT:  Right.  But the relief is what?  An

18   agreement not to engage in the securities business in the

19   future?

20         MR. MAWN:  The relief, as requested from Mr. Medoff,

21   was to cease the violative conduct.  It was put in affidavit to

22   the Court and to the SEC that he's halted the conduct.

23   Mr. Levy also put forth an affidavit to the Court and the SEC

24   about Mr. Medoff's current business activities and his future

25   business activities.

 1          THE COURT:  Could you speak up a little, please?

 2          MR. MAWN:  Mr. Levy put an affidavit to the Court and

 3  to the SEC that he has also spoken to the status of

 4  Mr. Medoff's business activities, so Mr. Medoff has halted the

 5  conduct.  Mr. Medoff provided notice to the clients and the

 6  investors of Nova Capital that he used an alias and that there

 7  was a 2016 judgment against him, and he provided notice of that

 8  to them.  He also provided, as part of discovery, rescission

 9  agreements for certain income and engagement for current

10  clients.  And then he provided the accounting as required.

11          THE COURT:  So basically, he's been cooperative since

12  he got counsel and came to court?

13          MR. MAWN:  I think that's a fair characterization.

14          THE COURT:  Ms. Kirshenbaum?

15          MS. KIRSHENBAUM:  So, Your Honor, as the SEC's

16  presentation has made clear and --

17          THE COURT:  You want to pull that microphone a little

18  closer to you and speak up, please.

19          MS. KIRSHENBAUM:  Since everything that's happened in

20  October of 2023, Mr. Medoff has been extremely cooperative.  He

21  understands that he's on a very tight leash here and that he

22  has no other choice but to cooperate.  He's aware of that, and

23  he's made every effort to comply with everything the SEC has

24  asked of him and everything the Court's asked of him.  He's

25  produced hundreds, if not more, pages of --

1    THE COURT:  I actually didn't ask him to do anything.

2   I allowed the opportunity for him to do it.  You and the SEC

3   asked for the opportunity.  But go ahead.  In other words, I

4   want to make it -- I entered a particular order that you had

5   agreed to that -- I mean, I think it's helpful, but I didn't

6   order them to do this and, in fact, you'll see -- or saw -- in

7   the transcript from October, '23, I think it is, that I told

8   him he had a Fifth Amendment right not to say anything.  That

9   was before he had a lawyer and, you don't need to tell me, but

10  perhaps you discussed that with him, too.  Go ahead.

11    MS. KIRSHENBAUM:  He is trying to prove that he's

12  going to comply with this order.  He understands that he

13  doesn't have a good track record with the Court and with the

14  SEC, and he is trying to turn that around and change that.  So

15  what he's really hoping for -- we've made this offer that he's

16  going to provide quarterly accounting of all business records

17  showing income, assets, expenses.  He's going to be

18  apportioning 20 percent of his personal income to pay down this

19  debt, understanding that it's going to take years and that he's

20  going to have to find ways to do it that don't violate the

21  order or come close to violating the order.

22    THE COURT:  Does he have any employment now?

23    MS. KIRSHENBAUM:  He has a few potential streams of

24  revenue as set forth in this affidavit.  He has contacts that

25  are helping him develop these business relationships, these

1    consulting agreements, that have nothing to do with securities.

2    I think a big part of his issue in the past was gray area --

3    what he saw as gray area in terms of what participating in the

4    issuance of a security means and --

5            THE COURT:  If it was so gray -- he used an alias,

6    right?

7            MS. KIRSHENBAUM:  And going forward, he understands,

8    whether it's black, white, or gray, he needs to avoid it

9    completely, and that's what he's going to do.  So he is trying

10   to find ways to make money to support himself but also pay down

11   these debts.

12           THE COURT:  Is he forming a business with Mr. Levy?

13           MS. KIRSHENBAUM:  Mr. Levy has incorporated a

14   business, but they haven't used the business to do anything

15   yet.

16           THE COURT:  Mr. Levy -- okay.  Go ahead.

17           MS. KIRSHENBAUM:  So what Mr. Medoff is asking the

18   Court for is time to demonstrate -- based on the offer that

19   he's made, to give him time to demonstrate that he's going to

20   remain accountable to the SEC and he's going to apportion that

21   20 percent of his personal income towards paying down this

22   debt, and to hold off on referring him for criminal contempt so

23   he can show that he's in compliance with the Court's order and

24   that further order of disgorgement is not going to be futile.

25   He's going to comply.  He just needs time to prove it.

1      THE COURT:  Mr. Medoff's affidavit that he voluntarily

2  submitted yesterday, Docket 784, says he's already paid $10,000

3  toward the disgorgement and civil penalties he owes from the

4  2016 final judgment.  Where'd that $10,000 come from?

5      MS. KIRSHENBAUM:  He had to get it from the trust.  He

6  had to beg for it, but my understanding is the trust is not

7  amenable to making any further disbursements for the purpose of

8  paying down these debts.  He's going to have to earn income in

9  order to pay them down.

10      THE COURT:  And you're retained counsel?

11      MS. KIRSHENBAUM:  Yes.

12      THE COURT:  And you're being paid?

13      MS. KIRSHENBAUM:  Some of that money, I believe, came

14  from the trust, too, but he's going to need to earn income in

15  order to maintain counsel, as well.

16      THE COURT:  And he told me at the outset, before you

17  came into the case, when we had the first hearing, he said he

18  wanted a couple of days to go to Mr. Krupp to get money to hire

19  counsel.  So I understood that the trust had been providing

20  money to retain you, your firm.  Then, on page 2, it says --

21  well, 1 and 2, paragraph 5 -- "I anticipate having the

22  following income sources in the next six months.  I'll serve as

23  a mortgage broker between a commercial real estate developer

24  and various mortgage lenders to help the developer secure hard

25  money loans."  Who's the developer?

1            THE DEFENDANT:  Community Redevelopment.

2            MS. KIRSHENBAUM:  It was one of the -- it was a Nova

3    client.  It's a client that received the curative notice, but

4    Mr. Medoff's relationship with the person involved has

5    continued in spite of that.

6            THE COURT:  Is that a client that received one of the

7    notices the SEC required?

8            MS. KIRSHENBAUM:  Yes.

9            THE COURT:  And then, it says he will assist a

10   marketing company in pitching of FinTech companies' debit cards

11   to groups such as unions and religious congregations.  What's

12   the FinTech company?

13           THE DEFENDANT:  Am I being asked that?

14           THE COURT:  You can tell your lawyer.  Or, you can

15   tell me if you want.  You should stand up.

16           THE DEFENDANT:  The company is called Motoverse, but

17   my agreement would be with the marketing company related to the

18   FinTech company.

19           THE COURT:  What's the marketing company?

20           THE DEFENDANT:  Casa Sana LLC.

21           THE COURT: How do you spell that?

22           THE DEFENDANT: C-A-S-A S-A-N-A.

23           THE COURT: Who's the principal?

24           THE DEFENDANT:  Brett Greene, who was a principal at

25   Adelia who also received curative notice, and Brett was the

1    person that lent $10,000 to me for legal fees, and the trust

2    paid $10,000.

3              THE COURT:  For legal fees in this case?

4              THE DEFENDANT:  In this case, yeah.

5              THE COURT:  And who's the principal, the human

6    personification of the commercial real estate developer?

7              THE DEFENDANT:  The CEO is Richard Balles,

8    B-A-L-L-E-S. Community Redevelopment, the symbol is "CRDV."

9    It's publicly traded on the pink sheets.  And the money,

10   what -- my specific role is not for developing, it's for the

11   acquisition of multifamily properties in Washington, D.C.

12   that's low-income housing.  That's their specialty.

13             THE COURT:  Mr. Medoff, you have very substantial

14   financial obligations.  And there's the Lyn Medoff Irrevocable

15   Inter Vivos Trust, which the SEC says has more than $900,000.

16   Are you the only beneficiary of that trust?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And the trustee is your cousin, George

19   Krupp, I was told.

20             THE DEFENDANT:  Yes.

21             THE COURT:  Have you read those trust documents?

22             THE DEFENDANT:  Yes.  Yes, the trust is from my mother

23   from many years ago, and I put in half the money, she put in

24   half the money.  She died in 2007.  They distribute so little

25   money to me that it's still almost the same amount that there

1  was in 2007 -- a million dollars, approximately, now.

2       THE COURT:  All right.  Mr. Medoff, you don't have to

3  say anything -- well, let me ask you this, actually:  In

4  paragraph 10 of the affidavit you filed yesterday, Docket 784,

5  you say, in part, "I'm deeply apologetic to the Court that I

6  failed to comply with the 2016 final judgment."  Right?

7       THE DEFENDANT:  Yes.

8       THE COURT:  Okay, you may be seated, unless there's

9  something more that somebody would like to say.

10      MR. MAWN:  Nothing from the SEC.

11      MS. KIRSHENBAUM:  No, I think we've demonstrated

12  Mr. Medoff's intent to cooperate and, again, just ask the Court

13  for a little bit more time to prove it.

14      THE DEFENDANT:  Am I allowed to speak, Your Honor?

15      THE COURT:  If your attorney will let you.  If your

16  attorney doesn't persuade you not to, I'll listen to you

17  briefly.  But you can.  As far as I'm concerned, I'll give you

18  that opportunity.

19      THE DEFENDANT:  Well, I just want to reiterate to the

20  Court that in 2016, I was an active drug addict, and I

21  misinterpreted the order to be the equivalent of being barred

22  from the securities industry for life, and during the period of

23  my cooperation with the FBI, Justice, and the SEC from 1995 to

24  2005, they monitored what I did for half the clients.  But I'm

25  saying the confusion on my part was the result of the fact that

1    I was an active drug addict.

2             THE COURT:  In 2016?

3             THE DEFENDANT:  Yeah.

4             THE COURT:  Now, you mentioned your drug addiction at

5    the first hearing, I think, on about October 23.  When did you

6    stop using -- and led me to believe that you were no longer

7    using crack cocaine?  Have you stopped using crack cocaine?

8             THE DEFENDANT:  Three years ago, Your Honor.

9             THE COURT:  How long ago?

10            THE DEFENDANT:  Three years.

11            THE COURT:  But you continue to use an alias for your

12   Nova activities?

13            THE DEFENDANT:  Yes, that's correct.

14            THE COURT:  All right, you may be seated.  I am going

15   to issue a written order pursuant to 18 U.S.C. Section 401 in

16   Federal Rules of Criminal Procedure 42 requiring, in the terms

17   of the rule, Mr. Medoff to show cause why he shouldn't be held

18   in criminal contempt for knowing and willful violations of the

19   2016 final judgment which barred him, among other things, from

20   participating in the offer or sale of securities, which the

21   defendant did in connection with or through Nova.

22            I'll, as I say, memorialize this, amplify it; but in

23   my view, based on all the information I have, civil contempt

24   alone would be insufficient and inappropriate.  Civil contempt

25   is intended to coerce somebody to obey a court order.  And

1    first, and I've said this before, I don't issue -- this has

2    been a repeated theme in this case.  The SEC comes in and asks

3    me to issue orders that can't be enforced.  It happened in

4    2000 -- whenever Biochemics pled guilty.  They agreed to pay

5    $18 million, I think it was, and I said, "Do they have $18

6    million?"  They said, "no."  So then, there was a payment plan

7    developed, and that led to a shell game that generated years of

8    litigation.

9         But it would be futile to order Mr. Medoff to pay the

10   $100,000 fine he owes and to disgorge almost $2 million, and

11   the efforts that he says he's going to make to earn money in

12   the future are with Mr. Levy, who was involved in the

13   original -- the violation of the original injunction against

14   him and this one, too.  And I -- notwithstanding, what

15   Mr. Medoff says now when he's known since October that he's

16   facing the threat of criminal prosecutions, I have substantial

17   doubts that if I simply ordered him not to violate the law

18   again, I doubt he'd obey that.

19        But more significantly, as the case law explains --

20   cases like *Marquardo* 149 F.3d 36 at 39-40, essentially -- civil

21   contempt and criminal contempt serve different purposes.  Civil

22   contempt is intended to coerce.  I don't think it would be

23   effective, but it, more significantly, wouldn't be sufficient

24   on the facts of this matter.  Criminal contempt is intended to

25   serve a public purpose:  to punish disobedient court orders and

1    to deter future violations, as the First Circuit, among others,

2    have explained.

3         And I recognize that criminal contempt should be used

4    only after the judge determines for good reasons that the civil

5    remedy would be inappropriate; Supreme Court said that in

6    *Shillitani,* a case, I believe, I mentioned to you previously.

7    And I have that in mind.  But as I said:  first, holding

8    Mr. Medoff in civil contempt would be futile, but more

9    significantly, it would be inadequate.  There's far more than

10   probable cause to believe that Mr. Medoff willfully and

11   repeatedly disobeyed the 2016 final judgment.  And he disobeyed

12   it for years after he said he wasn't -- he said today that he

13   wasn't using crack cocaine.

14        If the violations, which essentially he's admitted --

15   well, take out the "essentially," but the allegations are very

16   serious.  I don't think in my 39 years as a judge I've

17   confronted such flagrant, repeated, now-alleged violations of a

18   court order.  And it's necessary that, if admitted or proven,

19   that it be appropriately punished to promote respect for the

20   law, to deter Mr. Medoff and perhaps send a message to others.

21        Because a sentence of six months could be necessary

22   under the sentencing guidelines -- which actually don't apply,

23   I think, to criminal contempt, but under Section 3553(a) --

24   Mr. Medoff will be entitled to a jury trial.  I'm appointing --

25   I will appoint in my order the United States Attorney to

1    prosecute the case, and, as the alleged contempt does not

2    involve disrespect or criticism of the judge, I'll preside in

3    the contempt proceedings as provided in Federal Rules of

4    Criminal Procedure 42(a)(3).

5         The First Circuit has held that simultaneous or

6    sequential civil and criminal contempt proceedings arising out

7    of the same facts are permissible -- that, again, is *Marquardo*,

8    page 41 -- so the SEC may continue to pursue the authorization

9    to move for disgorgement and related relief, but I expect and

10   intend to resolve the criminal charge before any civil charge.

11        I'm ordering the trial begin -- I'll talk to you in a

12   minute about this -- on a date in March, probably late March.

13   And I'm ordering that Mr. Medoff surrender by 10:00 a.m. on

14   Monday -- which is February 12 -- any passport he has to the

15   Probation Office.  The probation officer is here.  And I will

16   allow Mr. Medoff to be released, pending a decision by a

17   magistrate judge concerning whether he should be released on

18   conditions or detained pending trial.

19        I'm going to do the following -- see if this makes

20   sense:  I'm required to set a trial date.  I'll set a trial

21   date, but -- we'll set a trial date of April 1.  However -- and

22   I'll discuss with you this pretrial order, but I want to build

23   in a period of time for this to sink in and for you -- for the

24   Government and counsel for Mr. Medoff to talk to see if you

25   want to resolve this matter by agreement.  Dismissal is not an

1    option.  This isn't an indictment, but many of the arguments

2    that have been made about Mr. Medoff's conduct since last

3    September I think are relevant to sentencing.  They weren't

4    persuasive with regard to whether this should be a criminal

5    case.

6           That doesn't suggest what I think the sentence would

7    be -- I don't know, but it may be, as I said, at a minimum,

8    longer than six months, since he did several years previously.

9    But, you know, he's entitled to a trial, it's a criminal case,

10   if he -- turns out he can't afford a lawyer and he files an

11   affidavit that demonstrates he's indigent -- honestly

12   demonstrates he's indigent, he can get a court-appointed lawyer

13   which could be Ms. Kirshenbaum, if she's agreeable.  But we

14   don't have to do that right now.

15          MS. KIRSHENBAUM:  He will need appointed counsel.

16          THE COURT:  I went over this with him initially.  He's

17   going to have to fill out the affidavit; and, I mean, I might

18   want to see the trust documents.  But -- and then there will be

19   the question of whether you're -- don't answer it now --

20   whether you'd be willing to serve in that capacity, because now

21   you know what this is about and you've done a good job for your

22   client.  It's not a successful one so far, but I don't know

23   what more you would have done.  But right now, you're his

24   attorney and there are matters pending, so you would need leave

25   of Court to withdraw.

1    Just, as I say, think about it.  But if -- talk to

2    Mr. Medoff.  If he wants to have a trial, that's fine; he's

3    entitled to it.  Once you get what I write, which will probably

4    be on Monday at this point -- it's almost 3:00 -- I'll give you

5    some period of time, unless you come back later and say you

6    don't want it, to talk to the Government about whether there's

7    some agreement to resolve the case short of trial.  Okay?

8          MS. KIRSHENBAUM:  Understood.

9          THE COURT:  Ms. Wright, I think the date I just gave

10   you for the trial was April 1.  The SEC can't be the prosecutor

11   in the case, but they can cooperate with you.  I'm going to put

12   in my order -- and you can start earlier -- that you're to

13   report, at least initially, by February 20.  You'll get my

14   order, as I said, I expect on Monday.  And, you know, take a

15   week to see what Mr. Medoff wants to do.  Does he want a trial,

16   or -- given the fact that in his affidavit yesterday, he admits

17   to violating the order, among other things -- whether, in view

18   of everything, he wants to plead guilty and have the focus be

19   on what the appropriate sentence is?

20         And as I said -- does Mr. Medoff have a passport?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Then you have to deliver it to the

23   probation -- do you have it here today?

24         THE DEFENDANT:  No.  Where's Probation?

25         THE COURT:  It's in this building.  Where's the

1    passport?

2              THE DEFENDANT:  It's in my apartment.

3              THE COURT:  In the North End?

4              THE DEFENDANT:  My apartment is right next to the

5    aquarium by Boston Harbor.

6              THE COURT:  Here; I'm going to modify my order.  It's

7    a short walk.  Martha, are you going to be here until 4:30?

8              U.S. PROBATION:  Yes, Your Honor.

9              THE COURT:  Okay, I'm ordering you bring the passport

10   to the Probation Office by 4:30 today.  Okay?

11             THE DEFENDANT:  If you say so.

12             THE COURT:  I hereby order you to deliver your

13   passport to the United States Probation Office in the Moakley

14   Federal Courthouse by 4:30 p.m. today, February 9, 2024.  Any

15   failure to do that could be a criminal -- treated as a criminal

16   contempt of court.  And then, after I issue my order, you'll

17   have to appear before a magistrate judge to determine whether

18   you ought to be released; if you are released, whether it

19   should be on certain conditions; or whether you should be

20   detained pending a resolution of the charge against you.  This

21   is a criminal case.

22             THE DEFENDANT:  I'm sorry.  I'm a little confused.

23   When --

24             THE COURT:  Why don't you stand up.

25             THE DEFENDANT:  When am I supposed to appear in front

1    of the magistrate judge?

2         THE COURT:  You'll get an order telling you.  Okay, so

3    so far, I've told you what I'm going to do, but I haven't

4    formally done it yet.  In addition to what I said -- I want you

5    to understand this:  In addition to what I said, I'm going to

6    write it out, and when I write it out, that will be the formal

7    beginning -- when I write it out and file it, docket it, that

8    will be the formal beginning of the criminal case; and I'm

9    ordering that you turn in your passport today by 4:30 because I

10   want to make sure you're here for this case; and then -- then

11   you'll get an order as to when to appear before the magistrate

12   judge.

13        THE DEFENDANT:  Right.  But I have a right to counsel?

14        THE COURT:  This is a criminal case, and you've got a

15   right to a lawyer.  And at the moment, you have a lawyer.  If

16   your lawyer moves to -- because there are matters scheduled,

17   like a trial, she can't unilaterally withdraw under our local

18   rules.  But if she files a motion and there's good cause, I can

19   allow her to withdraw, and if you want a Criminal Justice Act

20   lawyer, a Court-appointed lawyer, you have to fill out the

21   affidavit that I sent you with my first order in this case, as

22   I recall, back in October.  But you can get another one; she

23   can get another one from the clerk.

24        And, you know, that almost a million dollars in the

25   trust -- you should get the trust documents, I expect I'm going

1   to want to see them.  Because if you've got some right to that

2   money, the public shouldn't be paying your lawyer.  If you

3   don't have a right to the money and it's all up to Mr. Krupp,

4   then I expect -- well, I'll see what the affidavit says.  You

5   want to be very careful, and you've done this to the SEC, I

6   think.  You want to be very careful to make sure that affidavit

7   is accurate and complete because you have to sign it under the

8   pains and penalties of perjury.  It's a federal crime to

9   knowingly make a false statement.  Okay?

10          THE DEFENDANT:  Yes, I understand.

11          THE COURT:  But one way or another, if you want a

12   lawyer, you'll have a lawyer.

13          THE DEFENDANT:  Thank you.

14          THE COURT:  Is there anything further in this matter

15   for today?

16          MR. MAWN:  Not from the SEC, Your Honor.

17          THE COURT:  Ms. Victoria will tell you where to find

18   her to deliver the passport.

19          U.S. PROBATION:  Yes, I'll talk to him after the

20   hearing.

21          THE COURT:  Thank you. Court is in recess.

22          (Whereupon the hearing was adjourned.)

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Jessica Leonard, Certified Shorthand Reporter

 4     and Federal Certified Realtime Reporter for the United States

 5     District Court for the District of Massachusetts, do hereby

 6     certify that the foregoing transcript is a true and correct

 7     transcript of the stenographically reported proceedings held in

 8     the above-entitled matter, to the best of my skill and ability.

 9              Dated this 19th day of February, 2024.

10

11

12              /s/ Jessica M. Leonard

13              Jessica M. Leonard, CSR, FCRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```